40ᵀᴴ JUDICIAL DISTRICT COURT FOR ST. JOHN THE BAPTIST PARISH

STATE OF LOUISIANA

NO. _70907_                                                      DIVISION "___"

**ROBERT TAYLOR, JR.; KERSHELL BAILEY; SHONDRELL P. CAMPBELL; GLORIA DUMAS; JENELLE EMORY; GEORGE HANDY; ANNETTE HOUSTON; ROGERS JACKSON; MICHAEL PERKINS; ALLEN SCHNYDER, JR.; LARRY SORAPURU, SR.; KELLI TABB; ROBERT TAYLOR, III (ON HIS OWN BEHALF AND O/B/O HIS MINOR DAUGHTER, NAYVE TAYLOR), EACH INDIVIDUALLY AND AS REPRESENTATIVE OF ALL THOSE SIMILARLY SITUATED**

v.

**DENKA PERFORMANCE ELASTOMER LLC; E.I. DUPONT DE NEMOURS AND COMPANY**

Eliana DeFrancesch - Clerk of Court
Filed: Jun 29, 2017  2:45 PM

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
131913436                                    **DEPUTY CLERK**

## CLASS ACTION PETITION

Plaintiffs—Robert Taylor, Jr., Kershell Bailey, Shondrell P. Campbell, Gloria Dumas, Jenelle Emory, George Handy, Annette Houston, Rogers Jackson, Michael Perkins, Allen Schnyder, Jr., Larry Sorapuru, Sr., Kelli Tabb, and Robert Taylor, III—individually and as representatives of all those similarly situated, file this Class Petition against the defendants, Denka Performance Elastomer LLC ("Denka") and E.I. DuPont De Nemours and Company ("DuPont") as follows:

## PARTIES

1. **Representative Plaintiffs.**

   1.1.    Robert Taylor, Jr., is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

   1.2.    Kershell Bailey is a person of the full age of majority and domiciled in Edgard in the Parish of St. John the Baptist, State of Louisiana.

   1.3.    Shondrell P. Campbell, is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

   1.4.    Gloria Dumas is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

```
EXHIBIT
1
```

1.5. Jenelle Emory is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.6. George Handy is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.7. Annette Houston is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.8. Rogers Jackson is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.9. Michael Perkins is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.10. Allen Schneider, Jr., is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.11. Larry Sorapuru, Sr., is a person of the full age of majority and domiciled in Edgard in the Parish of St. John the Baptist, State of Louisiana.

1.12. Kelli Tabb is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.13. Robert Taylor, III, is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

2. **Plaintiff Class and Sub-Classes.** The named Plaintiffs herein propose to proceed individually and on behalf of a class of persons defined as follows:

2.1.1.1. *All natural persons who have lived, worked, or attended school within an area surrounding the Pontchartrain Works facility, that area bounded on the North by Interstate-10, on the West by the St. John the Baptist/St. James Parish boundary, on the South by Louisiana Highway 3127, on the East by the eastern boundary of the community of Killona on the West Bank of the Mississippi River and by the western boundary of the Bonnet Carre Spillway on the East Bank of the Mississippi River ("the defined area"), at any time from January 1, 2011, through the present.*

2.1.1.2.   *While certain impacts of excess chloroprene exposure are clear and are mature torts that are presently and immediately remediable by injunctive relief to halt Defendants' activities resulting in excess chloroprene concentrations to the surrounding community and by compensatory remedies for the nuisance and trespass caused by Defendants' conduct, the health effects of chronic and/or acute exposure to chloroprene remain under investigation and, as such, may give rise to additional, albeit currently immature, torts. So that Plaintiffs may proceed with the mature causes of action (specifically for injunctive relief and for nuisance and trespass), without splitting the causes of action based on the potentially immature personal-injury-related torts, and in order to efficiently adjudicate the claims of such class members and to administer the litigation of those torts and remedies that are fully mature while reserving class members' rights for those torts that may be immature as of the time of this filing but may subsequently ripen, in addition to the above class definition, Plaintiffs propose the following Sub-Classes: (1) a Medical Monitoring Sub-Class, consisting of all class members who have been exposed to chloroprene within the defined area and have a justified fear of development of cancer due to chloroprene exposure; and (2) a Personal Injury Sub-Class, consisting of all residents in the defined area who have experienced personal injury, physical and emotional.*

3.   **Defendants.** Made defendants herein are the following two companies:

   3.1.   Denka Performance Elastomer LLC ("Denka") is a Delaware limited liability company with its principal place of business and corporate headquarters in LaPlace, Louisiana. At least one of Denka's members is domiciled in LaPlace, Louisiana.

   3.2.   E.I. DuPont De Nemours and Company ("DuPont") is a corporation organized under the laws of the State of Delaware, which conducts business regularly in the State of Louisiana, and owns property in St. John the Baptist Parish. Collectively, Denka and DuPont are referred to herein as "Defendants."

## JURISDICTION AND VENUE

4. Venue is proper in this court pursuant to La. C.C.P. articles 74 and 593 because Defendants engaged in wrongful conduct in and damages were sustained within this judicial district.

## BACKGROUND FACTS

5. Neoprene was invented by DuPont in 1931. It is a synthetic rubber that is used in chemical- and weather-resistant products ranging from wet suits to orthopedic braces. Neoprene is used also as a base resin in adhesives, electrical insulation, and coatings.

6. DuPont constructed a neoprene manufacturing unit at its Pontchartrain Works facility in LaPlace, Louisiana, in 1969.

7. The manufacturing process at the Pontchartrain Works facility includes a Neoprene Unit, a Chloroprene Unit, an HCL Recovery Unit, and associated utilities.

8. Chloroprene is manufactured at the site of neoprene production and is used as a component of neoprene. Chloroprene is emitted into the air and discharged into the water as a result of these manufacturing processes. Chloroprene has been released into the environment around the Pontchartrain Works facility for 48 years.

9. Prior to 2008, DuPont produced neoprene at both its facility in Louisville, Kentucky (commencing in 1941) and its Pontchartrain Works facility in LaPlace, Louisiana (commencing in 1968). DuPont had also produced neoprene at a facility in Montague, Michigan from 1956 through 1972.

10. In 2007, DuPont announced that it would close its neoprene facility in Louisville and consolidate its neoprene production at the Pontchartrain Works facility.

11. As a result of the plant consolidation, nation-wide chloroprene emissions were concentrated predominantly in LaPlace, Louisiana.

12. In response to DuPont's announcement, United Steelworkers (USW), the nation's largest industrial union with 850,000 members, including 1,800 DuPont workers, warned then-Governor Kathleen Blanco to monitor the Pontchartrain Works facility's chloroprene emissions closely. Billy Thompson, USW District 8 Director, advised Governor Blanco, "The real costs will be borne by the citizens of Louisiana, not DuPont."

13. DuPont moved its neoprene production to LaPlace.

14. By 2008, the Pontchartrain Works facility was the only manufacturing facility for neoprene in the United States.

15. Despite the warnings from sources familiar with emissions from the Louisville facility, as detailed below chloroprene exposure levels were not measured until October 2016.

16. Chloroprene exposure levels were first reported at the Pontchartrain Works facility in October 2016.

17. DuPont sold the neoprene production facility at the Pontchartrain Works facility to Denka effective November 1, 2015, but retained ownership of the land underlying the Pontchartrain Works facility.

18. DuPont had knowledge of the deleterious effects of exposure to chloroprene emissions by at least 1988.

19. DuPont concealed its knowledge of the deleterious effects of exposure to chloroprene emissions.

20. DuPont has, for decades, studied and assessed the risks and harms of exposure to chloroprene, but concealed such knowledge from its employees, from the communities around its facilities, and from government agencies, including the Environmental Protection Agency ("EPA"), Louisiana Department of Environmental Quality ("LA DEQ"), and local St. John the Baptist Parish officials.

21. DuPont also established internal concentration-based maximum exposure levels to chloroprene for its facilities; however, it often exceeded those levels, and withheld both the internal exposure level limits and the facts of the exceedance of those levels from the communities around their facilities.

22. At the time that DuPont sold the Pontchartrain Works neoprene production facility to Denka, Denka had the same knowledge of the harms of chloroprene exposure as did DuPont.

23. When Denka acquired the Pontchartrain Works facility from DuPont, Denka retained 235 of the approximately 240 DuPont employees at the Pontchartrain Works facility.

24. While Denka had knowledge of the harmful concentrations of chloroprene emitted from its Pontchartrain Works facility, it continued to conceal that knowledge and associated data from the EPA, the LA DEQ, and local St. John the Baptist Parish officials.

25. The EPA notes that "[s]ymptoms reported from acute human exposure to high concentrations of chloroprene include giddiness, headache, irritability, dizziness, insomnia, fatigue, respiratory irritation, cardiac palpitations, chest pains, nausea, gastrointestinal disorders, dermatitis, temporary hair loss, conjunctivitis, and corneal necrosis." In addition, the EPA notes that "[a]cute exposure may: damage the liver, kidneys, and lungs; affect the circulatory system and immune system; depress the central nervous system (CNS); irritate the skin and mucous membranes; and cause dermatitis and respiratory difficulties in humans[.]"

26. More critically, however, the EPA has classified chloroprene as a "likely human carcinogen." In 2010, the EPA provided its Integrated Risk Information System ("IRIS") assessment of chloroprene. In that assessment, the agency concluded that chloroprene is "'likely to be carcinogenic to humans' through a mutagenic mode of action and that the primary exposure route of concern is the inhalation pathway."

27. In December 2015, the EPA released a screening-level National Air Toxics Assessment ("NATA")[1], and classified chloroprene as a likely human carcinogen. EPA's NATA evaluation analyzes levels of exposure to various toxins, and establishes a 1-in-10,000 (or 100 in 1 million) incidence of cancer as the upper limit of "acceptable risk." Exposure above that "acceptable risk" threshold represents an unacceptable risk of cancer from exposure to that toxin. The NATA acceptable risk exposure threshold for chloroprene was established in the December 2015 assessment as 0.2 $\mu g/m^3$.

28. Despite having knowledge of the threshold for unsafe exposure concentrations to chloroprene, Denka has continued through the present to emit chloroprene at hundreds of times the 0.2 $\mu g/m^3$ threshold into the surrounding community.

---

[1] "NATA is EPA's ongoing comprehensive evaluation of air toxics in the U.S. EPA developed the NATA as a state-of-the-science screening tool for State/Local/Tribal Agencies to prioritize pollutants, emission sources and locations of interest for further study in order to gain a better understanding of risks." https://www.epa.gov/national-air-toxics-assessment/nata-overview.

29. From May 25, 2016 through the present, the EPA has collected 24-hour air samples every three days from six locations in the census tracts in the defined area—collection sites are located in St. John the Baptist Parish at Acorn and Highway 44, the Mississippi River Levee, Fifth Ward Elementary School, Ochsner Hospital, 238 Chad Baker, and East St. John the Baptist High School. Air samples at all six locations are frequently well in excess of the $0.2 \ \mu g/m^3$ threshold, up to 700 times that threshold or more.

30. EPA held its first community meeting to discuss the potential chloroprene emission issues on July 7, 2016. At that meeting, a representative from the Louisiana Department of Health advised that children should not breathe chloroprene.

31. EPA did not report sampling results showing the exceedances above the chloroprene acceptable risk threshold in the vicinity of the Pontchartrain Works facility until October 2016.

32. Denka commenced 24-hour air sampling every six days on August 8, 2016 at five locations in the census tracts in the defined area—Entergy, Railroad, Western Edge of Denka property at Spruce Street, Mississippi River Levee, Ochsner Hospital, and the St. John the Baptist Parish Courthouse in Edgard. As with the EPA sampling, samples collected at all five Denka sampling sites are frequently well in excess of the $0.2 \ \mu g/m^3$ threshold, including concentrations of hundreds of times that threshold.

33. According to Denka's own sampling numbers for chloroprene concentrations, the *average* chloroprene concentration across all Denka sampling sites from August 2016 through March 2017 has ranged from $4.08 \ \mu g/m^3$ to $6.65 \ \mu g/m^3$, *i.e.* from 20.4 to 33.25 times the $0.2 \ \mu g/m^3$ threshold directed by EPA.

34. On October 7, 2016, Denka submitted modeling results for chloroprene concentrations surrounding the Pontchartrain Works facility to Louisiana DEQ for the period 2011 through 2015, showing maximum modeled concentration of $7.88 \ \mu g/m^3$ in 2011, $9.88 \ \mu g/m^3$ in 2012, $12.07 \ \mu g/m^3$ in 2013, $8.23 \ \mu g/m^3$ in 2014, and $7.22 \ \mu g/m^3$ in 2015—all, of course, well in excess of the $0.2 \ \mu g/m^3$ threshold.

35. Despite the measured elevated chloroprene concentrations, and despite EPA's NATA-based $0.2 \ \mu g/m^3$ acceptable risk threshold, at a St. John the Baptist Parish School Board meeting on or about December 8, 2016, Louisiana DEQ Secretary Chuck Brown dismissed those

expressing concern about the chloroprene concentrations as "fearmongerers" and said "forget about 0.2."

36. Historically, the Pontchartrain Works facility has had chloroprene air emissions well in excess of the 0.2 µg/m³ threshold.

37. The concentrations of chloroprene emissions from the Pontchartrain Works facility have frequently exceeded DuPont's (and then Denka's) own internal "acceptable emissions limits" since 1976.

38. Notably, the census tracts that include the Pontchartrain Works facility have a risk of cancer more than 800 times the national average.

39. There are no other sources of chloroprene within the census tracts that include the Pontchartrain Works facility. The attached isopleth map created for Denka (**Exhibit A** to this Petition, and incorporated herein), demonstrates the width of the geographic scope of the area subject to chloroprene air concentrations above 0.2 µg/m³, based solely on Denka's own air sampling and modeling.

40. On June 6 through 10, 2016, EPA's National Enforcement Investigation Center ("NEIC") conducted a Clean Air Act inspection of the Pontchartrain Works facility's chloroprene unit, neoprene unit, and HCl Recovery Unit.

41. Shortly after EPA commenced its investigation, representatives of the Defendants held a meeting with select neighbors of the Pontchartrain Works facility and expressed to them that there was no problem arising from the Pontchartrain Works facility's chloroprene emissions.

42. Not until April 3, 2017, did EPA make available to the public a redacted copy of the inspection report generated from the NEIC inspection. A copy of that inspection report is attached hereto as **Exhibit B**.

43. The EPA's NEIC inspection report revealed numerous areas of non-compliance spanning both DuPont's and Denka's operation of the Pontchartrain Works facility, including but not limited to: failure from 1997 through the present to meet the monitoring, recordkeeping, and reporting requirements for the chloroprene vent condenser; approximately 10,000 regulated components that have been neither identified nor monitored for leaks and emissions; failures to replace leaking valves within required time limits; more than 500 open-ended lines; failure to include

appropriate emissions factors in air permit application materials; failure to institute appropriate emissions controls for the chloroprene Group I storage tank, the surge control vessels, and the combustion chambers; and failure to maintain required destruction efficiency and minimum atomization flow rates. The redacted inspection report is attached hereto as **Exhibit B**.

44. On information and belief, the acts and failures of Defendants as recorded in the NEIC inspection report are currently under review by the U.S. Department of Justice.

45. On January 6, 2017, Denka entered into an Administrative Order on Consent ("AOC") with LDEQ with a target to reduce its chloroprene emissions by 85%. Even if the results of the AOC are successful, however, an 85% reduction from the emission levels displayed by Denka's own community-wide modeling will still be far in excess of the $0.2 \, \mu g/m^3$ threshold.

46. The EPA has observed that "[t]he top 6 census tracts with the highest NATA-estimated cancer risks nationally are in Louisiana due to Denka (formerly DuPont) chloroprene emissions." The "Background Cancer Risk" reported in the NATA assessment for the census tracts in the vicinity of the Pontchartrain Works facility is 3.365 per million, while the cancer risk from chloroprene exposure in those census tracts ranges from 158.515 to 768.46 per million, all well above the acceptable risk level recommended by EPA.

47. The Plaintiffs, along with all proposed class members, are exposed regularly to unsafe levels of chloroprene emitted by the Denka Pontchartrain Works facility and are therefore at a high risk for cancer.

## CLASS ACTION REQUISITES

48. Plaintiffs and all those similarly situated, as defined above, are entitled to maintain this action as a class action pursuant to La. C.C.P. art. 591 for the following reasons:

48.1.  First, the class is objectively ascertainable. As defined above, the class is proposed to consist of "*All natural persons who have lived, worked, or attended school within an area surrounding the Pontchartrain Works facility, that area bounded on the North by Interstate-10, on the West by the St. John the Baptist/St. James Parish boundary, on the South by Louisiana Highway 3127, on the East by the eastern boundary of the community of Killona on the West Bank of the Mississippi River and by the western*

*boundary of the Bonnet Carre Spillway on the East Bank of the Mississippi River ('the defined area'), at any time from January 1, 2011, through the present."* This class may be easily determined through objective documentation of property records showing ownership, and/or lease agreements documenting residence in the defined area; school attendance records, employment records, and various other legal filings and public records.

48.2.   The Class consists of a total number of class members within the defined area who are so numerous that joinder of all members is impracticable; on information and belief, there are tens of thousands of such affected putative class members.

48.3.   Questions of law and fact common to all members of the Class predominate over individual issues, including but not limited to:

48.3.1. whether DuPont released chloroprene at levels beyond the $0.2 \ \mu g/m^3$ threshold, and if so, how often and for how long;

48.3.2. whether Denka released chloroprene at levels beyond the $0.2 \ \mu g/m^3$ threshold, and if so, how often and for how long;

48.3.3. the extent and timing of DuPont's knowledge of the hazardous nature of chloroprene emissions at the levels at which it was releasing chloroprene from the Pontchartrain Works facility;

48.3.4. the extent and timing of Denka's knowledge of the hazardous nature of chloroprene emissions at the levels at which it was releasing chloroprene from the Pontchartrain Works facility;

48.3.5. the steps DuPont could have taken to reduce chloroprene emissions below the $0.2 \ \mu g/m^3$ threshold, and its decisions to not do so;

48.3.6. the steps Denka could have in the past or could in the future take to reduce chloroprene emissions below the $0.2 \ \mu g/m^3$ threshold, and its decisions to not do so;

48.3.7. whether the Defendants are liable to Plaintiffs for the release of excess amounts of chloroprene from the Pontchartrain Works facility;

48.3.8. whether Defendants are liable, pursuant to Louisiana Code Articles, including article 2317, for the injuries and damage to the Class Members;

48.3.9. whether Defendants are liable pursuant to Louisiana Civil Code Articles, including articles 667-669, for conducting activities and/or making works upon DuPont's property in the Pontchartrain Works facility owned and operated by Denka that are injurious to neighboring estates;

48.3.10. whether Defendants are absolutely liable pursuant to Louisiana Civil Code Articles, including article 2315, for conducting an ultrahazardous activity injurious to members of the class;

48.3.11. whether Defendants are liable for punitive damages;

48.3.12. whether Defendants are liable for attorneys' fees and costs pursuant to any applicable law;

48.3.13. whether Defendants are liable for nuisance and trespass;

48.3.14. the appropriate injunctive relief to prevent Denka from continuing to release chloroprene in excess of the 0.2 $\mu g/m^3$ threshold.

48.4. The claims of the Representative Plaintiffs, each of whom either live, work, and/or have children who attend school throughout the class defined area, are typical of the claims of the proposed Class, who are by definition likewise within the class defined area. Because the Representative Plaintiffs have incurred the same exposure to chloroprene above acceptable risk thresholds as the members of the proposed Class, their interests in the injunctive remedies for nuisance and trespassing (and, upon subsequent certification of the proposed sub-classes, for medical monitoring, and personal injury remedies) are identical to those of the proposed Class.

48.5. The Representative Plaintiffs will fairly and adequately protect the interests of the proposed Class, as each has an interest in gaining injunctive relief to stop the release of chloroprene from the Denka Pontchartrain Works facility in amounts resulting in exposure to the Class Members in excess of 0.2 $\mu g/m^3$. Plaintiffs have retained counsel experienced in the prosecution of class action litigation and counsel will adequately represent the interests of the class. Plaintiffs and their counsel are aware of no conflicts of

interest between plaintiff and absent class members or otherwise. Plaintiffs have, or can acquire, adequate financial resources to assure that the interests of the class will not be harmed. Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

48.6.   The criteria for defining the proposed Class, as set out above, are objectively ascertainable through objective documentation of property records showing ownership, and/or lease agreements documenting residence in the defined area; school attendance records, employment records, and various other legal filings and public records, as well as Denka's own map showing the 0.2 $\mu g/m^3$ isopleth, which is itself objectively demarcated on **Exhibit A** hereto and which corresponds to the class defined area.

48.7.   The prosecution of separate actions by individual putative class members within the class defined area, rather than a Class as proposed, would create a risk of inconsistent or varying adjudications and the potential for imposition of inconsistent duties and standards of care as to each of the Defendants and for prejudicial determinations as to the rights of subsequent plaintiffs, as each Defendant's conduct has harmed all Class Members.

48.8.   Due to the widespread effect of the Defendants' actions, any resistance of liability by the Defendants would be applicable to the whole of the proposed class, making class-wide injunctive relief appropriate.

48.9.   As noted above, the common issues of fact and law predominate over those issues that may pertain to individual plaintiffs' claims.

48.10.   The class action procedure is superior to other methods for the fair and efficient adjudication of the claims herein, because:

48.10.1.   The vast majority of the class members have no interest in, and it would be impractical for them to pursue, controlling the prosecution of individual actions for the remedies sought in this Petition, due to the expense in investigating and prosecuting the issues common to the whole class;

48.10.2.   It is desirable to concentrate all litigation regarding the effects of the excess release of chloroprene within a single forum, particularly insofar as a single

injunctive remedy is appropriate to halt the excess release of chloroprene, and

insofar as the Defendants should be ordered to fund the research to determine

the carcinogenicity of exposure to their emissions of chloroprene;

48.10.3.   Class litigation is an efficient mechanism for managing the claims of the

class members, due to the opportunity to afford reasonable notice of significant

phases of the litigation to class members and to permit distribution of the

recovery; and

48.10.4.   The vindication of public policy interests in halting the release of likely

human carcinogens such as chloroprene at levels that present a high risk of

cancer to the public are implicated and therefore justify the invocation of the

process of class litigation, including any attendant costs or burdens.

## COUNT 1: NUISANCE UNDER LA. C.C. ARTS. 667-669

49. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if

fully set forth herein.

50. Plaintiffs work, live, or attend school within the class defined area, which corresponds with

the 0.2 $\mu g/m^3$ isopleth.

51. The conduct of Denka and DuPont in their respective operations on the property that DuPont

continues to own—specifically at the site of Denka's Pontchartrain Works neoprene

manufacturing facility—constitutes an unreasonable interference with Plaintiffs' lawful use of and

presence on properties within the Defined Area.

52. Plaintiffs suffered injury to their persons and property and were deprived of enjoyment of property

within the Defined Area, due to exposure to chloroprene in excess of 0.2 $\mu g/m^3$.

53. The emissions from Denka's Pontchartrain Works facility are sufficient to cause physical

discomfort and annoyance to Plaintiffs, who must often confine themselves indoors to escape the

excess concentrations of chloroprene emissions.

54. In addition, the excess concentrations of chloroprene emissions lead to a reasonable and justified

elevated fear of cancer, as chloroprene at concentrations above 0.2 $\mu g/m^3$ has been determined by

the EPA to present an unacceptable risk of exposure to a likely human carcinogen, and those emissions thereby constitute a nuisance.

55. This nuisance is caused solely by emissions from the Pontchartrain Works facility, operated by Denka on property owned by DuPont.

56. Denka and DuPont each knew that the release of chloroprene in levels resulting in concentrations greater than 0.2 $\mu g/m^3$ presented a disruption of nearby class members' peaceful enjoyment of their property in the form of an unreasonable irritation and an unacceptable risk of cancer.

57. Denka and DuPont could have prevented the damage and deprivation of enjoyment had they exercised reasonable care by instituting and implementing technology and processes that prevented the excess release of chloroprene from the Pontchartrain Works facility. Nevertheless, Defendants failed to exercise reasonable care.

58. Therefore, Denka and DuPont are liable to be enjoined from any further emissions of chloroprene that will result in exposure of any Class member to concentrations of chloroprene in excess of 0.2 $\mu g/m^3$.

59. To the extent the claims for such remedies become mature, Denka and DuPont would also be liable for damages caused by their conduct, including but not limited to the cost of testing Class members for exposure to chloroprene, the cost of research to determine the carcinogenicity of exposure to chloroprene emissions, medical monitoring for development of cancer and other maladies due to chloroprene exposure, treatment of physical symptoms of chloroprene exposure, compensation for reasonable and justified fear of cancer due to chloroprene exposure, and diminution of value of property due to the presence of concentrations of chloroprene in excess of the acceptable risk level of 0.2 $\mu g/m^3$.

## COUNT 2: TRESPASS

60. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

61. Denka's operation of the Pontchartrain Works facility—and DuPont's before it—caused Defendants' hazardous substance, chloroprene, to encroach upon Plaintiffs' properties in concentrations in excess of 0.2 $\mu g/m^3$. These emissions have resulted in an actual physical invasion onto and into Plaintiffs' properties. This physical invasion is continuing.

62. The entry and presence of excess levels of chloroprene on Plaintiffs' properties is unauthorized. Defendants are prohibited under Louisiana law from causing such materials to encroach upon the property of its neighbors.

63. As a result of the unlawful encroachment of Defendants' chloroprene onto Plaintiffs' properties, Plaintiffs suffered damage to their person and property.

64. Therefore, Denka and DuPont are liable to be enjoined from any further emissions of chloroprene that will result in further trespass on the property owned or leased by any Class member of chloroprene in concentrations in excess of 0.2 $\mu g/m^3$.

65. To the extent the claims for such remedies become mature, Denka and DuPont would also be liable for damages caused by their conduct, including but not limited to the cost of testing Class members for exposure to chloroprene, the cost of research to determine the carcinogenicity of exposure to chloroprene emissions, medical monitoring for development of cancer and other maladies due to chloroprene exposure, treatment of physical symptoms of chloroprene exposure, compensation for reasonable and justified fear of cancer due to chloroprene exposure, and diminution of value of property due to the presence of concentrations of chloroprene in excess of the acceptable risk level of 0.2 $\mu g/m^3$.

## COUNT 3: NEGLIGENCE PURSUANT TO LA. C.C. ART. 2315

66. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

67. Plaintiffs have suffered and are suffering damages to their persons and property as detailed above.

68. Defendants had and have a duty to protect Plaintiffs and their property from the effects of excessive chloroprene pollution described herein.

69. The risk of harm suffered by Plaintiffs was encompassed within the scope of the duties owed them by Defendants.

70. Defendants breached their duties to Plaintiffs. Defendants knew the hazardous nature of chloroprene emissions; yet Defendants, in their respective periods operating the Pontchartrain Works facility, failed to act reasonably to prevent emissions of chloroprene that would result in concentrations of greater than 0.2 $\mu g/m^3$ around the surrounding community—indeed, those concentrations were hundreds of times the threshold for reasonable and safe chloroprene exposure.

71. To the extent the claims for such remedies become mature, Denka and DuPont would be liable for damages caused by their conduct, including but not limited to the cost of testing Class members for exposure to chloroprene, the cost of research to determine the carcinogenicity of exposure to chloroprene emissions, medical monitoring for development of cancer and other maladies due to chloroprene exposure, treatment of physical symptoms of chloroprene exposure, compensation for reasonable and justified fear of cancer due to chloroprene exposure, and diminution of value of property due to the presence of concentrations of chloroprene in excess of the acceptable risk level of 0.2 $\mu g/m^3$.

## COUNT 4: STRICT LIABILITY PURSUANT TO LA. C.C. ARTS. 2317-2317.1

72. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

73. La. C.C. arts. 2317-2317.1 provide that a custodian is strictly liable for damages occasioned by the things he owns. At all material times, DuPont owned and received substantial benefits from the ownership of the property where the Pontchartrain Works facility is located. Prior to November 2015, DuPont—and after November 2015, Denka—owned and controlled the neoprene manufacturing facility on that property, including all units that release chloroprene at the Pontchartrain Works facility. The operation of those units in a manner resulting in releases of chloroprene in concentrations in excess of 0.2 $\mu g/m^3$ in the surrounding community is the cause-in-fact for Plaintiffs' damages.

74. The defects in Defendants' operation of the Pontchartrain Works facility caused an unreasonable risk of harm to Plaintiffs. Exposure to the excess chloroprene released from the Pontchartrain Works facility can cause severe damage to persons, and an unacceptably high risk of cancer, as detailed above. The burden of reducing chloroprene emissions from the Pontchartrain Works facility is slight as compared to the potential gravity of harm to Plaintiffs.

75. Defendants knew of the unreasonable risks attendant to excess releases of chloroprene from the Pontchartrain Works facility.

76. The damage suffered by Plaintiffs could have been prevented by Defendants' exercise of reasonable care.

77. Plaintiffs suffered damages to their persons and property, as detailed above, as a result of the defective operation of the Pontchartrain Works facility, and Defendants are strictly liable for those damages.

## COUNT 5: ABSOLUTE LIABILITY FOR CONDUCTING ULTRA-HAZARDOUS ACTIVITIES

78. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

79. Plaintiffs state a cause of action for absolute liability pursuant to La. C.C. art. 2315 for conducting an ultrahazardous activity against Defendants based upon the allegations stated herein.

80. Defendants were directly engaged in manufacturing, storing, processing, and transferring toxic chemicals, including chloroprene, as part of their business at the Pontchartrain Works facility. Under Louisiana law, industrial, and societal customary understanding, chloroprene constitutes poisonous gas and is a likely human carcinogen. The storage of poisonous gas is an activity which can cause damages to others even when conducted with great care and prudence.

81. The Defendants knowingly released toxic gases from the manufacture and storage of chloroprene into the atmosphere. The toxic gases released caused injury to Plaintiffs' persons and property.

**WHEREFORE**, the Plaintiffs and all those similarly situated pray that, after due proceedings be had, this action be ordered to go forward as a class action as petitioned for herein, there be judgment rendered in their favor and against each Defendant finding that each Defendant is liable and indebted to the Plaintiffs and all those similarly situated, jointly and solidarily, for:

a) Certification of the class as alleged herein in Paragraphs 2 and 49 (and their associated sub-paragraphs);

b) Injunctive relief in the form of abatement of chloroprene releases in concentrations greater than 0.2 $\mu g/m^3$ in the surrounding community;

c) To the extent the causes of action for such remedies become mature, all damages as are just and reasonable under the circumstances, including but not limited to the cost of testing Class members for exposure to chloroprene, the cost of research to determine the carcinogenicity of exposure to chloroprene emissions, treatment of physical symptoms of chloroprene exposure, compensation for reasonable and justified fear of

cancer due to chloroprene exposure, and diminution of value of property due to the

presence of concentrations of chloroprene in excess of the acceptable risk level of 0.2

μg/m³;

d) To the extent the causes of action for such remedy becomes mature, medical monitoring

for development of cancer and other maladies due to chloroprene exposure,

e) Judicial interest from the date of the judicial demand;

f) Punitive damages to the extent permitted under any applicable law;

g) The award of costs, expenses and reasonable attorneys' fees in favor of the Plaintiffs

and all those similarly situated to the fullest extent authorized by law; and

h) Such other and further relief which the Court deems necessary and proper at law and

in equity and that may be just and reasonable under the circumstances of this matter.

i) Plaintiffs request a jury trial of all claims in this matter.

Respectfully submitted,

JONES, SWANSON, HUDDELL &
GARRISON, LLC
Eberhard D. Garrison (La. Bar No. 22058)
Lynn E. Swanson (La. Bar No. 22650)
H.S. Bartlett III (La. Bar. No. 26795)
Kevin E. Huddell (La. Bar. No. 26930)
Lindsay E. Reeves (La. Bar No. 32703)
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

BRUNO & BRUNO, L.L.P.
Joseph M. Bruno (La. Bar No. 3604)
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775

THE LAMBERT FIRM, PLC
Hugh P. Lambert, T.A. (La. Bar #7933)
Cayce C. Peterson, Esq. (La. Bar #32217)
Morgan Embleton, Esq. (La. Bar #35769)
701 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-1750
Facsimile: (504) 529-2931

OF COUNSEL:
CUMMINGS & CUMMINGS, LLC
John Cummings (La. Bar No. 4652)
416 Gravier Street
New Orleans, LA 70118
Telephone: (504) 586-0000
Facsimile: (504) 522-8423

Sylvia Elaine Taylor (La. Bar No. 08245)
1126 W. Airline Highway
LaPlace, Louisiana 70068

Randal L. Gaines (La. Bar No. 17576)
7 Turnberry Drive
LaPlace, Louisiana 70068

***Counsel for Plaintiffs and all those similarly situated***

**PLEASE SERVE:**

**Denka Performance Elastomer LLC**
Through Its Registered Agent:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816

**E.I. Dupont De Nemours and Company**
Through Its Registered Agent:
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, Louisiana 70816







UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 6
1445 ROSS AVENUE, SUITE 1200
DALLAS TX 75202-2733

April 13, 2017

**CERTIFIED MAIL:  RETURN RECEIPT REQUESTED~**

Ms. Celena J. Cage, Administrator, Enforcement Division
Louisiana Department of Environmental Quality
P.O. Box 4312
Baton Rouge, La. 70821-4312

Re:  Transmittal of NEIC Investigation Report redacted by Denka Performance Elastomer, LLC

Dear Ms. Cage:

On June 6-10, 2016, the U.S. Environmental Protection Agency's National Enforcement Investigations Center (NEIC) conducted a Clean Air Act Compliance Investigation of Denka Performance Elastomer, LLC's ("DPE") elastomers facility in LaPlace, Louisiana. Following the investigation, an Investigation Report, dated October 2016, was sent by NEIC to the Region 6 Enforcement Division. As a standard practice, Region 6 posts inspection reports to the EPA's public website except when the report or information contained therein is subject to protections, such as for confidential business information. Please note that DPE has redacted certain portions of the Investigation Report over which it asserts a claim of business confidentiality.

All inspection reports that are posted to the web are based upon observations made by the inspectors during the inspection and using information provided by the subject facility. Any finding identified in an inspection report may be subject to change based on new or additional information and/or technical discussions with the facility. Specifically, here, after the issuance of NEIC's inspection report, DPE submitted additional information to EPA in December 2016 that initially indicates that the hydrochloric acid production furnace (HAPF) discussed in potential areas of noncompliance 12 through 16 has operational restrictions and automatic waste feed cut-off valves that could affect the number of alleged parameter exceedances identified in the NEIC Report. EPA Region 6 is currently conducting a detailed review of the additional information.

If you have any questions, please call James Leathers at (214) 665-6569 or Justin Lannen at (214) 665-8130.

Sincerely yours,

Steve Thompson,
Chief
Air Enforcement Branch

EXHIBIT
**B**

Enclosure

cc (without enclosure):       Robert Holden, Liskow & Lewis

CBI REDACTED COPY--LISKOW & LEWIS--MARCH 29, 2017



United States Environmental Protection Agency
Office of Enforcement and Compliance Assurance
Office of Criminal Enforcement, Forensics and Training

NEICVP1216E01

# FOCUSED CLEAN AIR ACT COMPLIANCE INVESTIGATION

Denka Performance Elastomer LLC
La Place, Louisiana
NEIC Project No.: VP1216

October 2016

**Project Manager:**

Doreen Au, Chemical Engineer

**Other Contributors:**

Armando Bustamante, Environmental Engineer
Martha Hamre, Chemical Engineer
Matthew Schneider, Chemical Engineer
Bill Squier, Mechanical Engineer
David Holzwarth, Information Technology Specialist
Richard Helmich, Ph.D., Principal Analytical Chemist

**Prepared for:**
EPA Region 6
1445 Ross Avenue
Dallas, Texas 75202

**Authorized for Release by:**

Suzanne Schulman, Civil Services Section Chief

NATIONAL ENFORCEMENT INVESTIGATIONS CENTER
P.O. Box 25227
Building 25, Denver Federal Center
Denver, Colorado 80225

NEIC

Page 1 of 52

# CONTENTS

INTRODUCTION ........................................................................................................ 4
    FACILITY BACKGROUND ................................................................................ 4
    ON-SITE INSPECTION SUMMARY .............................................................. 4
        Clean Air Act ................................................................................................. 5
        Process Description ........................................................................................ 5
        40 CFR Part 63 Subpart G – Hazardous Organic NESHAP (HON) ............ 7
        40 CFR Part 63 Subpart H – Leak Detection and Repair Requirements ...... 10
        40 CFR Part 63 Subpart U – Polymers and Resins I MACT ........................ 13
        40 CFR Part 63 Subpart EEE – Hazardous Waste Combustor MACT .......... 17
        Emission Calculations ................................................................................... 19
        On-Site Laboratory Evaluation ..................................................................... 20
        Wastewater Sampling .................................................................................... 22
SUMMARY OF FINDINGS ..................................................................................... 25
    CLEAN AIR ACT ............................................................................................... 25

## TABLES

1    Process Unit Components in Organic HAP Service .......................................... 11
2    EPA Monitoring Results ................................................................................... 12
3    Storage Vessels ................................................................................................ 14
4    Group 1 Vessel Capacity and Vapor Pressure Conversions ............................ 15
5    Storage Vessel Calculated Temperatures and Associated Vapor Pressures ...... 16
6    Hazardous Waste Combustor Mact Emission Standards .................................. 17
7    Operating Parameter Limits ............................................................................. 18
8    NEIC Chloroprene Analysis Summary ........................................................... 22

## FIGURE

1    Wastewater sample locations ............................................................................ 24

## APPENDICES (*NEIC-created documents)

A    *NEIC Photographs CBI (9 pages)
B    Chloroprene Process Diagram CBI (1 page)
C    *Neoprene Process Diagram CBI (1 page)
D    September 1997 HON Notification of Compliance Status (332 pages)
E    Chloroprene and Neoprene Title V Permits (185 pages)
F    November 2001 Polymers and Resins I Notification of Compliance Status (42 pages)
G    2011–2016 Chloroprene Analytical Results for DCB JVC Effluent Tank CBI (spreadsheet)
H    2011–2016 Chloroprene Analytical Results for Isom JVC Effluent Tank CBI (spreadsheet)
I    2014 Wastewater Sampling Results (3 pages)
J    DPE LDAR Procedures (33 pages)
K    DPE February 2016 LDAR Periodic Report (5 pages)
L    *Late Final Repair Component Data (1 page)
M    *Late First Attempt at Repair Component Data (1 page)
N    *NEIC Monitoring Summary (2 pages)
O    DuPont February 2016 LDAR Periodic Report (5 pages)
P    DuPont Back-end Provision Notification (1 page)

APPENDICES (*NEIC-created documents) (continued)

| | |
|---|---|
| Q | DuPont January 2016 Subpart U Report (12 pages) |
| R | 2008 Polymers and Resins I Compliance Manual CBI (113 pages) |
| S | 2015 Emission Factors for Neoprene Products CBI (1 page) |
| T | 2013 Emission Calculations CBI (folder) |
| U | 2014 Emission Calculations CBI (folder) |
| V | 2015 Emission Calculations CBI (folder) |
| W | 2010 Hazardous Waste Comprehensive Performance Test CBI (2 pages) |
| X | 2015 Hazardous Waste Comprehensive Performance Test (4 pages) |
| Y | *NEIC Laboratory Report (128 pages) |
| Z | *Chloroprene Vapor Pressure Curve (spreadsheet) |
| AA | *Carbon Monoxide Analysis (Spreadsheet) |
| BB | *Parameter Exceedances Data Analysis (Spreadsheet) |
| CC | Hazardous Waste Combustor Periodic Reports (folder) |
| DD | DPE August 2016 Email (5 pages) |
| EE | DuPont Fugitive Emission Factor Guidance CBI (5 pages) |
| FF | DPE July 2016 Email (3 pages) |
| GG | *Dr. Lowry Expert Opinion (9 pages) |

This Contents page shows all of the sections contained in this report
and provides a clear indication of the end of this report.

## INTRODUCTION

At the request of U.S. Environmental Protection Agency (EPA) Region 6, EPA's National Enforcement Investigations Center (NEIC) conducted a focused Clean Air Act (CAA) compliance investigation of Denka Performance Elastomer LLC (DPE) in La Place, Louisiana. NEIC conducted the on-site compliance investigation from June 6–10, 2016. DPE's operations and associated waste streams are subject to major environmental statutes, including the Clean Air Act (CAA), Clean Water Act (CWA), and Resource Conservation and Recovery Act (RCRA). DPE's operations are also subject to the requirements of environmental permits and regulations administered by the EPA and the Louisiana Department of Environmental Quality (LDEQ).

## FACILITY BACKGROUND

DPE operates a synthetic rubber manufacturing facility that manufactures 2-chlorobuta-1,3-diene (hereafter referred to as chloroprene or CD) and polymerizes the chloroprene to manufacture different formulations of neoprene referred to as "types." ████████████████

DPE purchased the facility from E.I. DuPont de Nemours (DuPont) on or about November 1, 2015. DPE retained 235 of 240 employees from DuPont. DPE is a joint venture owned by Denka Company Limited (70 percent) and Mitsui Company (30 percent). DPE is a major source of hazardous air pollutants (HAPs). The majority of chloroprene emissions are generated by two processes: the chloroprene process and the neoprene process. The CAA Title V operating permit for the chloroprene process (permit No. 3000-V5) was issued to DuPont on September 9, 2014, expiring on April 26, 2017. The Title V permit for the neoprene process (permit No. 2249-V8) was issued to DuPont on June 15, 2015, expiring on May 15, 2019. On November 12, 2015, DPE submitted a request to LDEQ to transfer these permits, as well as other additional permits, from DuPont to DPE.

Photographs taken during the on-site inspection are included in **Appendix A**. Emission sources at this facility include distillation towers, polymer kettles, storage vessels, a boiler, a flare, drying lines, strippers, the wastewater treatment system, and process fugitives.

## ON-SITE INSPECTION SUMMARY

NEIC conducted the on-site inspection from June 6–10, 2016. EPA Region 6 inspectors James Leathers, Justin Chen, and Sarah Frey and LDEQ inspector Daniel Odem participated in and/or observed the on-site inspection. During the opening conference, NEIC inspectors presented credentials to Patrick Walsh, DPE's safety, health, and environmental manager, and Douglas Melancon, environmental engineer. During the on-site inspection, DPE representatives provided a site orientation walking tour, a detailed facility description, process area walkthroughs, and

documentation/records pertaining to the focused CAA investigation. NEIC inspectors reviewed records and documents, performed a visual inspection of the facility, performed comparative EPA Reference Method 21 monitoring, collected wastewater samples, and interviewed DPE personnel. At the conclusion of the on-site inspection, an exit meeting was held to discuss preliminary findings. NEIC personnel stated that final determinations would be made in conjunction with EPA Region 6 personnel.

**Clean Air Act**

NEIC inspectors investigated DPE's compliance with the following CAA regulations applicable to the facility operations:

- 40 CFR Part 63 Subpart U – National Emission Standards for Hazardous Air Pollutant Emissions: Group I Polymers and Resins (Polymers and Resins I MACT).
- 40 CFR Part 63 Subpart G – National Emission Standards for Organic Hazardous Air Pollutants from the Synthetic Organic Chemical Manufacturing Industry for Process Vents, Storage Vessels, Transfer Operations, and Wastewater (HON)
- 40 CFR Part 63 Subpart H – National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks (Leak Detection and Repair [LDAR] Requirements)
- 40 CFR Part 63 Subpart EEE – National Emission Standards for Hazardous Air Pollutants from Hazardous Waste Combustors (Hazardous Waste Combustor MACT)

DPE relies on DuPont's applicability determinations regarding DPE's compliance with 40 Code of Federal Regulations (CFR) Part 63 Subparts G, U, and EEE. DPE also uses DuPont's emission calculation methodology for calculating annual air emissions.

**Process Description**

*Chloroprene (Monomer Area)*





*Neoprene (Polymers Area)*

According to DPE, 27 types of neoprene are made on-site. Approximately 65 to 75 million pounds (lbs) of neoprene are made annually. Some of these products are considered liquid dispersion types, in which neoprene polymer is suspended in water, and is not dried and further processed. NEIC generated a process flow diagram based on process information provided by DPE engineers (**Appendix C**).



**40 CFR Part 63 Subpart G – Hazardous Organic NESHAP (HON)**

*Process Vents*

DPE relies on DuPont's applicability determinations for the chloroprene process. DuPont submitted a notification of compliance status (NOCS) for the chloroprene process dated September 16, 1997 (Appendix D). In this document, one Group 1 process vent is identified, the mole sieve vent with a total resource effectiveness (TRE) value of 0.098. This stream is discharged to a flare. DuPont also identifies the CD vent condenser (TRE value of 2.1!) as a stream that has a TRE value between 1 and 4 and requires additional monitoring. In addition, seven vent streams have a TRE value greater than 4: pentane column, heads column, topper column, refiner column, recovery column, isom distillation columns, and isom reactor vent.



Because the TRE value of the CD vent condenser was between 1 and 4, DPE is required to monitor the exit temperature of the product exiting the condenser to ensure that the TRE value does not drop below 1. DPE relied on modeling data provided by DuPont in 1997 and the chloroprene Title V permit 3000-V5, Part 70, Specific Condition 2 (**Appendix E, p. 56 of 185, and p. 79 of 185**), which requires the cooling media (brine temperature) to remain below 10 °C to maintain a TRE value above 1. Monitoring the temperature of the cooling media instead of the outlet temperature of the vent stream does not indicate how effectively the condenser is operating. In addition, the brine temperature was established based on the 1997 configuration, which is different from the current configuration of the plant.

The following language is identical in the 1997 and 2015 regulations:

**40 CFR § 63.117(a)** *Each owner or operator subject to the control provisions for Group 1 process vents in §63.113(a) or the provisions for Group 2 process vents with a TRE index value greater than 1.0 but less than or equal to 4.0 in §63.113(d) shall: (1) Keep an up-to-date, readily accessible record of the data specified in paragraphs (a)(4) through (a)(8) of this section, as applicable…*

**40 CFR § 63.117(a)(7)** states, *Record and report the following when achieving and maintaining a TRE index value greater than 1.0 but less than 4.0 as specified in §63.113(a)(3) or §63.113(d) of this subpart. (i) The parameter monitoring results for absorbers, condensers, or carbon adsorbers, as specified in table 4 of this subpart, and averaged over the same time period of the measurements of the vent stream flow rate and concentration used in the TRE determination (both measured while the vent is normally routed and constituted)*

*Table 4 to Subpart G of Part 63 – Process Vents – Monitoring, Recordkeeping, and Reporting Requirements for Maintaining a TRE Index Value >1.0 and <= 4.0*

| Final recovery device | Parameters to be monitored | Recordkeeping and reporting requirements for monitored parameters |
|---|---|---|
| Condenser | Exit (product side) temperature [63.114(b)(2)] | 1. Continuous records. 2. Record and report the exit temperature averaged over the full period of the TRE determination NCS. 3. Record the daily average exit temperature for each operating day. 4. Report all daily average exit temperatures that are outside of the |

| Final recovery device | Parameters to be monitored | Recordkeeping and reporting requirements for monitored parameters |
|---|---|---|
| | | range established in the NCS or operating permit – P.R. (periodic report) |

DPE does not monitor the product side temperature as required by 40 CFR § 63.117(a)(7); instead, as stated above, it monitors the condenser brine temperature. The original NOCS in 1997 identifies that DuPont will monitor the condenser brine temperature, per 40 CFR § 63.117(a)(7), which is not the parameter required to be monitored. No alternative to this requirement was requested by either DuPont or DPE as part of the 1997 NOCS. However, this requirement is listed in the chloroprene Title V permit, as noted previously.

### Storage Vessels

Chloroprene manufactured in the monomer area is stored in a 2 million (MM) pound chloroprene storage tank (emission point 1700.21A) in the polymers area and in other smaller crude CD tanks. The chloroprene is refined in the polymers area and then is used in the manufacture of neoprene. DuPont did not list these storage vessels as being subject to HON requirements in the initial HON notification in December 1997 (**Appendix D**). Instead, DuPont listed these as Group 2 tanks in the vessel evaluation for the Polymers and Resins I MACT in the November 2001 NOCS (**Appendix F**).

### Wastewater

DPE and DuPont have sampling data for chloroprene concentrations from the DCB JVC effluent tank and isomerization JVC effluent tank. DPE provided DCB JVC results from 2011–2016 (up to NEIC inspection date). This information is in **Appendix G**. Isom JVC results are in **Appendix H**. DuPont also conducted wastewater sampling for wastewater streams in 2014, and the results are included in **Appendix I**. According to a DPE process engineer, the DCB JVC effluent tank is the same as stream 1 in the DCB Refining JVC Effluent Stream in the 2014 sampling plan. The isomerization effluent tank is the same as stream 2 in the ISOM JVC Effluent Stream in the 2014 sampling plan, and is also known as MP in the 2011–2016 data.

From the DCB JVC effluent tank, the highest measured concentration of beta chloroprene was 1813.39 parts per million (ppm) on September 4, 2012. From sampling data from 2011–2016, the average concentration of the 176 samples taken was 85 ppm. Beta chloroprene is another name for chloroprene with CAS number 126-99-8, which is listed on EPA's hazardous air pollutant list. For the same location in the 2014 wastewater sampling event, chloroprene was "non-detect."

Effluent from the isomerization JVC effluent tank is injected into non-hazardous deep wells. From the isomerization JVC effluent tank, the highest measured concentration of chloroprene was 722.74 ppm on December 7, 2015. From sampling data from 2011–2016, the

average concentration of the 131 samples taken was 37 ppm. For the same location in the 2014 wastewater sampling event, chloroprene was non-detect.

**40 CFR Part 63 Subpart H – Leak Detection and Repair Requirements**

According to DPE's LDAR procedure (**Appendix J**), DPE follows a fugitive emissions consolidated source agreement, effective January 1, 2014. This agreement allows for the site to comply with the most stringent fugitive emissions rule, identified as 40 CFR Part 63 Subpart H. The facility submits a semiannual fugitive emissions consolidated agreement periodic report. In DPE's February 15, 2016, semiannual fugitive emissions report, it reported that, for November and December 2015, it monitored a total of 5 connectors, 4,339 valves, 256 pumps, 2 compressors, 345 instrumentation systems, 25 agitators, and 515 pressure relief devices (**Appendix K**).

*LDAR Program Background*

DPE currently has approximately 32,500 active components in three process units that are subject to LDAR requirements. **Table 1** shows, for each LDAR-regulated process unit, the unit name and the total number of components by type in organic hazardous air pollutant service, based on the facility recordkeeping database at the time of the NEIC inspection. DPE monitors for fugitive leaks of organic HAPs from valves, pumps, connectors, pressure relief devices, compressors, and other types of equipment, in accordance with EPA Reference Method 21 (40 CFR Part 60, Appendix A), as referenced by 40 CFR § 63.180(b)(1).

At the time of the NEIC inspection, DPE contracted with Emission Monitoring Service, Inc. (EMSI) to perform monitoring of equipment subject to LDAR requirements. Before DPE purchased the facility in November 2015, DuPont had contracted with Guardian Compliance for monitoring of equipment subject to LDAR requirements. Monitoring is performed using a toxic vapor analyzer (TVA), model 1000B instrument.

**Table 1. PROCESS UNIT COMPONENTS IN ORGANIC HAP SERVICE**
**Denka Performance Elastomer LLC**
**La Place, Louisiana**

| Process Unit | Valves | Pumps | Connectors | Agitators | Compressors | Instrumentation Systems | Open-ended Lines | Relief Devices |
|---|---|---|---|---|---|---|---|---|
| Chloroprene | 3,703 | 79 | 16,159 | 3 | 2 | 428 | 729 | 22 |
| Hydrochloric acid (HCl) recovery | 471 | 19 | 3,125 | 0 | 0 | 3 | 97 | 8 |
| Neoprene | 1,176 | 43 | 5,818 | 2 | 0 | 179 | 407 | 28 |

## Recordkeeping and Reporting

DPE uses the LeakDAS® database software to manage information pertaining to its LDAR program. The database functions as the central repository for equipment monitoring frequency, repair history, and other information related to LDAR requirements. NEIC received copies of DPE's LeakDAS® data tables for February 2013–December 2015 (archived) and November 2014–June 2016 (current), and reviewed the information for DPE's compliance with 40 CFR Part 63 Subpart H requirements. A transition to a new tagging system of components in the LDAR program occurred during the overlapped time of the archived and current databases.

Component inventories were tabulated for active components in each set of data tables. Comparison of active component inventories between the archived and current data tables shows active component inventories of 21,659 (archived) and 32,501 (current), which is an increase of 10,842 active components in the current data tables. 40 CFR Part 63 Subpart H requires that equipment that is subject to the requirements of this subpart to be identified such that it can be distinguished from equipment that is not subject to the requirements.

## Repair Requirements

Based on information in the facility's LDAR recordkeeping database, DPE failed to perform final repairs to one valve or to place the component on the delay-of-repair list, within 15 days of identification of the leak, between February 2013 and June 2016. Appendix L identifies the component, along with the date and time the leaks were determined.

DPE also failed to perform a first attempt at repair of one valve within the required timeframe between February 2013 and June 2016. Appendix M identifies the missed first attempt at repair and related monitoring and repair history.

## Investigation Monitoring/Field Audit Results

NEIC inspectors performed comparative monitoring in two DPE process units: the chloroprene unit and the neoprene unit. All monitoring was conducted using Thermo TVAs. In accordance with NEIC operating procedures, the TVAs were calibrated daily using certified methane-in-air calibration gases. Monitoring and field audit results are presented in Appendix N.

NEIC inspectors monitored 2,155 valves, 5,059 connectors, 62 pumps, 13 agitators, 4 pressure relief devices, and 514 open-ended lines and identified 31 valves and 20 connectors leaking in excess of 500 ppm and 1 pump leaking in excess of 1,000 ppm. NEIC inspectors notified DPE escorts and EMSI personnel of each leak identified, and EMSI personnel verified all leaks with their instruments during the on-site inspection. **Table 2** lists the number of valves, connectors, pumps, agitators, open-ended lines, and pressure relief devices that NEIC identified as leaking; the total components monitored; and a calculated leak rate for each component type.

**Table 2. EPA MONITORING RESULTS**
**Denka Performance Elastomer LLC**
**La Place, Louisiana**

| Process Unit | Total Leaking | Total Monitored | Percent Leaking |
|---|---|---|---|
| **Chloroprene** | | | |
| Valves | 30 | 1,555 | 1.93 |
| Connectors | 12 | 3,337 | 0.36 |
| Pumps | 1 | 48 | 2.08 |
| Agitators | 0 | 1 | 0 |
| Open ends | * | 234 | * |
| PRDs | 0 | 4 | 0 |
| **Neoprene**\*\* | | | |
| Valves | 1 | 600 | 0.17 |
| Connectors | 8 | 1,722 | 0.46 |
| Pumps | 0 | 14 | 0 |
| Agitators | 0 | 12 | 0 |
| Open-ended lines | * | 280 | * |

\* For any open-ended lines and plugs that were monitored and leaking above 500 ppm, the leak was attributed to the adjacent valve.
\*\* The neoprene unit was not processing material at the time of the NEIC LDAR inspection.

DuPont submitted a semiannual fugitive emissions consolidated source agreement periodic report for the semiannual period of July 1, 2015, through December 31, 2015 (**Appendix O**). This report summarized the leak rate for each component type over the entire site. DuPont monitored 4,712 valves in the third quarter of 2015 and identified two leaking valves for a leak rate of 0.04 percent. The other component types had zero leak rates for this monitoring period.

While performing comparative monitoring at DPE, NEIC inspectors identified 514 open-ended lines. 40 CFR Part 63 Subpart H requires open-ended valves or lines to be equipped with a cap, blind flange, plug, or a second valve, except if the valves or lines contain material that would autocatalytically polymerize. DPE representatives stated that the fluid in the process lines would autocatalytically polymerize and, therefore, the process lines are exempt from the requirement of being equipped with a cap, blind flange, plug, or second valve.

NEIC inspectors observed throughout the plant open-ended lines on piping that was labeled as containing toluene. NEIC inspectors also observed some plugs, second closed valves, and blind flanges on a few open-ended lines, but many other open-ended lines in the same chemical service without them. The majority of the valve leaks identified during the on-site comparative monitoring

were from open-ended lines where the leak was attributed to the adjacent valve. DPE has not provided EPA with any documentation identifying which chemicals in which specific lines meet the exemption.

**40 CFR Part 63 Subpart U – Polymers and Resins I MACT**

The notification of compliance status report DuPont submitted on November 13, 2001 (**Appendix F**) for the Polymers and Resins Group I MACT indicates that it has four Group 2 storage vessels and ten Group 2 process vents, and is subject to no back-end provisions. In a July 13, 2011, letter, DuPont notified that it is subject to back-end provisions under 40 CFR § 63.499, and would achieve the residual limits by using strippers with three condensers in series (**Appendix P**). DuPont also stated that the applicable HAP emission limitation is 0.00091 megagram (Mg) HAP/Mg neoprene produced. The January 2016 semiannual report DuPont submitted in accordance with 40 CFR Part 63 Subpart U indicated that its calculated back-end HAP emission rate was 0.00087 Mg HAP/Mg neoprene (**Appendix Q**) from July 1–October 31, 2015.

*Front-end Process Vents*



In 2008, DuPont appears to have recalculated the batch emission rate at the exit of the common condenser. In accordance with 40 CFR § 63.488(a)(2), the annual uncontrolled organic HAP emissions should be calculated at the exit of the batch unit operation. A primary condenser would be considered part of the batch unit operation if it refluxes back to the unit. Because the common condenser, in this situation, recovers HAP, but does not reflux them, the vent stream exiting the poly kettle, prior to the common condenser, is the exit of the batch unit operation.

DPE provided calculations performed for the emission rate at the exit of the common condenser. These calculations were documented in the *Neoprene Unit Polymers and Resins I Compliance Manual* revised July 2008 (**Appendix R**). These calculations also provide information regarding the vent stream entering the common condenser, per charge. Using this inlet calculation and DPE's production record from 2015, each poly kettle has greater than 225 charges per year, and, therefore, each kettle generates greater than 26,000 pounds of HAP emissions a year, and each kettle's vent meets the definition of a Group 1 batch front-end process vent per 40 CFR § 63.482.

The flash cooler vent is also part of the front-end process; however, neither DPE nor DuPont evaluated this vent stream under this regulation **(Appendix R, p. 8)**. Based on the definition in 40 CFR § 63.482, the vent is part of the front-end process because the flash cooler is part of the stripping operation.

DPE also relied on DuPont's TRE calculations for the front-end continuous process vent from the CD refining column and the three stripping units. DPE was unable to explain the specific locations in the process where DuPont evaluated the TRE values. Therefore, NEIC could not determine if the TRE calculations were performed at the appropriate locations. The TRE values that were calculated indicate that each stream had a TRE value between 1 and 4, and additional monitoring is required on the condensers to ensure that the stream did not become a Group 1 continuous process vent. DPE relies on an alternative monitoring request submitted by DuPont allowing it to monitor the temperature of the brine, rather than the temperature of the exiting stream.

### Back-end Process Vents

Following stripping, the back-end provisions are designed to limit the emissions from unreacted monomers in the polymer after stripping. According to 40 CFR § 63.494 (a)(4)(iii), the back-end organic HAP emission limit shall be calculated by dividing 30 Mg/year (yr) by the mass of neoprene produced in 2007. DPE provided information that the DuPont-calculated limit was 0.00091 Mg HAP/Mg neoprene produced.

To determine compliance with this limit, DPE uses its production rate and emission factors for residual chloroprene and toluene for different neoprene types. Factors for liquid dispersion neoprene are averaged, since liquid dispersions are sampled and analyzed for each LD type due to customer requirements for residual chloroprene content. The remaining factors for types 1–9 were from samples collected at the Pontchartrain site in 1996, and types 10–15 were from samples collected at the Louisville site in 1992 **(Appendix S)**.

### Storage Vessels

DPE relies on DuPont's regulatory analysis for storage vessels. The November 13, 2001, Polymers and Resins I Notification of Compliance Status **(Appendix F)** lists four storage tanks that contain chloroprene that DuPont listed as Group 2 storage tanks **(Table 3)**.

**Table 3. STORAGE VESSELS**
**Denka Performance Elastomer LLC**
**La Place, Louisiana**

| Emission Point | Vessel Name | Liquid Stored | Volume (gallons) | Vapor Pressure of HAPs (psi) | Type of Source | Group Status |
|---|---|---|---|---|---|---|

| 1700-21.1 | Crude Storage Tank No. 1 | Chloroprene | 50,000 | 0.7 | Storage tank | 2 |
| 1700-21.2 | Crude Storage Tank No. 2 | Chloroprene | 22,000 | 1.39 | Storage tank | 2 |
| 1700-21.3 | Crude Storage Tank No. 3 | Chloroprene | 25,750 | 1.46 | Storage tank | 2 |
| 1700-21A | 2 MM Pound CD Storage Tank | Chloroprene | 279,700 | 0.7 | Storage tank | 2 |

DPE provided NEIC no additional information about how the vapor pressure for each tank was determined. The storage vessel provisions in 40 CFR § 63.484 state that the owner or operator should comply with the storage vessel requirements in 40 CFR §§ 63.119 through 63.123 and 63.148. Table 3 to 40 CFR Part 63 Subpart U defines a Group 1 storage vessel. **Table 4** provides the information in Table 3 to 40 CFR Part 63 Subpart U in its original units, and then in gallons and psi, as DuPont uses.

Table 4. GROUP 1 VESSEL CAPACITY AND VAPOR PRESSURE CONVERSIONS
Denka Performance Elastomer LLC
La Place, Louisiana

| Vessel capacity (cubic meters) | Vessel capacity (gallons) | Vapor pressure[a] (kilopascals [kPa]) | Vapor pressure[a] (psi) |
|---|---|---|---|
| 75 ≤capacity <151 | 19,812.9 ≤capacity <39,890 | ≥13.1 | ≥1.9 |
| 151 ≤capacity | 39,890 ≤capacity | ≥5.2 | ≥0.75 |

[a]Maximum true vapor pressure of total organic HAP at storage temperature.

EPA lists the vapor pressure for chloroprene at 20 °C (68 degrees Fahrenheit [°F]) at 188 millimeters of mercury (mmHg) (*https://www3.epa.gov/ttn/atw/hlthef/chloropr.html*). The 2013, 2014, and 2015 emission inventory calculations list the 1700-21A, 2 MM pound CD storage tank contents as 100 percent chloroprene and a daily average liquid surface temperature of 466.8 rankine (R) (7.13 °F). According to the monomer plant diagram, this tank is cooled with -18 °C (-1 °F) brine.

Emission ID points for crude storage tanks 1, 2, and 3, 1700-21.1, 1700-21.2, and 1700-21.3, are not listed in the 2013, 2014, and 2015 emission inventory calculations (**Appendices T, U, and V**); however, the tab "1700-63" includes crude storage tanks 1, 2, and 3. This tab lists the temperature of the vapor in the common vent header as 5 °C (41 °F).

NEIC used the Antoine equation and associated chloroprene Antoine equation parameters to estimate the vapor pressure of the tanks based on the temperatures provided in DPE's emission

Denka Performance Elastomer LLC

calculations.[1] NEIC also calculated the temperature at which the chloroprene in the tank would exceed the vapor pressure threshold for Group 1 storage vessels and additional controls would be required.

Table 5. STORAGE VESSEL CALCULATED TEMPERATURES AND ASSOCIATED VAPOR PRESSURES
Denka Performance Elastomer LLC
La Place, Louisiana

| Emission Point | Vessel Name | Volume (gallons) | Temperature per emission Inventory (°F) | Calculated Vapor Pressure (psi) at Temperature in Emission Inventory | Group Status | Minimum Temperature (°F) to be Group 1 Storage Tank | Calculated Vapor Pressure (psi) at Minimum Temperature to be Group 1 Storage Tank |
|---|---|---|---|---|---|---|---|
| 1700-21.1 (1700-63) | Crude Storage Tank No. 1 | 50,000 | 41 | 1.62 | 1 | 17 | 0.77 |
| 1700-21.2 (1700-63) | Crude Storage Tank No. 2 | 22,000 | 41 | 1.62 | 2 | 47 | 1.92 |
| 1700-21.3 (1700-63) | Crude Storage Tank No. 3 | 25,750 | 41 | 1.62 | 2 | 47 | 1.92 |
| 1700-21A | 2 MM Pound CD Storage Tank | 279,700 | 7 | 0.54 | 2 | 17 | 0.77 |

The 2008 polymers and resins compliance manual **(Appendix R)** lists emission points 1700-63.1 and 1700-63.2 as CD Solution Tanks with volumes of less than 19,815 gallons and emission points 1700-63.3 and 1700-63.4 as recovered CD tanks with volumes of less than 19,815 gallons. If these tanks were repurposed from crude storage tanks, different volumes are reported for the tanks.

*Surge Vessels*

DPE relies on DuPont's regulatory analysis for surge control vessels. 40 CFR § 63.481 states that existing sources should be in compliance by June 19, 2001. 40 CFR § 63.502 (a) requires that facilities comply with the provisions of 40 CFR Part 63 Subpart H. Surge control vessels are listed under 40 CFR Part 63 Subpart H, 40 CFR § 63.170. CFR § 63.502(a) also allows facilities with surge control vessels that require control under 40 CFR § 63.170 (Subpart H) to choose to comply with the Group 1 storage vessel provisions in 40 CFR § 63.484.

In the November 2001 polymers and resins I NOCS **(Appendix F)** and the 2008 polymers and resins I compliance manual **(Appendix R)**, DuPont identified that the vent stream from the surge vessel, refined CD tank, associated with the CD refining column either would be required to either route back to the process through a closed vent system, or route to a control device, or to comply with floating roof control requirements to meet regulatory standards. DuPont chose to

---

[1] NIST Chemistry Webbook, 2-chloro-1,3-butadiene.                                          Accessed August 10,
2016.

route the refined CD tank vent stream back to the uncontrolled crude CD tanks, which then vent to the atmosphere. DuPont states that this is routing the vent stream back to the process, because instead of using nitrogen to vapor-balance the crude CD tanks, the refined CD vapors would provide the vapor balance and no additional emissions of chloroprene would be released from the crude CD tanks. No engineering calculations, modeling, or testing were included to support these statements.

*Wastewater*

DPE relies on DuPont's engineering analysis of the wastewater streams from the condensers in the neoprene process, contained in the 2008 polymers and resins compliance manual (Appendix R). The engineering analysis states that chloroprene concentrations in wastewater could not exceed 1,000 ppm based on its solubility. Neither DuPont nor DPE conducted sampling to verify this engineering analysis.

**40 CFR Part 63 Subpart EEE – Hazardous Waste Combustor MACT**

DPE operates a hydrochloric acid production furnace (HAPF), which generates hydrochloric acid by incinerating chlorinated organic hazardous waste derived from on-site processes. The HAPF system consists of two parallel combustion chambers, a series of absorbers to recover HCl, and a DynaWave scrubber as a final air pollution control device. The HAPF is subject to the Hazardous Waste Combustor MACT emission standards for existing hydrochloric acid production furnaces that burn hazardous waste at facilities that are major sources of hazardous air pollutants.

The Hazardous Waste Combustor MACT requires DPE to meet emission standards for various pollutants, as shown in **Table 6**:

Table 6. HAZARDOUS WASTE COMBUSTOR MACT EMISSION STANDARDS
Denka Performance Elastomer LLC
La Place, Louisiana

| Pollutant | Emission Standard | Regulatory Citation |
|---|---|---|
| Dioxins and furans | Compliance with the CO and HC emission standards | 40 CFR § 63.1218(a)(1) |
| Mercury | Compliance with the HCl/Cl₂ emission standard | 40 CFR § 63.1218(a)(2) |
| Semivolatile metals | Compliance with the HCl/Cl₂ emission standard | 40 CFR § 63.1218(a)(3) |
| Low volatile metals | Compliance with the HCl/Cl₂ emission standard | 40 CFR § 63.1218(a)(4) |
| Hydrogen chloride and chlorine (HCl/Cl₂) | 150 ppmv dry or 99.923% system removal efficiency (SRE) | 40 CFR § 63.1218(a)(6) |
| Particulate matter (PM) | Compliance with the HCl/Cl₂ emission standard | 40 CFR § 63.1218(a)(7) |
| Carbon monoxide (CO) | 100 ppmv | 40 CFR § 63.1218(a)(5)(i) |
| Hydrocarbons (HC) | 10 ppmv | 40 CFR § 63.1218(a)(5)(ii) |

**Table 6. HAZARDOUS WASTE COMBUSTOR MACT EMISSION STANDARDS**
Denka Performance Elastomer LLC
La Place, Louisiana

| Pollutant | Emission Standard | Regulatory Citation |
|---|---|---|
| Destruction and removal efficiency (DRE) | 99.99% | 40 CFR § 63.1218(c)(1) |
| Maximum combustion system pressure | Maintain below 0 in. (inch) water column | 40 CFR § 63.1209(p) |

To demonstrate compliance with the emission standards, DPE was required to conduct an initial comprehensive performance test (CPT) within 6 months after the compliance date of the regulation (commenced on May 12, 2010) (**Appendix W**), and a subsequent CPT within 61 months of the commencing the previous CPT (commenced March 24, 2015) (**Appendix X**). During CPTs, DPE is required to determine the minimum or maximum range of specific operating parameters that ensure compliance with the emission standards. These parameters must then be continuously monitored and recorded to ensure continuous compliance with the standards. Limits for carbon monoxide (below 100 ppm on an hourly rolling average [HRA]) and maintenance of combustion chamber pressure below 0 inch of water column (based on instantaneous measurement) can be directly measured and were, therefore, not required to be established during the CPTs. The HAPF is required to be operated with an automatic waste feed cutoff (AWFCO) that immediately and automatically cuts off waste feed when an operating parameter limit (OPL) or emission standard is exceeded. The OPLs established during the CPTs are as follows:

**Table 7. OPERATING PARAMETER LIMITS**
Denka Performance Elastomer LLC
La Place, Louisiana

| Operating Parameter | Applicable Emission Standards | Limit (2010 CPT) | Limit (2015 CPT) | Averaging Period |
|---|---|---|---|---|
| Minimum combustion chamber temperature | HC, DRE | 1,405 °C | 1,405 °C | HRA |
| Maximum total combustion air flow rate | HC, DRE, HCl/$Cl_2$ | 440,840 standard cubic feet per hour (scfh) | 445,000 scfh | HRA |
| Maximum total hazardous waste feed rate | HC, DRE | 3,853 pounds per hour (lb/hr) | 3,853 lb/hr | HRA |
| Minimum atomizing fluid flow rate | HC, DRE | 4,000 scfh | 4,000 scfh | Instantaneous |
| Maximum chlorine feed rate | HCl/$Cl_2$ | 2,030 lb/hr. | 1,752 lb/hr | HRA |
| Minimum DynaWave scrubber pressure drop | HCl/$Cl_2$ | 14 in. w.c. | 9.0 in. w.c. | HRA |
| Minimum DynaWave scrubber liquid pH | HCl/$Cl_2$ | 2.1 | 2.1 | HRA |
| Minimum DynaWave scrubber liquid to gas ratio | HCl/$Cl_2$ | 107 gal/thousand | 113 gal/Mscf | HRA |

**Table 7. OPERATING PARAMETER LIMITS**
Denka Performance Elastomer LLC
La Place, Louisiana

| Operating Parameter | Applicable Emission Standards | Limit (2010 CPT) | Limit (2015 CPT) | Averaging Period |
|---|---|---|---|---|
| | | standard cubic feet (Mscf) | | |

NEIC received continuous parameter monitoring data on a minute-by-minute basis for the previous 3 years of HAPF operation, which includes data from January 1, 2013, to June 2, 2016. The data for each parameter was analyzed by calculating an HRA each minute (or instantaneous measurements for appropriate parameters) and comparing the result to the emission standard or OPL established during the relevant performance test. The emission standards only apply when hazardous waste is in the combustion chamber and are also not applicable during startup, shutdown, or malfunction (SSM). If an exceedance or excursion was observed in the data, the hazardous waste feed rate was observed to determine if hazardous waste was being fed into the combustion chamber at the time of the exceedance. Any observed exceedances were also compared against dates and times that were reported by DPE as SSM events in the required semiannual reports. Additionally, as described in 40 CFR § 63.1209, for intermittent operations, when data is missing or when the source is not operating (i.e., when hazardous waste is not being fed into the combustion chamber), the time periods must be ignored for the purposes of calculating rolling averages. When the HAPF began operating again or any missing data became available again, the first one-minute value was added to the previous 59 valid data values to calculate the HRA.

**Emission Calculations**

Title V permits for the chloroprene and neoprene process require annual emission calculations. DPE keeps emission calculations for the different process areas. NEIC requested copies of these emission calculations for the chloroprene and neoprene processes for calendar years 2013, 2014, and 2015 (**Appendices T, U, and V**). DPE performed emission calculations from the point in time when it purchased the facility (November 2015) through the end of 2015 (**Appendix V**). DuPont performed the emission calculations for 2013, 2014, and part of 2015 (January through October 31, 2015).

DPE used DuPont's emission estimation methodology for its emission reports. NEIC reviewed emission calculations for the following points: CD vent condenser, chloroprene fugitive emissions, neoprene poly kettles, neoprene strippers, neoprene dryers, and neoprene fugitive emissions.



## On-Site Laboratory Evaluation

Part of the DPE neoprene area is an on-site laboratory used for performing various quality control checks of its product process steps. EPA personnel observed product quality sampling points in the polymerization unit and the plant analytical laboratory on June 8, 2016, and focused primarily on CD analysis. Inspection team members Richard Helmich and Sarah Frey were escorted by Dennis McCrea, Patrick Walsh, and Jack Hine to the on-site laboratory.

An initial discussion was held in the polymerization unit control room.

Denka Performance Elastomer LLC



In the laboratory, the laboratory manager provided a brief overview of the laboratory, and stated that the laboratory is ISO 9001 certified. Overall, the laboratory was well kept, and no immediate safety hazards were observed. All personnel were wearing proper attire and safety equipment.







## Wastewater Sampling

On June 10, 2016, NEIC inspectors collected wastewater samples at select wastewater locations in the neoprene process. These are locations where wastewater drains into open trenches prior to treatment at the wastewater treatment plant. Neither DPE nor DuPont previously sampled these locations to determine chloroprene concentrations for compliance with the wastewater provisions in the Polymers and Resins I MACT. NEIC inspector Doreen Au collected grab samples into 40 mL volatile organic analysis (VOA) vials. Samples were placed on ice before they were shipped in locked coolers via UPS to the NEIC laboratory for analysis. Wastewater sample locations are shown in in **Figure 1**; sample results are provided in **Table 8**. The complete NEIC laboratory report can be found in **Appendix Y**. The analytical results for these grab samples indicate they are Group 2 wastewater streams. NEIC did not have enough sample jars to collect any additional samples; for example, NEIC did not evaluate the chloroprene content of the aqueous phase of the RCD decanter.

**Table 8. NEIC CHLOROPRENE ANALYSIS SUMMARY**
Denka Performance Elastomer LLC
La Place, Louisiana

| Location Description | micrograms per liter (ug/L) | part per million by weight (ppmw) |
|---|---|---|
| Stripper #1 Condenser | 239,700 | 239.7 |
| | 205,200 | 205.2 |
| | 220,000 | 220.0 |
| Centrifugal Separator Pot Receiver Flow | 3,680 | 3.68 |
| | 4,500 | 4.5 |
| | 4,428 | 4.4 |

Denka Performance Elastomer LLC

Table 8. NEIC CHLOROPRENE ANALYSIS SUMMARY
Denka Performance Elastomer LLC
La Place, Louisiana

| Location Description | micrograms per liter (ug/L) | part per million by weight (ppm=) |
|---|---|---|
| Stripper #3 Water Condenser | 244,100 | 244.1 |
| | 319,000 | 319.0 |
| | 239,200 | 239.2 |
| #1 Precondenser Runoff | 86,400 | 86.4 |
| | 90,760 | 90.8 |
| | 93,420 | 93.4 |
| | 96,240 | 96.2 |
| | 95,750 | 95.8 |
| #3 Precondenser Runoff | 103,000 | 103.0 |
| | 110,500 | 110.5 |



Denka Performance Elastomer LLC
La Place, Louisiana

# SUMMARY OF FINDINGS

Observations made by NEIC during the DPE focused CAA investigation are summarized in the following table. These observations are linked to specific supporting documents that can be found in individual appendices to this table. These observations are categorized as areas of noncompliance (AON) and as areas of concern (AOC), areas of concern are inspection observations of problems or activities that could impact the environment or result in future or current noncompliance, and/or are areas associated with pollution prevention.

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | **CLEAN AIR ACT** | | |
| | **POTENTIAL AREAS OF NONCOMPLIANCE** | | |
| 1 | **40 CFR Part 63 Subpart G** | Since November 1, 2015, DPE did not meet the monitoring, recordkeeping, and reporting requirements required by 40 CFR § 63.117(a)(7) for the CD vent condenser. | Appendix D - HON Notification of Compliance Status |
| | **40 CFR § 63.119(a)** Each owner or operator subject to the control provisions for Group 1 process vents with a TRE index value less than 1.0 but greater than or equal to 4.0 in §63.113(d) shall: (1) Keep an up-to-date, readily accessible record of the data specified in paragraphs (a)(4) through (a)(8) of this section, as applicable: | From at least 1997 through October 31, 2015, DuPont did not did not meet the monitoring, recordkeeping and reporting requirements required by 40 CFR § 63.117(a)(7) for the CD vent condenser. | Appendix E - Chloroprene and Neoprene Title V Permits |
| | (7) Record and report the following when achieving and maintaining a TRE index value greater than 1.0 but less than 4 as specified in §63.113(d)(3) or §63.113(a) of this subpart. (i) The parameter monitoring values for absorbers, condensers, or carbon adsorbers, as specified in table 4 of this subpart, and averaged over the same time period of the measurement of the vent stream flow rate and concentration used in the TRE determination (both measured while the vent stream is normally routed and constituted). | Both DuPont and DPE monitored the outlet temperature of the brine from the condenser rather than the outlet temperature of the product as required. No alternatives to this requirement were requested in the 1997 NOCS. Alternatives can be requested per 40 CFR § 63.151(c). NEIC requested DPE provide a copy of any alternative requests submitted for regulatory purposes. DPE did not provide any alternative requests submitted to the Administrator for this requirement. | |
| | *Table 4 to Subpart G of Part 63 – Process Vents – Monitoring, Recordkeeping, and Reporting Requirements for Maintaining a TRE Index Value > 1.0 and < = 4.0* | Although included in the Title V permit, the state does not have the approval to grant any per alternatives to monitoring per 40 CFR § 63.155 (c). The authorities that current the requirements and permitting provisions, as well as monitoring, are not delegated to State, local, or Tribal agency are as specified in paragraphs (c)(1) through (9) of this section. (3). Approval of major alternatives to monitoring under § 63.8(f), as defined in § 64.90, and as required in this subpart. | |
| | | As referenced by Table 3 to Subpart G of Part 63 – General Provisions Applicability to Subparts F, G, and H to Subpart; per 40 CFR § 63.8(f), Use of an alternative monitoring method. (1) General... Until permission to use and alternative monitoring procedure (minor, intermediate, or major changes; see definition in §63.90(a)) has been granted by the Administrator under this paragraph (f)(1), the owner or operator of an affected source remains subject to the requirements of this section and the relevant standard. | |

Denka Performance Elastomer LLC
La Place, Louisiana

| # | Regulatory Citation | | Findings/Observations | Supporting Evidence |
|---|---|---|---|---|
| | **Final recovery device** | **Parameters to be monitored** | | |
| | | **Recordkeeping and reporting requirements for monitored parameters** | | |
| | Condenser: Exit (product side) temperature [63.1140(b)(2)] | 1. Continuous records. 2. Record and report the exit temperature averaged over the full period of the TRE determination. 3. Record the daily average exit temperature for each operating day. 4. Report all daily average exit temperatures that are outside the range established in the NCS or operating permit; PR. | A major change to monitoring means: 40 CFR §63.90, means a modification to federally required monitoring that uses "improved technology or procedures"... Examples of major changes to monitoring include, but are not limited to: (1) Use of a new monitoring approach developed to apply to a control technology not contemplated in the applicable regulation. Monitoring the outlet temperature of the brine rather than monitoring the exit temperature of the product is a new monitoring approach that was not contemplated in the applicable regulation. | |
| 2 | 40 CFR Part 63 Subpart H 40 CFR §63.162 Standards: General... (e) Each piece of equipment in a process unit to which this subpart applies shall be identified such that it can be distinguished readily from equipment that is not subject to this subpart. | | Approximately 10,000 regulated components were not identified or monitored prior to DPE's purchase of the facility from DuPont. NEIC received copies of DPE's LeakDAS® data tables for February 2013–December 2015 (archived) and November 2014–June 2016 (current), and reviewed the information for DPE's compliance with 40 CFR Part 63 Subpart H requirements. A transition to a new tagging system of components in the LDAR program occurred during the overlapped time of the archived and current databases. Component inventories were tabulated for active components in each set of data tables. Comparison of active component inventories between the archived and current data tables | |

Denka Performance Elastomer LLC
LaPlace, Louisiana

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| 3 | 40 CFR § 63.168 Standards: Valves in gas/vapor service and in light liquid service.... (i)(1) When a leak is detected, it shall be repaired as soon as practicable, but no later than 15 calendar days after the leak is detected. | shows active component inventories of 21,659 (archived) and 32,501 (current), which is an increase of 10,842 active components in the current data tables. DPE representatives Patrick Walsh and Doug Melancon both stated during two separate interviews that, within the last several years, they discovered approximately 10,000 regulated components that had never been identified or monitored. Neither DuPont nor DPE self-disclosed this compliance issue to LDEQ or EPA. **DPE failed to repair, or place on delay of repair, one leaking valve within 15 in-service calendar days.** | Appendix L – Late Final Repair Attempt Component Data |
| 4 | 40 CFR § 63.168 Standards: Valves in gas/vapor service and in light liquid service.... (i)(2). A first attempt at repair shall be made no later than 5 calendar days after each leak is detected. | Based on information in the facility's LDAR recordkeeping database, DPE failed to perform a first attempt at repair of one valve within the required timeframe, between February 2013 and June 2016. **DPE failed to complete a first attempt at repair of one leaking valve within 5 in-service calendar days.** | Appendix M – Late First Attempt at Repair Component Data |
| 5 | 40 CFR § 63.167 Standards: Open-ended valves or lines. (a) (1) Each open-ended valve or line shall be equipped with a cap, blind flange, plug, or a second valve, except as provided in § 63.162(b) of this subpart and paragraphs (d) and (e) of this section. | **DPE does not equip each open-ended valve or line with a cap, blind flange, plug, or a second closed valve.** DPE representatives stated that the fluid in the process lines would automatically polymerize and, therefore, they are exempt from the requirements of 40 CFR § 63.167(a)(1). DPE has not provided EPA with any documentation showing which chemicals in which specific lines meet the exemption. NEIC inspectors observed throughout the plant open-ended lines on piping that was labeled as containing toluene. NEIC inspectors also observed some plugs, second closed valves, and blind flanges on a few open-ended lines, but many other open-ended lines in the same chemical service without them. A majority of the valve leaks (fugitive emissions) were observed to be coming from the unequipped open-ended lines. NEIC inspectors identified a total of 31 valve leaks, of which 16 were observed to be coming from the unequipped open-ended line. | Field observations/notes |
| 6 | 40 CFR Part 63 Subpart U 40 CFR §63.488(a)...(2) The annual uncontrolled organic HAP or TOC emissions and annual average batch vent flow rate shall be determined at the exit from the batch unit operation. For the purposes of | **DPE did not determine the group status of the batch poly kettles at the appropriate location.** | Appendix C – Neoprene Process Diagram |

NBKOVP2I68.01

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | these determinations, the primary condenser operating as a reflux condenser on a reactor... shall be considered part of the batch unit operation. All other devices that recover or oxidize organic HAP or TOC vapors shall be considered control devices as defined in §63.482. | This common condenser does not reflux any material back to any kettle and, therefore, is not part of the batch unit. The appropriate location to determine the group status for each poly kettle is prior to the shared condenser. | Appendix R – 2008 Polymers and Resins I Compliance Manual |
| 7 | 40 CFR § 63.483 Front-end refers to the unit operations in an EPPU prior to, and including, the stripping operations. For all gas-phased reaction processes, all unit operations are considered to be front-end.<br><br>40 CFR § 63.483 Group 1 batch front-end process vent means a batch front-end process vent releasing annual organic HAP emissions greater than or equal to 1,800 kg/yr and with a cutoff flow rate, calculated in accordance with §63.488(f) greater than or equal to the annual average batch flow rate. Annual organic HAP emissions and annual average batch vent flow rate are determined at the exit of the batch unit operation, as described in §63.489(a)(2). Annual organic HAP emissions are determined as specified in §63.488(b), and annual average batch vent flow rate is determined as specified in §63.489(b).<br><br>40 CFR § 63.482 Aggregate batch vent stream means a gaseous emission stream containing only the exhausts from two or more batch front-end process vents that are ducted, hard-piped, or otherwise connected together for a continuous flow. | The five batch poly kettles at DPE have been based on data provided by DPE, and Group 2 as previously determined, when performing the group determination at the appropriate location.<br><br>The calculation in the 2009 Polymer and Resin I compliance manual (p. 25), indicates that the highest chloroprene-emitting process step occurs during the emulsification of the reactants. Chloroprene is also released during other process steps. The chloroprene inlet rate into the condensing system was calculated as 0.113446 pounds chloroprene per cubic foot ($ft^3$) of total vapor (p. 26). The average displacement charging rate was 32.4 $ft^3$/minute (min) (p. 16). The length of emulsification was identified as 31.6 minutes (p. 25).<br><br>For each charge in the emulsification step, the total mass of chloroprene into the condenser was:<br><br>0.113446 lbs CB/$ft^3$ × 32.4 $ft^3$/min × 31.6 minutes = 116 pounds per charge (52.6 kg/charge).<br><br>To exceed the 26,000-pound-per-year threshold to become a Group I batch front-end process vent, each poly kettle would have to be charged: | Appendix R – 2008 Polymers and Resins I Compliance Manual<br><br>Appendix V – 2015 Emission Calculations |

NEICWH18650M

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000028

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | 40 CFR § 63.487...(i) Aggregate batch vent streams. The owner or operator of an aggregate batch vent stream that contains one or more Group 1 batch/front-end process vents shall comply with the requirements of either paragraph (h)(1) or (h)(2) of this section. Compliance may be based on either organic HAP or TOC. <br><br> (2) For each aggregate batch vent stream, reduce organic HAP emissions by 90 weight percent or to a concentration of 20 ppmv, whichever is less stringent, on a continuous basis using a control device. | 26,000 pounds/year = 116 pounds CD/charge = 225 charges <br><br> Using an average displacement rate of 22.40 ft³/min (without nitrogen) instead of the average displacement charge rate of 32.4 ft³/min: <br><br> 0.1133446 lbs CD/ft³ * 22.4 ft³/min * 31.6 min = 80.2 lbs CD/charge (36.4 kg/charge) <br><br> 26,000 pounds/year / 80.2 pounds CD/charge = 325 charges <br><br> According to DuPont's calculations (in 2001), at the permitted production capacity of 90 MM pounds of neoprene, it would produce 5,634 charges per year. <br><br> 1,127 charges for each kettle with a typical mixture of 6176 charges of W-type neoprene and 451 charges of A-type neoprene. | |
| | 40 CFR § 63.489...(e) Aggregate batch front-end process vent procedures for compliance with § 63.487(h)(2). Except as specified in paragraph (f) through (h)(3) of this section, owner or operators of aggregate batch vent streams complying with § 63.487(h)(2) shall conduct a performance test using the performance testing procedures for continuous front-end process vents in §63.116(c). | DPE also provided data showing that the facility manufactured 70,940,758 pounds of neoprene in 2015. <br><br> From 2015 emission inventory calculations, the total charges of all types in 2015 (Jan.-Oct. = 3709, Nov.-Dec =672)² total 4,381 charges/five reactors = 876 charges per reactor. | |
| | 40 CFR § 63.489...(b) Batch front-end and aggregate batch vent stream monitoring equipment. (i) Where a condenser is used, a condenser exit temperature (product side) monitoring device equipped with a continuous recorder is required. | If 876 charges per reactor is greater than either the 225 charges or 325 charges, the minimum amount of charge for each kettle to exceed the 26,000-pound-per-year threshold to be considered a Group 1 batch process vent using enclosed displacement rate. <br><br> An estimate of the cutoff flow rate (CFR) using equation 15 in 40 CFR § 63.488 0: <br><br> CFR = (0.00437)*(AE) − 51.6 <br><br> AE = annual emissions (at exit of batch operation) <br><br> Using emissions from 31.4 ft³/min charge rate: <br><br> CFR = (0.00437)*876 charges (52.6 kg/charge) − 51.6 <br><br> CFR = 149 standard cubic meters per minute (scmm) | |
| | (e) Establishment of parameter monitoring levels. Parameter monitoring levels for batch front-end process vents and aggregate batch vent streams shall be established as specified in paragraphs (e)(1) through (e)(3) of this section. (1) For each parameter monitored under paragraph (b) or (c) of this section a level, defined as either a maximum or minimum operating parameter as denoted in Table 7 of this subpart, that indicates proper operation of the control device. The level shall be established in accordance with the procedures specified in §63.505. | | |

Denka Performance Elastomer LLC<br>La Place, Louisiana

NEIC-VP21IA3201

NEIC-000029

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---------------------|-----------------------|---------------------|
|   | 40 CFR § 63.985... (a) Establishment of parameter monitoring levels. The owner or operator of a control or recovery device that has one or more parameter monitoring level requirements specified under this subpart shall establish a maximum or minimum level for each measured parameter. If a performance test is required by this subpart for a control device, the owner or operator shall use the procedures in either paragraph (b), or (c) of this section to establish the parameter monitoring level(s). | Using as an estimate for the annual average emission flow rate at the exit of the vessel (average displacement charging rate of 12.4 ft³/min (from emulsification step which lasts the longest)) (No measurement data is available):<br><br>12.4 ft³/min * 0.0283 m³/ft³ = 0.92 m³/min (scmm)<br><br>149 scmm > 0.92 scmm<br><br>The cutoff flow rate is greater than the annual average batch flow rate.<br><br>Using emissions from 12.4 ft³/min charging rate:<br><br>CFR = 159 standard cubic meters per minute (scmm)<br><br>Using as an estimate for the annual average emission flow rate at the exit of the vessel (average displacement charging rate of 22.4 ft³/min (from emulsification step which lasts the longest)) (No measurement data is available):<br><br>22.4 ft³/min * 0.0283 m³/ft³ = 0.63 m³/min (scmm)<br><br>139 scmm > 0.63 scmm<br><br>The cutoff flow rate is greater than the annual average batch flow rate.<br><br>Using either displacement rate as listed by DuPont, each poly kettle emits greater than 26,000 pounds (11,600 kilograms (kg)) a year and has a cutoff flow rate greater than the annual average batch flow rate, the kettles meet the definition of a Group 1 batch front-end process vent. This is a conservative estimate only using emissions from the emulsification step of the batch.<br><br>Since the combination of all the poly kettle vents create an aggregate batch vent, DPE should have conducted a performance test, established parameter monitoring levels for the condenser, and continuously monitored the minimum temperature for the condenser. Neither DPE nor DuPont conducted a performance test on the condenser to determine compliance with 40 CFR § 63.987(b) since the process was changed in the 2005/2006 timeframe. Because no performance test was conducted, no parametric monitoring | |

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | | conditions were established and no continuous monitoring was conducted or evaluated against this condition. | |
| 8 | 40 CFR § 63.482 Front-end refers to the unit operations in an EPPU prior to, and including, the stripping operations. For all gas-phased reaction processes, all unit operations are considered to be front-end.

40 CFR § 63.482 Stripping means the removal of organic compounds from a raw elastomer product; in the production of an elastomer, stripping is a discrete step that occurs after the reactor and before the dryers (other than those dryers with a primary purpose of devolatilization) and other finishing operations. Examples of types of stripping include steam stripping, direct volatilization, chemical stripping, and other methods of devolatilization. For the purposes of this subpart, devolatilization that occurs in dryers (other than those dryers with a primary purpose of devolatilization, extruders, and other finishing operations is not stripping.

40 CFR § 63.482 Group 1 batch front-end process vent means a batch front-end process vent releasing annual organic HAP emissions greater than or equal to 11,800 kg/yr and with a cutoff flow rate, calculated in accordance with § 63.488(g)(3) greater than or equal to the annual average batch vent flow rate. Annual organic HAP emissions and annual average batch vent flow rate are determined at the exit of the batch unit operation, as described in § 63.488(g)(2). Annual organic HAP emissions are determined as specified in § 63.488(b), and annual average batch vent flow rate is determined as specified in § 63.488(e).

40 CFR § 63.482 Group 1 continuous front-end process vent means a continuous front-end process vent for which the flow rate is greater than or equal to 0.005 standard cubic feet per minute, the total organic HAP concentration is greater than or equal to 50 parts per million by volume, and the total resource | DPE has not evaluated the vent stream from the second-stage separators associated with each flash cooler to determine group status.

Devolatilization occurs at the flash coolers and associated separators. The flash coolers are a wide spot in the line where the pressure is lowered and any additional unreacted chloroprene is volatilized. This operation is part of the stripping operations, and any vent streams from this process should be evaluated. | Appendix F-November 2001 Polymers and Resins 1 Notification or Compliance Status

Appendix R-Polymers and Resins 1 Compliance Status Manual

Appendix C-Neoprene Process Diagram |

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| 9 | effectiveness index's value, calculated according to §63.115 is less than or equal to 1.0.

40 CFR § 63.494 Basic-end and emission limitations

(a)(4) For neoprene, the organic HAP emission limitation, in units of Mg organic HAP emissions per Mg of neoprene product, shall be calculated by dividing 30 Mg/yr by the mass of neoprene produced in 2007, in Mg.

40 CFR § 63.498 Back-end process provisions— recordkeeping. (a) Each owner or operator shall maintain the records specified in paragraphs (a)(1) through (4), and paragraphs (e) of this section, as appropriate.

(e) If the back-end process operation is subject to an organic HAP emission limitation in §63.494(a)(4), the records specified in paragraphs (e)(1) through (4) of this section.

(1) The applicable organic HAP emission limitation determined in accordance with §63.494(a)(4)(i) through (iv).

(2) The organic HAP emissions from all back-end process operations for each month, along with documentation of all calculations and other information used in the engineering assessment to estimate these emissions.

(3) The mass of elastomer product produced each month.

(4) The total mass of organic HAP emitted for each 12-month period divided by the total mass of elastomer produced during the 12-month period, determined in accordance with §63.495(g)(5). | DPE does not have records supporting why emission factors from the 1990s at other DuPont facilities are relevant to the context of chloroprene in stripped neoprene from its facility.

To determine compliance with the back-end limit in 2015, DPE uses its production rate and emission factors for residual chloroprene and toluene for different neoprene types.

Emission factors for types 1-9 were from samples collected at the Pontchartrain site in 1996, and types 10-15 were from samples collected at the Louisville site in 1992. DPE cannot explain how these factors are relevant to emissions in 2005/2006, yet DuPont and La Place facility changed its polymer stripping operations in 2005/2006.

DPE continue to use these outdated emission factors for 15 of the types of neoprene made on-site.

DPE has analytical results for residual HAP in liquid dispersion products because they are sampled in every lot, per customer demand. However, in its emission calculations, DPE continues to use different emission factors, between 0.002 to 0.03 percent chloroprene, instead of the analytical averages of 0.009 to 0.049 percent. DPE did not provide NEIC information on the source of the emission factors for the liquid dispersion products.

Without current and accurate residual chloroprene content for the neoprene made on-site using the current plant set-up, there is no data to confirm DPE's compliance with back-end emission limitations in the La Place facility. | Appendices T, U, and V - 2013, 2014, and 2015, Neoprene Emission Calculations

Appendix S- 2015 Emission Factors for Neoprene Products |

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| 10 | 40 CFR § 63.484 Storage vessel provisions.<br><br>(a) This section applies to each storage vessel that is assigned to an affected source, as determined by §63.480(d). Except for those storage vessels exempted by paragraph (b) of this section, the owner or operator of affected sources shall comply with the requirements of §§63.119 through 63.123 and 63.148, with the differences noted in paragraphs (c) through (e) of this section, for the purposes of this subpart.<br><br>(d) When the term "Group I storage vessel" is used in §§63.119 through 63.123, the definition of this term in §63.482 shall apply for the purpose of this subpart.<br><br>40 CFR § 63.482 Group 1 storage vessel means a storage vessel at an existing affected source that meets the applicability criteria specified in Table 3 of this subpart, or a storage vessel at a new affected source that meets the applicability criteria specified in Table 4 of this subpart.<br><br>Table 3 to Subpart U of Part 63–Group 1 Storage Vessels at Existing Affected Sources<br><br>| Vessel capacity (cubic meters) | Vapor pressure* (kilopascals) |<br>|---|---|<br>| 75 ≤ capacity <151 | ≥ 13.1 |<br>| 151 ≤ capacity | ≥ 5.2 |<br><br>* Maximum true vapor pressure of total organic HAP at storage temperature. | DPE's crude chloroprene storage tank T (emission point 1706-21) (1700-63) is a Group 1 storage tank based on the temperature of the vapor provided in the 2013 neoprene emission inventory calculations, and it requires additional controls.<br><br>DPE relies on DuPont's storage vessel regulatory determinations. In the November 2001 notification of compliance status, crude storage tank T is identified as having a capacity of 50,000 gallons (1893.4 cubic meters) with a vapor pressure of 0.7 psi (4.83 kPa).<br><br>This tank is not listed as a storage vessel in the 2008 polymers and resins compliance manual.<br><br>However, this tank is listed as a source to the common header 1700-63 in the 2013 neoprene emission inventory calculations. The 2013 emission inventory calculation states that the temperature of the vapor is 5 °C (41 °F). The calculated vapor pressure using the Antoine equation for 41 °F is 1.62 psi (11.17 kPa). This tank does not appear in the 2014 or 2015 emission inventory calculations.<br><br>Based on the size of the crude storage tank, 1,893.4 cubic meters with a vapor pressure of 11.17 kPa, the tank is a Group 1 storage tank that requires additional controls. | Appendix Z – Chloroprene Vapor Pressure Curve<br><br>Appendix F – November 2001 Polymers and Resins I Notification of Compliance Status<br><br>Appendix R – 2008 Polymers and Resins I Compliance Manual<br><br>Appendices T, U, and V – 2013, 2014, and 2015 Neoprene Emission Calculations |
| 11 | 40 CFR § 63.502 Equipment leaks and heat exchange system provisions.<br><br>(a) Equipment leak provisions. The owner or operator of each affected source, shall comply with the requirements of subpart H of this part....Storage control vessels required to be controlled by subpart H | DPE is routing vent streams from a surge control vessel to uncontrolled storage tanks that vent to the atmosphere.<br><br>In the polymers and resins I compliance manual, DuPont identified that that vent stream from the surge vessel, refined CD tank, associated with the CD refining column, either would be required to route back to the process through a closed vent system, or to route to a control device, or to comply with floating roof control requirements. DuPont close to | Appendix F – November 2001 Polymers and Resins I Notification of Compliance Status |

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000033

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | nay, alternatively, comply with the Group 1 storage vessel provisions specified in §63.484.<br><br>**40 CFR § 63.170 Standards: Surge control vessels and bottoms receivers.**<br><br>*Each surge control vessel or bottoms receiver that is not routed back to the process and that meets the conditions specified in table 2 or table 3 of this subpart shall be equipped with a closed-vent system that routes the organic vapors vented from the surge control vessel or bottoms receiver back to the process or to a control device that complies with the requirements in §63.172 of this subpart, except as provided in §63.162(b) of this subpart, or comply with the requirements of §63.119(b) or (c) of subpart G of this part.* | route the refined CD tank vent stream back to the process via the uncontrolled crude CD tanks, which then vent to the atmosphere.<br><br>In the polymers and resins compliance manual, DuPont stated that this is routing the vent stream back to the process because instead of using nitrogen to vapor-balance the crude CD tanks, the refined CD vapors would provide the vapor balance and no additional emissions of chloroprene would be released from the crude CD tanks. No engineering calculations, modeling, or testing were included to support these statements. | Appendix R – 2008 Polymers and Resins 1 Compliance Manual. |
| 12 | **40 CFR Part 63 Subpart EEE**<br>**40 CFR § 63.1216. (a) Emission limits for existing sources.** *You must not discharge or cause combustion gases to be emitted to the atmosphere that contain:*<br><br>*(1) For dioxins and furans either carbon monoxide or hydrocarbon emissions in excess of the limits provided by paragraph (a)(5) of this section:*<br><br>*(5) For carbon monoxide and hydrocarbons either:*<br>*(i) Carbon monoxide in excess of 100 ppm per million by volume, over an hourly rolling average...*<br><br>**40 CFR § 63.1209... (k) Dioxins and furans.** *You must comply with the dioxin and furan emission standard by establishing and complying with the following operating parameter limits.*<br><br>*(2) Minimum combustion chamber temperature. You must measure the temperature of each combustion chamber.* | While operating the HAPF, DuPont and DPE failed to meet the emissions standards for dioxins and furans and carbon monoxide.<br><br>As described previously in "On-site Inspection Summary," NEIC evaluated continuous monitoring data from the operation of the HAPF. Compliance with the CO emission limit of 100 ppm on an hourly rolling average is one requirement for compliance with the HAPF emission standards for dioxins and furans. Conversely, DuPont's failure to operate the HAPF in compliance with the CO emission limit also constitutes failure to meet the dioxin and furan emission standards.<br><br>Additionally, surrogate parameters (OPLs) established during the CPTS that must be monitored to ensure compliance with the dioxin and furan emission limit are minimum combustion chamber temperature, maximum flue gas flow rate, and maximum hazardous waste feedrate. DPE failed to meet the OPLs listed below.<br><br>DPE acquired the facility from DuPont in November 2015.<br><br>Carbon monoxide<br><br>DPE maintains four district CO monitors on its HAPF stack. In its evaluation, NEIC only included CO exceedances that showed greater than 100 ppm from all four monitors tuning the same time period. Prior to DPE's acquisition of the facility, DuPont emitted gases | Appendix AA – Carbon Monoxide Analysis<br><br>Appendix BB – Parameter Exceedances Data Analysis<br><br>Appendix CC – Hazardous Waste Combustor Periodic Reports<br><br>Appendix W – 2010 Hazardous Waste Comprehensive Performance Test<br><br>Appendix X – 2015 Hazardous Waste |

NEICVP1216(8)

Page 34 of 52

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | (ii) You must establish a minimum hourly rolling average limit. | contained greater than 100 ppm CO while hazardous waste was being fed into one of the combustion chambers for the following number of hourly rolling averages: | Comprehensive Performance Test |
| | (3) Maximum flue gas flowrate or production rate. | | |
| | (4) As an indicator of gas residence time in the control device, you must establish and comply with a limit on the maximum flue gas flowrate... | **Number of HRA exceedances for CO by semiannual period** | |

| | 1/1/13 – 6/30/13 | 13 |
|---|---|---|
| | 7/1/13 – 12/31/13 | 0 |
| | 1/1/14 – 6/30/14 | 39 |
| | 7/1/14 – 12/31/14 | 110 |
| | 1/1/15 – 6/30/15 | 743 |
| | 7/1/15 – 12/31/15 | 0 |
| | 1/1/16 – 6/30/16 | 0 |
| | Total | 905 |

(i) You must comply with this limit on a hourly rolling average basis;

Maximum combustion chamber temperature 1,605°C.

DPE continuously measures the combustion chamber temperature independently for each of the two combustion chambers. The following number of HRA temperature exceedances were observed while hazardous waste was being fed into the corresponding combustion chamber.

**Number of HRA exceedances for combustion chamber temperature by semiannual period**

| Semiannual period | Combustion Chamber 1 | Combustion Chamber 2 |
|---|---|---|
| 1/1/13 – 6/30/13 | 0 | 12,325 |
| 7/1/13 – 12/31/13 | 3,492 | 46,771 |
| 1/1/14 – 6/30/14 | 58,480 | 10,514 |
| 7/1/14 – 12/31/14 | 63,152 | 12,502 |
| 1/1/15 – 6/30/15 | 60,488 | 39,552 |
| 7/1/15 – 12/31/15 | 47,651 | 2,407 |
| 1/1/16 – 6/30/16 | 10,012 | 24,231 |
| Total | 243,275 | 148,282 |

(4) Maximum hazardous waste feedrate. (i) You must establish limits on the maximum... hazardous waste feedrate (for each location where waste is fed...

Maximum flue gas flow rate 440,840 scfh (2010 CPT)/445,000 scfh (2015 CPT)

(iii) You must comply with the feedrate limit(s) on a hourly rolling average basis;

DPE continuously monitors the combustion air flow rate in each of the combustion chambers and then adds them together to calculate the total flue gas flow rate. The

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| 13 | 40 CFR § 63.1218...(c) Destruction and removal efficiency (DRE) standard – (1) 99.99% DRE. *To remain in compliance with the (DRE) standard, you must establish operating limits...for the following parameters...and comply with those limits at all times that hazardous waste remains in the combustion chamber.* <br> (1) *Minimum combustion chamber temperature.* <br> (ii) *You must measure the temperature of each combustion chamber.* <br> (iii) *You must establish the temperature of each combustion chamber...as a minimum hourly rolling average limit.* <br> (2) *Maximum flue gas flowrate or production rate.* <br> (i) *As an indicator of residence time in the control device, you must establish and comply with a limit on the maximum flue gas flowrate...* <br> (ii) *You must comply with this limit on an hourly rolling average basis.* <br> (3) *Maximum hazardous waste feedrate.* <br> (i) *You must establish limits on the maximum hazardous waste feedrate for each location where hazardous waste is fed.* <br> (iii) *You must comply with the feed rate limits on an hourly rolling average basis.* | No exceedances of the hazardous waste feed rate were observed for either combustion chamber during the three years analyzed by NEIC. <br><br> Number of HRA exceedances for flue gas flowrate by semiannual period <br><br><table><tr><td>1/1/13 – 6/30/13</td><td>0</td></tr><tr><td>7/1/13 – 12/31/13</td><td>0</td></tr><tr><td>7/1/14 – 6/30/14</td><td>0</td></tr><tr><td>7/1/14 – 12/31/14</td><td>0</td></tr><tr><td>7/1/15 – 6/30/15</td><td>653</td></tr><tr><td>7/1/15 – 12/31/15</td><td>0</td></tr><tr><td>1/1/16 – 6/30/16</td><td>0</td></tr><tr><td>Total</td><td>653</td></tr></table><br> Following number of HRA flue gas flow rate exceedances were observed while hazardous waste was being fed into either of the combustion chambers: <br><br> DuPont and DPE failed to maintain a DRE above 99.99% at all times hazardous waste was being fed into the combustion chambers: <br><br> Some of the parameters (minimum combustion chamber temperature and minimum flue gas flow rate) that are established to maintain continuous compliance with the DRE standard are the same parameters monitored to ensure compliance with the dioxins and furans emission standard. See AON 12 for the number of exceedances for each of those parameters. <br><br> DPE acquired the facility from DuPont in November 2015. <br><br> Operation of waste firing system <br><br> DPE has established a minimum atomization flowrate of 4,000 standard cubic feet per hour (scfh) on an instantaneous basis to show proper operation of the waste firing system. The number of exceedances due to failure to maintain the minimum atomization flow rate while hazardous waste was being fed into the combustion chamber are tabulated below: | Appendix BB – Exceedances Data Analysis <br><br> Appendix CC – Hazardous Waste Combustion Periodic Reports <br><br> Appendix W – 2010 Hazardous Waste Comprehensive Performance Test <br><br> Appendix X – 2015 Hazardous Waste Comprehensive Performance Test |

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | | Number of instantaneous (1-minute) atomization flow rate exceedances by semiannual period | |

| Semiannual Period | Combustion Chamber 1 | Combustion Chamber 2 |
|---|---|---|
| 1/1/13 – 6/30/13 | 257 | 127,686 |
| 7/1/13 – 12/31/13 | 83 | 46,683 |
| 1/1/14 – 6/30/14 | 671 | 10,738 |
| 7/1/14 – 12/31/14 | 137 | 11,076 |
| 1/1/15 – 6/30/15 | 535 | 36,765 |
| 7/1/15 – 12/31/15 | 449 | 2,998 |
| 1/1/16 – 6/30/16 | 274 | 25,904 |
| **Total** | 2,174 | 261,850 |

Supporting Evidence: Appendix BB – Parameter Exceedances Data Analysis

---

**14** 40 CFR § 63.1218...(a) Emission limits for existing sources. You must not discharge or cause combustion gases to be emitted to the atmosphere that contain:

(6) For hydrogen chloride and chlorine gas....

(i) Emission in excess of 130 parts per million by volume.

DuPont and DPE failed to comply with the emission standards for hydrogen chloride and chlorine gas at all times hazardous waste was being fed into the combustion chambers.

The maximum flue gas flow rate requirement is an overlapping requirement for both the DRE and dioxin and furan emission standards. See AON 12 for the exceedances related to the maximum flue gas flow rate.

Supporting Evidence: Appendix CC – Hazardous Waste Combustor Periodic Reports

40 CFR § 1209...(o) Hydrogen chloride and chlorine gas. You must comply with the hydrogen chloride and chlorine gas emission standard by establishing and complying with the following operating parameter limits:

(1) Feedrate of total chlorine and chloride.

(2) Maximum flue gas flowrate or production rate.

(3) Wet Scrubber. If your combustor is equipped with a wet scrubber:

(i) If your source is equipped with a high energy wet scrubber... you must establish a limit on minimum pressure drop across the wet scrubber on an hourly rolling average.

DPE operates a DynaWave scrubber as the final control device for hydrogen chloride and chlorine gas. DPE acquired the facility from DuPont in November 2015.

The following exceedances for each scrubber parameter were observed while hazardous waste was being fed into one of the combustion chambers:

Supporting Evidence: Appendix W – 2010 Hazardous Waste Comprehensive Performance Test

Number of EURA exceedances for minimum scrubber pressure drop (14 in water column 2010 CPT)? by semiannual period

| Semiannual Period | |
|---|---|
| 1/1/13 – 6/30/13 | 302 |
| 7/1/13 – 12/31/13 | 4,720 |
| 1/1/14 – 6/30/14 | 16,116 |
| 7/1/14 – 12/31/14 | 2,852 |
| 1/1/15 – 6/30/15 | 1,757 |
| 7/1/15 – 12/31/15 | 469 |
| 1/1/16 – 6/30/16 | 7,199 |
| **Total** | 33,415 |

(iv) You must establish a limit on minimum pH on an hourly rolling average.

(v) You must establish limits on either the minimum liquid to gas ratio or the minimum

Number of EURA exceedances for minimum scrubber pressure drop (2015 CPT) in. water column (2015 CPT)? by semiannual period

Supporting Evidence: Appendix X – 2015 Hazardous Waste Comprehensive Performance Test

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000037

NEACVP11368.01

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | | Number of HRA exceedances for minimum pH (≤2.1) by semiannual period | |
| | | scrubber water flowrate and maximum flue gas flowrate on an hourly rolling average. | |
| 15 | 40 CFR § 1206...(c) Operating requirements...(5) Combustion system leaks. (i) Combustion system leaks of hazardous air pollutants must be controlled by:<br><br>(B) Maintaining the maximum combustion zone pressure lower than ambient pressure using an instantaneous monitor.<br><br>40 CFR § 63.1206(c)(5) Maximum combustion chamber pressure. (i) If you comply with the requirement for combustion system leaks under §1206(c)(5) by maintaining the maximum combustion chamber pressure lower than ambient pressure to | | Appendix BB Parameter Exceedances Data Analysis<br><br>Appendix CC Hazardous Waste Combustor Periodic Reports |

| Period | Total |
|---|---|
| 1/1/13 – 6/30/13 | 19 |
| 7/1/13 – 12/31/13 | 530 |
| 1/1/14 – 6/30/14 | 6,146 |
| 7/1/14 – 12/31/14 | 0 |
| 1/1/15 – 6/30/15 | 157 |
| 7/1/15 – 12/31/15 | 0 |
| 1/1/16 – 6/30/16 | 0 |
| **Total** | **6,852** |

Number of HRA exceedances for minimum liquid to gas ratio [(107 gal/thousand standard cubic feet (cscf)) 2018 CPT/1115 gal cscf2015 CPT)] by semiannual period

| Period | Total |
|---|---|
| 1/1/13 – 6/30/13 | 319 |
| 7/1/13 – 12/31/13 | 4,245 |
| 1/1/14 – 6/30/14 | 14,707 |
| 7/1/14 – 12/31/14 | 1,772 |
| 1/1/15 – 6/30/15 | 850 |
| 7/1/15 – 12/31/15 | 348 |
| 1/1/16 – 6/30/16 | 6,848 |
| **Total** | **29,089** |

No exceedances of the chlorine and chloride feed rates were observed during the three years analyzed by NEIC.

While operating the HAFP, DuPont and DPE failed to maintain the combustion chambers under negative pressure while hazardous waste was being fed into the combustion chambers.

As described previously in "On-site Inspection Summary," NEIC evaluated continuous monitoring data from the operation of the HAFP. DPE continuously monitors the combustion chamber pressure, which must be maintained below ambient pressure at all times. Rather than a rolling average, the instantaneous value must be used to trigger the automatic waste feed cutoff. DPE acquired the facility from DuPont in November 2015.

The following number of pressure exceedances were observed while hazardous waste was being fed into the combustion chambers

Deuls Performance Elastomer LLC
La Place, Louisiana

NEIC-000038

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | *prevent combustion system leaks from hazardous waste combustion, you must perform instantaneous monitoring of pressure and the automatic waste feed cutoff system must be engaged when negative pressure is not adequately maintained.* | | |
| 16 | **40 CFR § 1206...(e) Operating Requirements...(3)** *Automatically cuts off the hazardous waste feed when exceedances occur. Upon that compliance date, you must operate the hazardous waste combustor with a functioning system that immediately and automatically cuts off the hazardous waste feed.*<br><br>*(A) When any of the following are exceeded: Operating parameter limits . . . on a emission standard monitored by a CEMS; and the allowable combustion chamber pressure;*<br><br>*(B) When the upon value of any CMS detector, except a CEMS, is met or exceeded;*<br><br>*(C) Upon malfunction of a CMS monitoring an operating parameter limit specified under § 63.1209 or an emission level, or*<br><br>*(D) When any component of the automatic waste feed cutoff system fails.* | DuPont and DPE have failed to operate a functioning AWFCO that immediately and automatically cuts off the hazardous waste feed when exceedances occur.<br><br>As discussed in the AONs 12–15, there are many thousands of instances when monitored parameters or pollutants directly monitored were above or below the established limits. These exceedances are only listed in this report if hazardous waste was being fed into the combustion chamber at the time of the exceedance. Therefore, the AWFCO failed to cut off the hazardous waste feed when the exceedances occurred.<br><br>**Number of instantaneous (1-minute) pressure exceedances by semiannual period**<br><br>| Semiannual period | Combustion Chamber 1 | Combustion Chamber 2 |<br>|---|---|---|<br>| 1/1/13 – 6/30/13 | 2 | 291 |<br>| 7/1/13 – 12/31/13 | 43,217 | |<br>| 1/1/14 – 12/31/14 | 17,303 | 5,546 |<br>| 7/1/14 – 12/31/14 | 9,275 | 1,329 |<br>| 1/1/15 – 6/30/15 | 30,198 | 20,083 |<br>| 7/1/15 – 12/31/15 | 16,408 | 5 |<br>| 7/1/16 – 6/30/16 | 5,853 | 945 |<br>| **Total** | **99,019** | **71,418** | | **Appendix BB –** Parameter Exceedances Data Analysis |
| 17 | **Title V Permits**<br><br>**Neoprene Title V Permit 2249-V8**<br><br>UNO/DNI Neoprene Unit<br><br>Condition 260 [LAC 33:III.919] Submit Emission Inventory [EI]/Annual Emission Statement. Due | DPE used improper emission factors to calculate emissions of chloroprene for 2013–2015. and DuPont used improper emission factors for 2013–2015.<br><br>Poly kettle emissions: The 2013 emission inventory spreadsheet provided by DPE has a tab entitled "K.ettles New." This tab showed excess toluene emissions from sampling data from tests performed on March 18, 2002 and March 18, 2002, each poly kettle had its own individual condenser. | **Appendix E.** Chloroprene & Neoprene Title V Permits<br><br>Appendices T, U, and V – 2013 |

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-0000039

NEICVP1S16IB00

NEICVP12S6E01

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | | shared condenser. Using sampling data from March 2002 does not reflect current emissions. | |
| | annually, by the 30th of April for the period January 1 to December 31 of the previous year unless otherwise directed.

Condition 249 [LAC 33:III.5107.A] Submit annual Emissions Report (TEDI). Due annually, by the 31st of March unless otherwise directed by DEQ to the Office of Environmental Assessment in a format specified by DEQ. Identify the quantity of emissions in the previous calendar year for any toxic air pollutant listed in Table 51.1 or 51.2. | Chloroprene emissions for the poly kettles are improperly calculated. The spreadsheets state that the basis for the calculations is that all of the nitrogen flowing through the new condenser will saturate with chloroprene. In the spreadsheets, in the "Kettles New" tab, it is also stated that the condenser exit temperature is 2 °C. The Title V permit requirement is to ensure the brine temperature is below 5 degrees Centigrade (Condition 192), which would indicate that the exit condenser temperature consistently operates lower than the required brine temperature. These estimates do not account for the actual operating conditions required by the permit. | 2014, and 2015 Emission Calculations

Appendix S – 2015 Emission Factors for Neoprene Products |
| | Condition 248 [LAC 33:III.5107.A.2] Include a . . . certification statement with the annual emission report and revisions to any emission report is the information contained in the . . . emission report is true, accurate, and complete, and that it is signed by a responsible official, as defined in LAC 33:III.502. Include the full name of the responsible official, title, signature, date signature, and phone number of the responsible official. | Stripper emissions: In the spreadsheets, in the "Strippers" tab, it is stated that a new condenser was installed in 2006 to service the three strippers; however, nitrogen flow is based on sampling data from tests performed on March 13, 2002, and March 19, 2002. The spreadsheet also states that the condenser (process gas) exit temperature is -20 °C. The Title V permit requirement is to monitor the common condenser brine inlet temperature to 15 degrees Centigrade (Condition 82). If the minimum inlet temperature of the brine is 15 °C, it is not possible for the process exit gas temperature to consistently be -20 °C.

The emission calculations also do not account for all emissions during the startup and shutdown of the strippers. The strippers do not operate continuously throughout the calendar year, but instead are operated for 2 to 3 days (or for as long as 5 to 7 days) before they are shut down and then restarted. Strippers typically are shut down for product changes or for maintenance.

No calculations from startup and shutdown emissions are located in the spreadsheet, either under the "Strippers" tab or other tabs.

Dryer emissions: In the 2013 emission inventory, tabs "1700-25A" and "1700-25A.C" contain calculations for emissions from the dryers. The tabs reference the "Balance" tab for the emission factors. DPE representatives explained that the chloroprene emission factors (column A.C in the "Balance" tab) were from DuPont and provided notes that the emission factors for types 1-9 were from samples collected at the Pontchartrain site in 1992, and types 10-15 were from samples collected at the Louisville site in 1992.

In the 2014 and 2015 emission inventory, tab "1700-25" state that the basis were from the factors collected for the 1996 Title V. DPE provided NEIC a copy of the 2015 factors in Appendix S and these are the same emission factors used in 2015 and 2014. These are | Appendix EE - DuPont Fugitive Emission Guidance

Appendix DD - DPE August 2016 Email |

NEICXP12169311

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | | also the same emission factors for chloroprene in the "Balance" tab, column A1, as in the 2013 emission inventory. | |
| | | DPE representatives cannot explain how these factors are relevant to emissions from its site. The La Place facility changed its polymer stripping operations in 2005/2006, yet DuPont and DPE continue to use these outdated emission factors for 15 of the types of neoprene made on-site. | |
| | | In addition, for the LD factors, DPE uses chloroprene emission factors that are based on sampling data. For customer needs, DPE samples each lot and less actual analytical results and average chloroprene emission rates. However, in the ERIC calculations for 2013, 2014, and 2015 DPE used emission rates of 0.021 to 0.035 percent instead of the actual average analytical results, which in 2015 were between 0.009 and 0.049. | |
| | | Fugitive emissions: DPE calculated fugitive emissions in the neoprene process for 2013–2015 by multiplying the number of components by a DuPont factor and then dividing the result by 3. | |
| | | The DPE La Place facility is the only neoprene-manufacturing facility in the United States, using emission factors developed for general refinery and chemical plants that may not be representative of the LDAR emissions at the facility. | |
| | | In its August 2016 response to EPA, DPE reported that it is reviewing using other methods to calculate fugitive emissions, including using EPA's correlation equations that use actual monitoring data. | |
| | | Wastewater emissions: For 2013–2015, DPE included no emission calculations for wastewater from the chloroprene process in the emission inventory. In the neoprene | |

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-0000-41

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| 18 | UNF0003 DuPont–Chloroprene Unit<br><br>Condition 452 [LAC:33:III.5107.F] Submit Emission Inventory (EI)/Annual Emission Statement: Due annually, by the 30th of April for the period January 1 to December 31 of the previous year unless otherwise directed.<br><br>Condition 441 [LAC:33:III.5107.A] Submit Annual Emissions Report: Due annually, by the 30th of April unless otherwise directed by DEQ, to the Office of Environmental Services in a format specified by DEQ. Identify the quantity of emissions in the previous calendar year for any toxic air pollutant listed in Table 51.1 or Table 51.3.<br><br>Condition 440 [LAC 33:III.5107.A.2] Include a certification statement with the annual emission report and revisions to any emission report that attest that the information contained in the emission report is true, accurate, and complete, and that it is signed by a responsible official, as defined. LAC 33:III.502.V responsible official, as defined. LAC 33:III.502 signature, date of signature, and phone number of the responsible official. | process, only emissions from wastewater tanks (a diversion tank, 3-95, two aeration tanks, 4-95 and 5-95, and one clarifier, 6-95) are included in the emission inventory. Emissions from open trenches or open wastewater streams do not appear to be included. Some emissions from the wastewater streams in the poly building may be included as part of the emissions from the building wall fans (1700-60), however, time-weighted average data from the building were from the period 1999–2002, prior to process changes.<br><br>For calendar year 2015, DPE used inaccurate emission factors for the CD vent condenser in the chloroprene area. For calendar years 2013–2015, DuPont used these same emission factors.<br><br>**CD vent condenser**<br><br>Calculations DPE provided to EPA indicate that DPE uses 2002 data to calculate emissions. Using test data from 2002 does not accurately represent the emissions of a process that was reconfigured in 2005/2006.<br><br>**Fugitive emissions:** Fugitive emissions in the chloroprene process for 2013–2015 generally were calculated by multiplying the number of components by a DuPont factor and then dividing the results by 3. In addition, for components containing 1,4-DCB, DuPont considered these components superior and divided the DuPont factor by 500.<br><br>As mentioned in AON 17, these factors were developed at other DuPont facilities that do not manufacture neoprene. These facilities also do not manufacture chloroprene so the factors may not be relevant. DPE and DuPont also improperly applied DuPont's guidance and further underreported chloroprene emissions.<br><br>In its August 2016 response to EPA, DPE reported that it is reviewing using other methods to calculate fugitive emissions, including using EPA's correlation equations that use actual monitoring data. | Appendices T, U, and V – 2013, 2014, and 2015 Emission Calculations<br><br>Appendix E – Chloroprene and Neoprene Title V Permits<br><br>Appendix EE – DuPont Fugitive Emission Factor Guidance |
| A | **AREAS OF CONCERN** | NEIC inspectors identified more leaking components than were identified in DPE's and DuPont's February 2016 LDAR report. | Appendix K – DPE February |

| Process Unit | EPA Monitoring Results | | |
|---|---|---|---|
| | Total Leaking | Total Monitored | Percent Leaking |
| Chloroprene | | | |

Delta Performance Elastomer LLC
La Place, Louisiana

NEIC-000042

NEICYP13GB01

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|

**B.**

Findings/Observations:

| | 2016 LDAR Periodic Report | Appendix O – DuPont February 2016 LDAR Periodic Report |
|---|---|---|
| Valves | 30 | 1,555 |
| Connectors | 12 | 1,337 |
| Pumps | 1 | 48 |
| Agitators | 1 | 1 |
| Open ends | * | 1 |
| PRDs | 0 | 234 |
| Neoprene | 0 | 600 |
| Valves | 1 | 1,722 |
| Connectors | 8 | 0 |
| Pumps | 0 | 14 |
| Agitators | 0 | 0 |
| Open ends | 0 | 280 |

1.93
0.36
2.08
*
*
*
0.17
0.46
0
0
*
*

* For any open-ended lines and plugs that were monitored and leaking above 500 ppm, the leak was attributed to the adjacent valve.

**Monitoring Comparison**

| Type of Compliance (Sitewide) | EPA Monitoring | | DPE February 2016 2016 LDAR Report Results (Nov – Dec 2015) | | DuPont February 2016 LDAR Report Results (July – Nov 2015) | |
|---|---|---|---|---|---|---|
| | Total Monitored | Percent Leaking | Total Monitored | Percent Leaking | Total Monitored | Percent Leaking |
| Valve | 2,155 | 1.44 | 4,339 | 0.59 | 5,813 | 0.04 (3rd Quarter) |
| Connectors | 5,059 | 0.40 | 5 | 0 | 6,118 | 0 |
| Pumps | 62 | 1.61 | 256 | 0 | 578 | 0 |
| Agitators | 13 | 0 | 25 | 0 | 88 | 0 |
| PRD | 4 | 0 | 515 | 0 | 421 | 0 |

NEIC inspectors only saw a few rubber plugs in place at open-ended lines which is inconsistent with DPE's stated policy.

DPE provided NEIC with a document describing the LDAR program at the facility, including standard operating procedures (SOPs), regulatory interpretations, etc. In this document, DPE states that in process areas where the lines contain materials that could autocatalytically polymerize, rubber plugs would be inserted into the open ends, so that they would blow out if there was an emergency overpressure. NEIC inspectors observed very few rubber plugs in place in the open-ended lines, a majority of them were left open with no plug.

Appendix J– DPE LDAR Procedures

Field observations/ notes

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| C | | DPE's LDAR contractor, EMSI, used instruments that were unable to read as high as NEIC's TVA readings on a majority of the leaks discovered. In some cases, the LDAR contractor could not confirm leaks that NEIC inspectors observed to be above 500 ppm. The sample tubing used on EMSI's TVAs was of a different material and contained more than one filter within the line. It is possible that the sample tube material contributed to the lower readings. Process equipment containing no solvent may be misclassified as containing light liquid and inappropriately included in the LDAR database. | Field observations/ notes |
| D | | Some process equipment in the polymer area contained material (finished neoprene) that DPE representatives stated no longer contained any solvent. There was evidence of leaking material, as a sticky, black, tar-like material coated the outside of many of the vessels. These vessels were identified in the LDAR database as containing light liquid; however, NEIC's TVAs were unable to register any elevated reading above background on this material, indicating that it likely did not contain a light liquid. | Field observations/ notes |
| E | | Including equipment in the LDAR monitoring program that is not possible to register above the leak definition can dilute the leak rate of the process unit, possibly giving DPE a longer period of time between monitoring events. There does not appear to be a method for the LDAR contractors to know which pieces of equipment are in or out of service while they are conducting monitoring. The polymer area contains many vessels that are used in batch processing. NEIC began conducting monitoring of these vessels and was not notified that the vessels were not operating with light liquids or vapors at the time of monitoring. | Field observations/ notes |
| F | | The plant sampling results from 2011-2016, from two HON wastewater streams in the chloroprene process, indicated higher concentrations of chloroprene than in sampling conducted in 2014 for HON wastewater verification. From the DCB JVC effluent tank, the highest measured concentration of beta chloroprene was 1,813.39 ppm on September 4, 2012. The average concentration of the 176 samples taken was 65 ppm. For this same location in the 2014 wastewater sampling event, chloroprene was non-detect. Effluent from the isomerization effluent tank is injected into non-hazardous deep wells. From the isomerization effluent tank, the highest measured concentration of chloroprene was 722.74 ppm on December 7, 2015. The average concentration of the 131 samples | Appendix G – 2011-2016 Chloroprene Analytical Results for DCB JVC Effluent Tank; Appendix H – 2011-2016 Chloroprene Analytical Results for ISOM JVC Effluent Tank |

NEICVP21166591

Denka Performance Elastomer LLC
LaPlace, Louisiana

NEIC-000044

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| F | | These results indicate that the HON wastewater samples may not be reflective of overall chloroprene concentrations. taken was 57 ppm. For the same location in the 2014 wastewater sampling event, chloroprene was non-detect. | Appendix 4 – 2014 Wastewater Sampling Results; Field observations/ notes |
| G | | DPE does not know which locations DuPont used for calculating the the TRE values for the stripper vents and refining column vents. Without this information, it is unclear if the TRE value calculations for these continuous streams were performed for the appropriate locations in the process. Because the calculated TRE values for the stripper vents were between 1 and 4, if the calculations were performed for locations after the series of condensers rather than before the first condenser (because the first condenser does not recover material), it is possible that DPE has three Group 1 continuous process vents. | Appendix C – Neoprene Process Diagram |
| H | | If these stripper vents are Group 1 continuous process vents, DPE must comply with the requirements during all times, including the startups and shutdowns that occur every 2-3 days at each of the strippers. Monitoring the temperature of the cooling media does not provide data on how effectively the condenser is operating to verify that the TRE values remain between 1 and 4. For the stripper vents (three vents) and the refining column vents (two vents), DPE monitors the temperature of the cooling media in the condensers rather than the temperature of the gas exiting the condensers to verify that the unit is operating properly and that the TRE values remain between 1 and 4, as required by DPE's Title V permit. According to paperwork provided by DPE, DuPont requested to use this approach as an alternative in its non-compliance report in accordance with 40 CFR Part 63 Subpart U. DuPont representatives did not hear otherwise from EPA, Region 6 within 45 days of submitting the request, so they believed their request was approved, and DPE continues to monitor only the cooling media temperature. This approach does not provide data that the condensers are properly cooling the gas to ensure that the TRE value remains between 1 and 4. | Appendix F – November 2001 Polymers and Resins I Notification of Compliance Status |
| 8 | 40 CFR § 63.480. – (i) Applicability of this subpart. Paragraphs (j)(1) through (4) of this section shall be followed during periods of non-operation of the affected source or any part thereof. (1) The emission limitations set forth in this subpart and the emission limitations referred to in this subpart | DPE personnel have depended on DuPont's regulatory evaluations of the facility. DPE may not be aware of all of the regulatory requirements and if/when DuPont made improper regulatory determinations. For example, in April 2011 EPA adjusted the polymers and resins I regulation to require continuous compliance during times of startup as well as shutdown. DuPont's 40 CFR Part 63 Subpart U reports refer to a startup and shutdown malfunction plan that is no longer | Field observations/ notes |

Deals Performance Review LLC

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | shall apply at all times except during periods of non-operation of the affected source (or specific portion thereof) resulting in cessation of the emissions to which this subpart applies. However, if a period of non-operation of one portion of an affected source does not affect the ability of a particular emission point to comply with the emission limitations to which it is subject, then that emission limitation shall still be required to comply with the applicable emission limitations of this subpart during the period of non-operation. For example, if there is an overpressure in the reactor area, and a storage vessel that is part of the affected source would still be required to be controlled in accordance with the emission limitations in §63.484. | required by the regulation because the facility is required to comply during all times of operation, with limited exceptions. | |
| | (2) The emission limitations set forth in subpart H of this part, as referred to in §63.502, shall apply at all times, except during periods of non-operation of the affected source (or specific portion thereof) in which the lines are drained and depressurized, resulting in cessation of the emissions to which §63.502 applies. | | |
| | (3) The owner or operator shall not shut down items of equipment that are required or utilized for compliance with this subpart during times when emissions (or wastewater streams or residuals) are being routed to such items of equipment, if the shutdown would contravene requirements of this subpart applicable to such items of equipment. | | |
| | (4) In response to an action to enforce the standards set forth in this subpart, an owner or operator may assert an affirmative defense to a claim for civil penalties for exceedances of such standards that are caused by a malfunction, as defined in §63.2. Appropriate penalties may be assessed, however, if the owner or operator fails to meet the burden of proving all the requirements in the affirmative defense. The affirmative defense shall not be available for claims for injunctive relief. | | |

NEIC/YL1136DU

Page 46 of 52

Dralia Performance Elastomer LLC
La Place, Louisiana

NEIC-000046

| # | Regulatory Citation | Findings/Observations | Supporting Evidence/ notes |
|---|---|---|---|
| J | **40 CFR § 63.111 Definitions** — Surge control vessel means feed drums, recycle drums, and intermediate vessels. Surge control vessels are used within a chemical manufacturing process unit when in-process storage, mixing, or management of flow rates or volumes is needed to assist in production of a product. | Unstripped polymer tanks contain up to 16 percent chloroprene and vent to the atmosphere.<br><br>The unstripped tanks (up to six tanks) hold neoprene, prior to the stripping process. The neoprene at this stage contains unreacted chloroprene (up to 16 percent). These surge vessels are nitrogen blanketed to be in the atmosphere or the pressure reaches 5.5 psi. These surge vessels are a smaller than the size for which emission controls are required under 40 CFR Part 63 Subpart U, as referenced by 40 CFR Part 63 Subpart U. These units are another source of chloroprene emissions.<br><br>Environmental records from stack tests are not kept for more than 5 years, even though test data is still currently relied upon for emission calculations. | Field observations/ notes |
| K | | NEIC requested process condition data (i.e., production rate and operational data) from stack tests that were conducted in 2002. DPE continues to use these test results to calculate emissions from the chloroprene process and from the CD vent condenser in the neoprene process.<br><br>DPE representatives responded that the process data are no longer available electronically since it is not environmentally critical and that, in accordance with the facility's document policy, data are not kept for more than 5 years. | Field observations/ notes |
| L | | Although the data were generated more than 5 years ago, DPE continues to rely on test data to calculate emissions. Without an understanding of the process conditions under which the stack tests were conducted, it is unclear if the tests are still reflective of emissions based on current plant operations.<br><br>For example, the CD vent condenser is a smaller pipe that was easily accessible by LDAR monitoring personnel. The vapor stream exiting this pipe flamed out the TVA units indicating VOC emissions of greater than 10,000 ppm.<br><br>Laboratory testing of aqueous wastes generated in the poly unit and subsequent calculations suggest possible additional emissions and exposure of DPE employees to significant chloroprene concentrations.<br><br>NEIC laboratory analysis results for chloroprene in water samples collected in the poly unit are in Appendix Y, with an abbreviated summary shown below. | Appendix Y<br>NEIC Laboratory Report |

| Location Description | Chloroprene Analysis Summary, | | |
|---|---|---|---|
| | micrograms per liter (ug/L) | | |
| Stripper #1 Condenser | 209,200 | | |
| | 239,700 | | |
| | 205,200 | | |

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000047

| Regulatory Citation | Findings/Observations | | Supporting Evidence |
|---|---|---|---|
| | Centrifugal Separator Pot Receiver Flow | 220,000 | |
| | | 3,680 | |
| | | 4,500 | |
| | Stripper #3 Water Condenser | 4,428 | |
| | | 244,100 | |
| | | 319,000 | |
| | | 239,200 | |
| | | 86,400 | |
| | #1 Precondenser Runoff | 90,760 | |
| | | 93,420 | |
| | | 96,240 | |
| | #3 Precondenser Runoff | 95,700 | |
| | | 102,000 | |
| | | 110,500 | |

Based on these results, Henry's Law can be used to estimate the concentration of chloroprene.

Henry's Law:

$$H^{cc} = \frac{C_a}{P}$$

Where $H^{cc}$ is the Henry's Law constant for chloroprene in Molarity per atmosphere pressure ($M/atm$), $C_a$ is the concentration of chloroprene in the aqueous phase in Molarity ($M$), and $p$ is the partial pressure of chloroprene in the headspace above the solution in atmosphere pressure (atm).

Several values of Henry's Law constants are available for chloroprene. A high value of 0.032 (Hine and Mookerjee, 1975) and a low value of 0.018 (Sanders, 2015) were found in the scientific literature.

Converting the measured concentration units from microgram per liter to Molarity is done:

$$239700 \ \frac{ug}{L} \cdot 10^{-6} \ \frac{g}{ug} \cdot \frac{mol}{88.53 \ g} = 2.707 \cdot 10^{-3} M$$

The molecular formula of chloroprene is $C_4H_5Cl$ with a molar mass of 88.5315 $\frac{g}{mol}$.

NSICVPD164801

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000048

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|

**Findings/Observations**

After correcting to Molarity, the partial pressure of chloroprene above the solution can be estimated with Henry's Law:

$$H^{cp} = \frac{C_g}{p}$$

Rearranging the equation to solve for partial pressure:

$$p = \frac{C_g}{H^{cp}}$$

The partial pressure of chloroprene estimated above the solution is shown in the table below using the Henry's Law constants given previously.

**Estimated Chloroprene Pressure**

| Location Description | Partial Pressure (atm) | |
|---|---|---|
| | $H^{cp}$ 0.032 $M$/atm | $H^{cp}$ 0.018 $M$/atm |
| Stripper #1 Condenser | 0.084608 | 0.1504144 |
| | 0.07243 | 0.1287765 |
| | 0.07654 | 0.1318052 |
| Centrifugal Separator Pot Receiver Flow | 0.001299 | 0.002824 |
| | 0.001588 | 0.002809 |
| | 0.001563 | 0.002779 |
| Stripper #3 Water Condenser | 0.086161 | 0.153175 |
| | 0.112599 | 0.200175 |
| | 0.084431 | 0.15011 |
| #1 Precondenser Runoff | 0.03049 | 0.054217 |
| | 0.02036 | 0.036953 |
| | 0.02975 | 0.058622 |
| #3 Precondenser Runoff | 0.033597 | 0.060391 |
| | 0.033792 | 0.060084 |
| | 0.036536 | 0.064633 |
| | 0.039004 | 0.06934 |

NEICVP1216K01I

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000049

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | | The partial pressures can be converted into parts per million by multiplying by 1,000,000, assuming a total pressure of 1 atm. Assuming an atmospheric pressure of 1 atm is appropriate since La Place is 10 feet above sea level.<br><br>The concentration of chloroprene above the water samples is estimated in the table below. | |

**Estimated Vapor Phase Chloroprene Concentration**

| Location Description | Concentration (ppm) | |
|---|---|---|
| Stripper #1 Condenser | 84,608 | 150,414 |
| | 72,430 | 128,765 |
| | 77,654 | 138,052 |
| Centrifugal Separator Pot/Receiver Flow | 1,299 | 2,309 |
| | 1,588 | 2,824 |
| | 1,563 | 2,779 |
| Stripper #3 Water Condenser | 86,161 | 153,175 |
| | 112,599 | 200,175 |
| | 84,431 | 150,100 |
| #1 Precondenser Runoff | 30,497 | 54,217 |
| | 32,036 | 56,953 |
| | 32,975 | 58,622 |
| | 33,970 | 60,391 |
| #3 Precondenser Runoff | 33,797 | 60,084 |
| | 36,356 | 64,633 |
| | 39,006 | 69,340 |

The results of the Henry's Law calculations show there is a significant concentration of chloroprene that can be generated from the wastewater being generated in the poly unit.

In terms of environmental release, the wastewater samples collected in the poly unit were from open sources flowing from the process vessel in open trenches into floor drains. Large fans in the poly unit push air into the building, but there is no emissions control device for the exhaust created by this ventilation.

Further, the possible concentrations of chloroprene to which workers could be exposed might be hazardous. The current Occupational Safety and Health Administration (OSHA) personal exposure limit for chloroprene is 25 ppm. The concentration of chloroprene above the wastewater can be between 50 and 8000 times the OSHA limit, and would

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000050

NEICVP2II6E0I

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| | | require very large dilutions to reach acceptable limits. Further investigation of this hazard is strongly suggested. | |
| | Jack Hine, Philip K. Mookerjee, Structural effects on rates and equilibriums XIX. Intrinsic hydrophilic character of organic compounds. Correlations in terms of structural contributions, *J. Org. Chem.*, 1975, 40 (3), pp 292–298. | | |
| M | R. Sander, Compilation of Henry's law constants, *Atmos. Chem. Phys.*, 15, 4399–4981, 2015 | DPE may have additional Group I storage tanks under 40 CFR Part 63 Subpart U requiring additional controls. | Appendix Z – Chloroprene Vapor Pressure Curve |
| | | EPA lists the vapor pressure for chloroprene at 20 °C (68 °F) as 188 mmHg. The 2013-2015 emission inventory calculations list the 1700-2(A, 2 MM pound CD tank contents as 100 percent chloroprene and a daily average liquid surface temperature of 466.8 rankine (R) (7.13 °F). According to this monomer plant diagram, this tank is cooled with -18 °C (-1.4 °F) brine. | Appendices T, U, and V – 2013, 2014, and 2015 Emission Calculations |
| N | | Emission ID points for crude storage tanks 1, 2, and 3 (1700-211, 1700-212, and 700-213, are not listed in the 2013-2015 emission inventory calculations; however, the tab '1700-67' includes crude storage tanks 1, 2, and 3. This tab lists the temperature of the vapor in the common vent header as 5 °C (41 °F). | |
| | | These chloroprene tanks are identified as venting to the atmosphere in the emission inventory calculations. | |
| | | If the actual storage temperature of the 2 Mor pound CD storage tank is just 10 °F higher, at 17 °F, the tank would have a vapor pressure of 0.076 psi, making it a Group 1 tank requiring additional control. | |
| | | If the actual storage temperatures of the crude storage tanks 2 and 3 were 10 °F higher, at 47 °F, these tanks would have a vapor pressure of 192 psi, making them Group 1 tanks. | |
| # | | The minimum pH established during the HAFF performance test is not sufficient to control chlorine emissions, and also results in excess emissions of sulfur dioxide gas. | Appendix FF – DPE July 2016 Email |
| | | DPE (formerly DuPont) was required to establish minimum/maximum operating parameters during performance testing to ensure compliance with the emission standards of the Hazardous Waste Combustor MACT. One of the required parameters is minimum pH, which was established at pH 2.1 in the scrubbing liquor of the DynaWave scrubber. According to DPE representative Doug Melanson, the DynaWave scrubber is the only air | Appendix GG – Dr. Lowry Expert Opinion |

Denka Performance Elastomer LLC
La Place, Louisiana

NEIC-000051

NEIC/VP124650J

| # | Regulatory Citation | Findings/Observations | Supporting Evidence |
|---|---|---|---|
| 0 | 40 CFR § 63.1207. (d) Notification of compliance— (1) Comprehensive performance test. (i) Except as provided by paragraphs (j)(4) and (j)(5) of this section, within 90 days of completion of a comprehensive performance test, you must postmark a Notification of Compliance documenting compliance with the emission standards and continuous monitoring system requirements, and identifying operating system requirements, and identifying operating parameter limits under §63.1209. (ii) Upon postmark of the Notification of Compliance, you must comply with all operating requirements specified in the Notification of Compliance in lieu of the limits specified in the Documentation of Compliance required under §63.1211(c). | pollution control device for the HAPF system and effectively removes RCl/Cl$_2$ from the wet scrubber effluent.<br><br>Sodium bisulfite is added to the scrubber solution to remove Cl$_2$ gas by reaction of bisulfite with hypochlorous acid (Cl$_2$ dissolved in water). However, at pH 2.1, the Cl$_2$ gas will not dissolve in the water within the scrubber, preventing it from participating in the aqueous phase reaction with bisulfite. Additionally, at low pH, the bisulfite disassociates to produce sulfur dioxide, which is released through stack emissions. As seen in AON #4, there were many instances when the actual pH of the scrubber effluent was less than 2.1.<br><br>**It is unclear if DPE is complying with the parameters established in the most recent comprehensive performance test.**<br><br>DuPont commenced a comprehensive performance test for the hydrochloric acid production furnace (subject to the Hazardous Waste Combustor MACT) in March 2015. A notification of compliance that describes the results of the CPT and lists the relevant continuous monitoring parameters established by that test was sent to the State of Louisiana within 90 days of the completion of the CPT.<br><br>DPE representative Doug Melanson stated during an interview with NEIC inspectors in June 2016 that the parameters established during the 2010 comprehensive performance test are still in force until the State of Louisiana issues the facility a permit modification incorporating the parameter values established during the 2015 CPT. DPE is required to comply with the newly established parameter values upon postmark of the notification of compliance, which was June 23, 2015.<br><br>A review of the semiannual reports verifies that DPE believes the 2010 CPT parameter limits continue to be in force; however, beginning with the July 2015 semiannual report the facility notes that it is now complying with the limits established during the 2015 performance test. | Appendix X – 2015 Hazardous Waste Comprehensive Test Performance Test<br><br>Appendix CC – Hazardous Waste Combustor Periodic Reports |

**LOUISIANA CIVIL CASE REPORTING**
Civil Case Cover Sheet - LA. R.S. 13:4688 and
**Part G, §13, Louisiana Supreme Court General Administrative Rules**

This civil case cover sheet shall be completed by counsel for the petitioner, counsel's authorized representative, or by the self-represented litigant (if not represented by counsel) and submitted with the original petition filed with the court. The information should be the best available at the time of filing. This information does not constitute a discovery request, response or supplementation, and is not admissible at trial.

**Suit Caption:** Robert Taylor, Jr, et al

vs.

Denka Performance Elastomer LLC, et al

**Court:** 40th JDC          **Docket Number:** 70907

**Parish of Filing:** St. John the Baptist          **Filing Date:** 6/29/17

**Name of Lead Petitioner's Attorney:** Eberhard D. Garrison

**Name of Self-Represented Litigant:** _____

**Number of named petitioners:** ____          **Number of named defendants:** ____

**Type of Lawsuit: Please check the categories which most appropriately apply to this suit (no more than 3 categories should be checked):**

- [ ] Auto: Personal Injury
- [ ] Auto: Wrongful Death
- [ ] Asbestos: Property Damage
- [ ] Product Liability
- [ ] Intentional Bodily Injury
- [ ] Intentional Wrongful Death
- [ ] Business Tort
- [ ] Defamation
- [x] Environmental Tort
- [ ] Intellectual Property
- [ ] Legal Malpractice
- [ ] Other Professional Malpractice
- [ ] Maritime
- [ ] Wrongful Death
- [ ] General Negligence

- [ ] Auto: Property Damage
- [ ] Auto: Uninsured Motorist
- [ ] Asbestos: Personal Injury/Death
- [ ] Premise Liability
- [ ] Intentional Property Damage
- [ ] Unfair Business Practice
- [ ] Fraud
- [ ] Professional Negligence
- [ ] Medical Malpractice
- [ ] Toxic Tort
- [x] Other Tort (describe below)
- [ ] Redhibition
- [x] Class action (nature of case)

Trespass

**Please briefly describe the nature of the litigation in one sentence of additional detail:**
Proposed class action and request for injunctive relief for nuisance and trespass associated with chloroprene emissions from Denka facility.

Following the completion of this form by counsel, counsel's representative, or by the self-represented litigant, this document will be submitted to the Office of the Judicial Administrator, Supreme Court of Louisiana, by the Clerk of Court.

Name, address and contact information of person completing form:

Name Eberhard D Garrison   Signature _____

Address 601 Poydras Street Suite 2655

Phone number: (504) 523-2500   E-mail address: egarrison@jonessurson.com

D55380083

D55380083

## CITATION

ROBERT TAYLOR JR

VS

DENKA PERFORMANCE ELASTOMER
LLC

DOCKET NUMBER: C-70907

40TH JUDICIAL DISTRICT COURT

PARISH OF ST.JOHN THE BAPTIST

STATE OF LOUISIANA

To:   **E.I. DUPONT DE NEMOURS AND COMPANY**
**THROUGH ITS REGISTERED AGENT :**
**CT CORPORATION SYSTEM**
**3867 PLAZA TOWER DRIVE**
**BATON ROUGE, LA 70816**

**Parish: BATON ROUGE**

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **EBERHARD D. GARRISON** and was issued by the Clerk of Court on the **JUNE 30, 2017**.

\* Also attached are the following documents:
**CLASS ACTION PETITION**

_KIWAUN J. TAYLOR_
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____ 20 ____ AND ON THE _____ DAY OF
_____ ; 20 ____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____ , A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED: PARISH OF _____ THIS _____ DAY OF
_____ , 20 ____

SERVICE $ _____          BY: _____
MILEAGE $ _____               DEPUTY SHERIFF
TOTAL ___ $ _____

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

RECEIVED

JUL 10 2017

E.B.R. SHERIFF'S OFFICE

Eliana DeFrancesch - Clerk of Court
Filed: Jul 24, 2017 9:30 AM

131956112



D55380075

D55380075

# CITATION

ROBERT TAYLOR JR

VS

DENKA PERFORMANCE ELASTOMER LLC

DOCKET NUMBER: C-70907

40TH JUDICIAL DISTRICT COURT

PARISH OF ST.JOHN THE BAPTIST

STATE OF LOUISIANA

To:     **DENKA PERFORMANCE ELASTOMER LLC.**
        **THROUGH ITS REGISTERED AGENT :**
        **CT CORPORATION SYSTEM**
        **3867 PLAZA TOWER DRIVE**
        **BATON ROUGE, LA 70816**

Eliana DeFrancesch - Clerk of Court
Filed: Jul 24, 2017 9:50 AM

131956104

**Parish: BATON ROUGE**

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **EBERHARD D. GARRISON** and was issued by the Clerk of Court on the **JUNE 30, 2017**

* Also attached are the following documents:
**CLASS ACTION PETITION**

I made service on the
CT Corporation

JUN 13 2017

by tendering

**KIWAUN J. TAYLOR**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____ 20 _____ AND ON THE _____ DAY OF _____ ,20 _____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____ ,A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED: PARISH OF _____ THIS _____ DAY OF _____ ,20 _____

SERVICE   $_____       BY:_____
MILEAGE $_____
TOTAL     $_____        DEPUTY SHERIFF

ORIGINAL – RETURN        COPY – SERVICE        COPY - CLERK

JUL 13 2017



**D55380075**

D55380075

## CITATION

ROBERT TAYLOR JR

VS

DENKA PERFORMANCE ELASTOMER
LLC
DOCKET NUMBER: C-70907

40TH JUDICIAL DISTRICT COURT

PARISH OF ST.JOHN THE BAPTIST

STATE OF LOUISIANA

To:   **DENKA PERFORMANCE ELASTOMER LLC.**
      **THROUGH ITS REGISTERED AGENT :**
      **CT CORPORATION SYSTEM**
      **3867 PLAZA TOWER DRIVE**
      **BATON ROUGE, LA 70816**

Emilia DeFrancesch - Clerk of Court
Filed: Jul 28, 2017 9:50 AM

**Parish: BATON ROUGE**

131656104

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **EBERHARD D. GARRISON** and was issued by the Clerk of Court on the **JUNE 30, 2017**

* Also attached are the following documents:
**CLASS ACTION PETITION**

I made service on the CT Corporation

**KIWAUN J. TAYLOR**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

JUN 13 2017

RECEIVED ON THE _____ DAY OF _____ 20 _____ AND ON THE _____ DAY OF _____ 20 _____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED: PARISH OF _____ THIS _____ DAY OF _____ 20

SERVICE  $ _____          BY: _____
MILEAGE $ _____               DEPUTY SHERIFF
TOTAL    $ _____

ORIGINAL – RETURN        COPY – SERVICE        COPY - CLERK

JUL 1 2 2017