## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ROBERT TAYLOR, JR., et al.,** | * | **Civil action no. 2:17-CV-07668** |
| | * | |
| **Plaintiffs** | * | **Section: F** |
| | * | |
| **v.** | * | **Division: 4** |
| | * | |
| **DENKA PERFORMANCE** | * | **Judge: Martin L.C. Feldman** |
| **ELASTOMER LLC and E.I. DUPONT** | * | |
| **DE NEMOURS AND COMPANY,** | * | **Magistrate: Karen Wells Roby** |
| | * | |
| **Defendants.** | * | |
| | * | |

### <u>SECOND AMENDED AND RESTATED CLASS ACTION COMPLAINT</u>

Plaintiffs—Robert Taylor, Jr., Kershell Bailey, Shondrell P. Campbell, Gloria Dumas, Janell Emery, George Handy, Annette Houston, Rogers Jackson, Michael Perkins, Allen Schnyder, Jr., Larry Sorapuru, Sr., Kellie Tabb, and Robert Taylor, III—individually and as representatives of all those similarly situated, file this Second Amended and Restated Class Complaint against the defendants, Denka Performance Elastomer LLC ("Denka") and E.I. DuPont De Nemours and Company ("DuPont") as follows:

### PARTIES

1. **Representative Plaintiffs.**

    1.1.    Robert Taylor, Jr., is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.2.     Kershell Bailey is a person of the full age of majority and domiciled in Edgard in the Parish of St. John the Baptist, State of Louisiana.

1.3.     Shondrell P. Campbell, is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.4.     Gloria Dumas is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.5.     Janell Emery is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.6.     George Handy is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.7.     Annette Houston is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.8.     Rogers Jackson is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.9.     Michael Perkins is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.10.    Allen Schneider, Jr., is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.11.    Larry Sorapuru, Sr., is a person of the full age of majority and domiciled in Edgard in the Parish of St. John the Baptist, State of Louisiana.

1.12.    Kellie Tabb is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.13.    Robert Taylor, III, is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

2.  **Plaintiff Class.** The named Plaintiffs herein propose to proceed individually and on behalf of a class of persons defined as follows:

2.1.1.1.    *All natural persons who have lived or been occupants of property within an area surrounding the Pontchartrain Works facility, that area bounded on the North by Interstate-10, on the West by the St. John the Baptist/St. James Parish boundary, on the South by Louisiana Highway 3127, on the East by the eastern boundary of the community of Killona on the West Bank of the Mississippi River and by the western boundary of the Bonnet Carre Spillway on the East Bank of the Mississippi River ("the defined area"), at any time from January 1, 2011, through the present.*

2.1.1.2.    *The named plaintiffs and the plaintiff class as neighbors of the Pontchartrain Works facility in LaPlace, Louisiana owned by Denka Performance Elastomer LLC and previously by E.I DuPont De Nemours and Company, as a result of the release of excessive concentrations of the chemical chloroprene into the geographic area described in paragraph 2.1.1.1 have been deprived of the liberty of enjoying property which they have occupied within the*

time period January 1, 2011 to the present constituting nuisance and trespass pursuant to La. C.C. art. 667.

2.1.1.3.    The plaintiffs and the plaintiff class's exposure to excessive amounts of chloroprene has caused them damage and emotional distress because: 1) the exposure is to a likely carcinogen, 2) the exposure has from time to time forced them to remain in their homes when they perceive the exposure to be physically uncomfortable, 3) the exposure has caused measurable amounts of mutagenic metabolites of chloroprene to reside in their bodies, and 4) the exposure has caused distress resulting in the knowledge that they are unable to reduce or eliminate their exposure  through any other means except to leave the area.

2.1.1.4.    Excess chloroprene concentrations are presently and immediately remediable by injunctive relief that would reduce concentrations of chloroprene emissions in the defined area so that they do not exceed 0.2 $\mu g/m^3$, and thereby remedy the nuisance and trespass caused by Defendants' conduct.

2.1.1.5.    Recognizing that at this time—due in no small part to Defendants' failure to release information they have developed or possess—claims for compensatory damages for physical injury present immature torts due to the undeveloped nature of evidence concerning the causal link between various concentrations of chloroprene emissions and physical human injury, and as such, causes of action for personal injury have not yet come into existence. Recognizing that under Louisiana law it impermissible to split a cause of action,

*plaintiffs and the plaintiff class, in an abundance of caution, seek to preserve their right to bring such claims when that evidence is developed. Plaintiffs and the plaintiff class, however, do not seek personal injury damages at this time. Plaintiffs and the plaintiff class do not seek damages pursuant to La. C.C. art. 667 and seek only certification of a class for the purposes of obtaining injunctive relief. Plaintiffs and the plaintiff class wish to reserve those damage claims not to profit thereby but with the belief that requiring the defendants to pay damages would motivate the defendants to return plaintiffs and the plaintiff class the peaceable possession of their homes, but further state that if the inclusion of those claims would cause the court not to certify a class, they will waive all such claim for damages pursuant to La. C.C. art. 667.*

3. **Defendants.** Made defendants herein are the following two companies:

   3.1.    Denka Performance Elastomer LLC ("Denka") is a Delaware limited liability company with its principal place of business and corporate headquarters in LaPlace, Louisiana. At least one of Denka's members is domiciled in LaPlace, Louisiana.

   3.2.    E.I. DuPont De Nemours and Company ("DuPont") is a corporation organized under the laws of the State of Delaware that conducts business regularly in the State of Louisiana and owns property in St. John the Baptist Parish. Collectively, Denka and DuPont are referred to herein as "Defendants."

## JURISDICTION AND VENUE

4.  Plaintiffs originally filed this action in the 40th Judicial District Court for the Parish of St. John the Baptist, State of Louisiana, where venue was proper pursuant to La. C.C.P. arts. 74 and 593 because Defendants engaged in wrongful conduct in and damages were sustained within this judicial district.

5.  Defendants removed this action to this Court. The 40th Judicial District Court lies geographically within this federal judicial district. Defendants' basis for removal jurisdiction is diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs reserve their right to contest the existence of such jurisdiction should subsequent discovery contradict the factual basis for Defendants' assertions of their citizenship in their response to Plaintiffs' motion to remand. Plaintiffs also reserve their right to appeal from the denial of their right to remand at the time any appeal ripens from any judgment in this matter.

## BACKGROUND FACTS

6.  Neoprene was invented by DuPont in 1931. It is a synthetic rubber that is used in chemical- and weather-resistant products ranging from wet suits to orthopedic braces. Neoprene is used also as a base resin in adhesives, electrical insulation, and coatings.

7.  DuPont constructed a neoprene manufacturing unit at its Pontchartrain Works facility in LaPlace, Louisiana, in 1969.

8.  The manufacturing process at the Pontchartrain Works facility includes a Neoprene Unit, a Chloroprene Unit, an HCL Recovery Unit, and associated utilities.

9.  Chloroprene is manufactured at the site of neoprene production and is used as a component of neoprene. Chloroprene is emitted into the air and discharged into the water as a result of these manufacturing processes. These chloroprene emissions and discharges have been released into the environment around the Pontchartrain Works facility for 48 years.

10. Prior to 2008, DuPont produced neoprene at both its facility in Louisville, Kentucky (commencing in 1941) and its Pontchartrain Works facility in LaPlace, Louisiana (commencing in 1968). DuPont had also produced neoprene at a facility in Montague, Michigan from 1956 through 1972.

11. In 2007, DuPont announced that it would close its neoprene facility in Louisville and consolidate its neoprene production at the Pontchartrain Works facility.

12. As a result of the plant consolidation, nation-wide chloroprene emissions have been concentrated almost exclusively in LaPlace, Louisiana.

13. In response to DuPont's announcement, United Steelworkers (USW), the nation's largest industrial union with 850,000 members, including 1,800 DuPont workers, warned then-Governor Kathleen Blanco to monitor the Pontchartrain Works facility's chloroprene emissions closely. Billy Thompson, USW District 8 Director, advised Governor Blanco, "The real costs will be borne by the citizens of Louisiana, not DuPont."

14. DuPont moved its neoprene production to LaPlace.

15. By 2008, the Pontchartrain Works facility was the only manufacturing facility for neoprene in the United States.

16. Despite the warnings from sources familiar with emissions from the Louisville facility, as detailed below chloroprene concentration exposure levels were not publicly available until October 2016.

17. DuPont sold the neoprene production facility at the Pontchartrain Works facility to Denka effective November 1, 2015, but retained ownership of the land underlying the Pontchartrain Works facility.

18. DuPont had knowledge of the deleterious effects of exposure to chloroprene emissions by at least 1988.

19. DuPont concealed its knowledge of the deleterious effects of exposure to chloroprene emissions.

20. DuPont has, for decades, studied and assessed the risks and harms of exposure to various concentrations of chloroprene, but concealed such knowledge from its employees, from the communities around its facilities, and from government agencies, including the Environmental Protection Agency ("EPA"), Louisiana Department of Environmental Quality ("LDEQ"), and local St. John the Baptist Parish officials.

21. DuPont also established internal concentration-based maximum exposure levels to chloroprene for its facilities; however, it often exceeded those levels, and withheld both the internal exposure level limits and the facts of the exceedance of those levels from the communities around their facilities—specifically including the community in the defined area herein.

22. At the time that DuPont sold the Pontchartrain Works neoprene production facility to Denka, Denka had the same knowledge of the harms of chloroprene exposure as did DuPont.

23. When Denka acquired the Pontchartrain Works facility from DuPont, Denka retained 235 of the approximately 240 DuPont employees at the Pontchartrain Works facility.

24. While Denka had knowledge of the harmful concentrations of chloroprene emitted from its Pontchartrain Works facility, it continued to conceal that knowledge and associated data from the EPA, the LDEQ, and local St. John the Baptist Parish officials.

25. The EPA notes that "[s]ymptoms reported from acute human exposure to high concentrations of chloroprene include giddiness, headache, irritability, dizziness, insomnia, fatigue, respiratory irritation, cardiac palpitations, chest pains, nausea, gastrointestinal disorders, dermatitis, temporary hair loss, conjunctivitis, and corneal necrosis." In addition, the EPA notes that "[a]cute exposure may: damage the liver, kidneys, and lungs; affect the circulatory system and immune system; depress the central nervous system (CNS); irritate the skin and mucous membranes; and cause dermatitis and respiratory difficulties in humans[.]"

26. More critically, the EPA has classified chloroprene as a "likely human carcinogen." In 2010, the EPA provided its Integrated Risk Information System ("IRIS") assessment of chloroprene. In that assessment, the agency concluded that chloroprene is "'likely to be carcinogenic to humans' [sic] through a mutagenic mode of action and that the primary exposure route of concern is the inhalation pathway."

27. In December 2015, the EPA released a screening-level National Air Toxics Assessment ("NATA"),[1] and classified chloroprene as a likely human carcinogen. EPA's NATA evaluation

---

[1]  "NATA is EPA's ongoing comprehensive evaluation of air toxics in the U.S. EPA developed the NATA as a state-of-the-science screening tool for State/Local/Tribal Agencies to prioritize

analyzes levels of exposure to various toxins, and establishes a 1-in-10,000 (or 100 in 1 million) incidence of cancer as the upper limit of "acceptable risk." Exposure above that "acceptable risk" threshold represents an unacceptable risk of cancer from exposure to that toxin. The NATA acceptable risk exposure threshold for chloroprene was established in the December 2015 assessment as 0.2 µg/m³.

28. Despite having knowledge of this upper limit of the acceptable risk threshold for exposure to concentrations to chloroprene, Denka has continued to emit chloroprene at hundreds of times the 0.2 µg/m³ threshold into the surrounding community.

29. Since May 25, 2016, the EPA has collected 24-hour air samples every three days from six locations in the census tracts in the defined area—collection sites are located in St. John the Baptist Parish at Acorn and Highway 44, the Mississippi River Levee, Fifth Ward Elementary School, Ochsner Hospital, 238 Chad Baker, and East St. John the Baptist High School. Air samples at all six locations are frequently well in excess of the 0.2 µg/m³ threshold, up to 700 times that threshold or more.

30. EPA held its first community meeting to discuss the potential chloroprene emission issues on July 7, 2016. At that meeting, a representative from the Louisiana Department of Health advised that children should not breathe chloroprene.

31. EPA did not report sampling results showing the exceedances above the chloroprene acceptable risk threshold in the vicinity of the Pontchartrain Works facility until October 2016.

---

pollutants, emission sources and locations of interest for further study in order to gain a better understanding of risks." https://www.epa.gov/national-air-toxics-assessment/nata-overview.

32. Denka commenced 24-hour air sampling every six days on August 8, 2016 at five locations in the census tracts in the defined area—Entergy, Railroad, Western Edge of Denka property at Spruce Street, Mississippi River Levee, Ochsner Hospital, and the St. John the Baptist Parish Courthouse in Edgard. As with the EPA sampling, samples collected at all five Denka sampling sites are frequently well in excess of the 0.2 µg/m$^3$ threshold, including concentrations at hundreds of times that threshold.

33. According to Denka's own sampling numbers for concentrations of chloroprene emissions, the *average* chloroprene concentration across all Denka sampling sites from August 2016 through March 2017 has ranged from 4.08 µg/m$^3$ to 6.65 µg/m$^3$, *i.e.* from 20.4 to 33.25 times the 0.2 µg/m$^3$ threshold directed by EPA.

34. On October 7, 2016, Denka submitted modeling results for concentrations of chloroprene emissions surrounding the Pontchartrain Works facility to LDEQ for the period 2011 through 2015, showing maximum modeled concentrations of 7.88 µg/m$^3$ in 2011, 9.88 µg/m$^3$ in 2012, 12.07 µg/m$^3$ in 2013, 8.23 µg/m$^3$ in 2014, and 7.22 µg/m$^3$ in 2015—all, of course, well in excess of the 0.2 µg/m$^3$ threshold.

35. Historically, the Pontchartrain Works facility has had chloroprene air emissions well in excess of the 0.2 µg/m$^3$ threshold.

36. The concentrations of chloroprene emissions from the Pontchartrain Works facility have frequently exceeded DuPont's (and then Denka's) own internal "acceptable emissions limits" since 1976.

37. There are no other sources of chloroprene within the census tracts that include the Pontchartrain Works facility. The attached isopleth map created for Denka (**Exhibit A** to this Petition, and incorporated herein), demonstrates the width of the geographic scope of the area subject to chloroprene air concentrations above 0.2 $\mu g/m^3$, based solely on Denka's own air sampling and modeling.

38. On June 6 through 10, 2016, EPA's National Enforcement Investigation Center ("NEIC") conducted a Clean Air Act inspection of the Pontchartrain Works facility's chloroprene unit, neoprene unit, and HCL Recovery Unit.

39. Shortly after EPA commenced its investigation, the Defendants' representatives held a meeting with select neighbors of the Pontchartrain Works facility and expressed to them that there was no problem arising from the Pontchartrain Works facility's chloroprene emissions.

40. Despite the measured elevated concentrations of chloroprene emissions, and despite EPA's NATA-based 0.2 $\mu g/m^3$ acceptable risk threshold, at a St. John the Baptist Parish School Board meeting on or about December 8, 2016, LDEQ Secretary Chuck Brown dismissed those expressing concern about the chloroprene concentrations as "fearmongerers" and said "forget about 0.2."

41. Finally, on April 3, 2017, the EPA for the first time made available to the public a redacted copy of the inspection report generated from the NEIC inspection. A copy of that redacted inspection report is attached hereto as **Exhibit B**.

42. The EPA's NEIC inspection report revealed numerous areas of non-compliance spanning both DuPont's and Denka's operation of the Pontchartrain Works facility, including but not limited

to: failure from 1997 through the present to meet the monitoring, recordkeeping, and reporting requirements for the chloroprene vent condenser; approximately 10,000 regulated components that have been neither identified nor monitored for leaks and emissions; failures to replace leaking valves within required time limits; more than 500 open-ended lines; failure to include appropriate emissions factors in air permit application materials; failure to institute appropriate emissions controls for the chloroprene Group I storage tank, the surge control vessels, and the combustion chambers; and failure to maintain required destruction efficiency and minimum atomization flow rates.

43. On information and belief, the acts and failures of Defendants as recorded in the NEIC inspection report are currently under review by the U.S. Department of Justice.

44. On January 6, 2017, Denka entered into an Administrative Order on Consent ("AOC") with LDEQ with a target to reduce its chloroprene emissions by 85%. Even if the results of the AOC are successful, however, an 85% reduction from the emission levels displayed by Denka's own community-wide modeling will still be far in excess of the 0.2 µg/m$^3$ threshold.

45. Denka has failed to meet all of the interim requirements, to date, for emissions controls and chloroprene emissions concentrations it agreed to in the AOC.

46. The EPA has observed that "[t]he top 6 census tracts with the highest NATA-estimated cancer risks nationally are in Louisiana due to Denka (formerly DuPont) chloroprene emissions." The "Background Cancer Risk" reported in the NATA assessment for the census tracts in the vicinity of the Pontchartrain Works facility is 3.365 per million, while the cancer risk from

chloroprene exposure in those census tracts ranges from 158.515 to 768.46 per million, all well above the acceptable risk level recommended by EPA.

47. Instead of reducing chloroprene emissions in accordance with the EPA's 0.2 µg/m$^3$ threshold, on June 26, 2017, representatives of Denka submitted to the EPA a Request for Correction ("RFC") to raise the 0.2 µg/m$^3$ threshold above the acceptable level thresholds previously determined by the EPA based on rigorous, peer-reviewed scientific review. Denka's stated justification for the requested change was "to prevent further significant damage to [Denka's] business."

48. Since the June 26, 2017 RFC, Denka has participated in a lobbying campaign to influence members of the United States Congress to undermine the EPA and support reduction and/or removal of the restrictions on chloroprene emissions at the Pontchartrain Works facility.

49. As recently as November 2017, however, Dr. Jimmy Guidry, the health officer for the Louisiana Department of Health, has acknowledged that the question of whether human exposure to particular concentrations of chloroprene can harm those exposed presents "difficult and complicated questions." Dr. Guidry stated that "[i]t is a big deal. … From what I know today those risks are something we have to consider. We have to minimize it. We have to mitigate it."

50. The Plaintiffs, along with all proposed class members, have suffered trespass and nuisance due to the regular and repeated exposure to concentrations of chloroprene emissions in excess of levels the Defendants know are unsafe—as demonstrated by the peer-reviewed scientific

analysis relied on in EPA's issuance of the 0.2 $\mu g/m^3$ threshold and as a result have sustained damages pursuant to La. C.C. art. 667.

## CLASS ACTION REQUISITES

51. Plaintiffs and all those similarly situated, as defined above, are entitled to maintain this action as a class action pursuant to Fed. R. Civ. P. 23 for the following reasons:

51.1. First, the class is objectively ascertainable. As defined above, the class is proposed to consist of "*All natural persons who have lived or been occupants of property within an area surrounding the Pontchartrain Works facility, that area bounded on the North by Interstate-10, on the West by the St. John the Baptist/St. James Parish boundary, on the South by Louisiana Highway 3127, on the East by the eastern boundary of the community of Killona on the West Bank of the Mississippi River and by the western boundary of the Bonnet Carre Spillway on the East Bank of the Mississippi River ('the defined area'), at any time from January 1, 2011, through the present.*" This class may be easily determined through objective documentation of property records showing ownership and/or lease agreements documenting residence in the defined area; school attendance records, employment records, and various other legal filings and public records.

51.2. The Class consists of a total number of class members within the defined area who are so numerous that joinder of all members is impracticable; on information and belief, there are tens of thousands of such affected putative class members.

51.3.    Questions of law and fact common to all members of the Class predominate over individual issues, including but not limited to:

51.3.1. whether DuPont released chloroprene at levels beyond the 0.2 µg/m$^3$ threshold, and if so, how often and for how long;

51.3.2. whether Denka released chloroprene at levels beyond the 0.2 µg/m$^3$ threshold, and if so, how often and for how long;

51.3.3. the extent and timing of DuPont's knowledge of the hazardous nature of chloroprene emissions at the levels at which it was releasing chloroprene from the Pontchartrain Works facility;

51.3.4. the extent and timing of Denka's knowledge of the hazardous nature of chloroprene emissions at the levels at which it was releasing chloroprene from the Pontchartrain Works facility;

51.3.5. the steps DuPont could have taken to reduce chloroprene emissions below the 0.2 µg/m$^3$ threshold, and its decisions to not do so;

51.3.6. the steps Denka could have in the past or could in the future take to reduce chloroprene emissions below the 0.2 µg/m$^3$ threshold, and its decisions to not do so;

51.3.7. whether Denka is in violation of the terms of the AOC it entered into with LDEQ, dated January 6, 2017;

51.3.8. whether those who live and are occupants of property in the defined area are third-party beneficiaries of the AOC;

51.3.9. whether the Defendants are liable to Plaintiffs for the release of chloroprene emissions in concentrations exceeding 0.2 µg/m$^3$;

51.3.10.    whether Defendants are liable pursuant to Louisiana Civil Code Articles, including but not limited to articles 667-669, 2315, or 2317, for conducting activities and/or making works upon DuPont's property in the Pontchartrain Works facility owned and operated by Denka that deprive Plaintiffs of the enjoyment of property where they live or that they occupy, or that trespass on such property where Plaintiffs live or are occupants;

51.3.11.    whether Defendants are liable for punitive damages;

51.3.12.    whether Defendants are liable for attorneys' fees and costs pursuant to any applicable law;

51.3.13.    the appropriate injunctive relief to prevent Denka from continuing to release chloroprene in excess of the 0.2 µg/m$^3$ threshold.

51.4.    The claims of the Representative Plaintiffs, each of whom live or have otherwise been occupants within the class defined area, are typical of the claims of the proposed Class, who are by definition likewise within the class defined area. Because the Representative Plaintiffs have incurred the same exposure to chloroprene above acceptable risk thresholds as the members of the proposed Class, their interests in the injunctive remedies for nuisance and trespassing and any ancillary relief are identical to those of the proposed Class.

51.5.   The Representative Plaintiffs will fairly and adequately protect the interests of the proposed Class, as each has an interest in gaining injunctive relief to stop the release of chloroprene from the Pontchartrain Works facility in amounts resulting in chloroprene emissions exposure to the Class Members in excess of $0.2\ \mu g/m^3$. Plaintiffs have retained counsel experienced in the prosecution of class action litigation, and counsel will adequately represent the interests of the class. Plaintiffs and their counsel are aware of no conflicts of interest between plaintiffs and absent class members or otherwise. Plaintiffs have, or can acquire, adequate financial resources to assure that the interests of the class will not be harmed. Plaintiffs are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

51.6.   The criteria for defining the proposed Class, as set out above, are objectively ascertainable through objective documentation of property records showing ownership and/or lease agreements documenting residence in the defined area; school attendance records, employment records, and various other legal filings and public records, as well as Denka's own map showing the $0.2\ \mu g/m^3$ isopleth, which is itself objectively demarcated on **Exhibit A** hereto and which corresponds to the class defined area.

51.7.   The prosecution of separate actions by individual putative class members within the class defined area, rather than a Class as proposed, would create a risk of inconsistent or varying adjudications and the potential for imposition of inconsistent duties and standards of care as to each of the Defendants and for prejudicial determinations as to

the rights of subsequent plaintiffs, as each Defendant's conduct has harmed all Class Members.

51.8.   Due to the widespread effect of the Defendants' actions throughout the class defined area, any resistance of liability by the Defendants would be applicable to the whole of the proposed class, making class-wide injunctive relief appropriate.

51.9.   As noted above, the common issues of fact and law predominate over those issues that may pertain to individual plaintiffs' claims.

51.10.  The class action procedure is superior to other methods for the fair and efficient adjudication of the claims herein, because:

51.10.1.    The vast majority of the class members have no interest in, and it would be impractical for them to pursue, controlling the prosecution of individual actions for the remedies sought in this Petition, due to the expense in investigating and prosecuting the issues common to the whole class;

51.10.2.    It is desirable to concentrate all litigation regarding the effects of the release of excess concentrations of chloroprene within a single forum, particularly insofar as a single injunctive remedy is appropriate to halt the release of excess concentrations of chloroprene emissions, and insofar as the Defendants should be ordered to fund the research to determine the carcinogenicity of exposure to their emissions of chloroprene; and,

51.10.3.    Class litigation is an efficient mechanism for managing the claims of the class members, due to the opportunity to afford reasonable notice of significant

phases of the litigation to class members on an issue of great public health importance throughout the community.

## COUNT 1: NUISANCE UNDER LA. C.C. ARTS. 667-669

52. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

53. Plaintiffs live within the class defined area, which corresponds with the 0.2 $\mu g/m^3$ isopleth.

54. The conduct of Denka and DuPont in their respective operations on the property that DuPont continues to own—specifically at the site of the Pontchartrain Works neoprene manufacturing facility—constitutes an unreasonable interference with Plaintiffs' lawful use of and presence on properties within the defined area.

55. Plaintiffs were deprived of enjoyment of property within the defined area, due to exposure to concentrations of chloroprene emissions in excess of 0.2 $\mu g/m^3$ and the determination of damages can be determined on a class wide basis.

56. The chloroprene emissions from the Pontchartrain Works facility are sufficient to cause physical discomfort and annoyance to Plaintiffs, who must often confine themselves indoors to escape the excess concentrations of chloroprene emissions, and those emissions thereby constitute a nuisance.

57. Concentrations of chloroprene emissions above 0.2 $\mu g/m^3$ have been determined by the EPA to present an unacceptable risk of exposure to a likely human carcinogen, and those emissions thereby constitute a nuisance.

58. This nuisance is caused solely by emissions from the Pontchartrain Works facility, operated by Denka on property owned by DuPont.

59. Denka and DuPont each knew that the release of chloroprene in levels resulting in concentrations greater than 0.2 $\mu g/m^3$ presented a disruption of nearby class members' peaceful enjoyment of their property.

60. Denka and DuPont could have prevented the deprivation of enjoyment had they exercised reasonable care by instituting and implementing technology and processes that prevented the excess release of chloroprene from the Pontchartrain Works facility. Nevertheless, Defendants failed to exercise reasonable care.

61. Therefore, Denka and DuPont are liable to be enjoined from any further emissions of chloroprene that will result in exposure of any Class member to concentrations of chloroprene in excess of 0.2 $\mu g/m^3$.

62. Plaintiffs also reserve their rights to assert claims for damages due to any personal injury or from exposure to chloroprene emissions, should such injury become manifest and such claims ripen and no longer be immature torts.

**COUNT 2: TRESPASS**

63. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

64. Denka's operation of the Pontchartrain Works facility—and DuPont's before it—caused Defendants' hazardous substance, chloroprene, to encroach upon the property where Plaintiffs live or are otherwise occupants, in concentrations in excess of 0.2 $\mu g/m^3$. These emissions have

resulted in an actual physical invasion onto and into Plaintiffs' properties. This physical invasion is continuing.

65. The entry and presence of excess levels of chloroprene on Plaintiffs' properties is unauthorized and cause and continue to cause damages to the plaintiffs along with all proposed class members. Defendants are prohibited under Louisiana law from causing such materials to encroach upon the property of its neighbors.

66. Therefore, Denka and DuPont are liable to be enjoined from any further emissions of chloroprene that will result in further trespass on the property owned or leased by any Class member of chloroprene in concentrations in excess of 0.2 $\mu g/m^3$.

67. Plaintiffs also reserve their rights to assert claims for damages due to any personal injury from exposure to chloroprene emissions, should such injury become manifest and such claims ripen and no longer be immature torts.

## COUNT 3: NEGLIGENCE PURSUANT TO LA. C.C. ART. 2315

68. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

69. Defendants had and continue to have a duty to protect Plaintiffs and their property from the effects of excessive chloroprene pollution described herein.

70. The risk Plaintiffs' exposure to concentrations of chloroprene emissions in excess of 0.2 $\mu g/m^3$ was encompassed within the scope of the duties owed them by Defendants.

71. Defendants breached their duties to Plaintiffs. Defendants knew the hazardous nature of chloroprene emissions; yet Defendants, in their respective periods operating the Pontchartrain

Works facility, failed to act reasonably to prevent emissions of chloroprene that would result in concentrations of greater than 0.2 µg/m$^3$ around the surrounding community—indeed, those concentrations were hundreds of times the threshold for reasonable and safe chloroprene exposure.

72. Moreover, Defendants have breached their duties to Plaintiffs by failing to warn and/or failing to disclose to EPA, LDEQ, St. John the Baptist Parish government officials, or any other governmental or community members, including those in the defined area, the information that Defendants had developed and had in their exclusive control regarding the harmful effects of exposure to chloroprene emissions.

73. Therefore, Denka and DuPont are liable to be enjoined from any further emissions of chloroprene that will result in further exposure of any Class member to chloroprene in concentrations in excess of 0.2 µg/m$^3$.

74. Plaintiffs also reserve their rights to assert claims for damages due to any personal injury from exposure to chloroprene emissions, should such injury become manifest and such claims ripen and no longer be immature torts.

**COUNT 4: STRICT LIABILITY PURSUANT TO LA. C.C. ARTS. 2317-2317.1**

75. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

76. La. C.C. arts. 2317-2317.1 provide that a custodian is strictly liable for damages occasioned by the things he owns. At all material times, DuPont owned and received substantial benefits from the ownership of the property where the Pontchartrain Works facility is located. Prior to

November 2015, DuPont—and after November 2015, Denka—owned and controlled the neoprene manufacturing facility on that property, including all units that release chloroprene emissions and discharges at the Pontchartrain Works facility. The operation of those units in a manner resulting in releases of chloroprene in concentrations in excess of 0.2 µg/m$^3$ in the defined area is the cause-in-fact for Plaintiffs' damages.

77. The defects in Defendants' operation of the Pontchartrain Works facility caused an unreasonable risk of harm to Plaintiffs. The burden of reducing chloroprene emissions from the Pontchartrain Works facility is slight as compared to the potential gravity of harm to Plaintiffs.

78. Defendants knew of the unreasonable risks attendant to excess releases of chloroprene from the Pontchartrain Works facility.

79. Therefore, Denka and DuPont are liable to be enjoined from any emissions of chloroprene that will result in further exposure of any Class member to chloroprene in concentrations in excess of 0.2 µg/m$^3$.

80. Plaintiffs also reserve their rights to assert claims for damages due to any personal injury or property damage from exposure to chloroprene emissions, should such injury or damage become manifest and such claims ripen and no longer be immature torts.

**WHEREFORE**, the Plaintiffs and all those similarly situated pray that, after due proceedings be had, this action be ordered to go forward as a class action as petitioned for herein,

there be judgment rendered in their favor and against each Defendant finding that each Defendant is liable to the Plaintiffs and all those similarly situated, jointly and solidarily, for:

a) Certification of the class as alleged herein in Paragraphs 2 and 51 (and their associated sub-paragraphs);

b) Injunctive relief in the form of abatement of chloroprene releases such that concentrations of chloroprene in the defined area never exceed 0.2 $\mu g/m^3$;

c) If the Court finds that the plaintiffs and the plaintiff class are entitled to injunctive relief, those common damages that can be ascertained on a class-wide basis for the deprivation to the class of the enjoyment of occupancy of property;

d) To the extent that causes of action for non-injunctive remedies that Plaintiffs herein specifically reserve if they become mature, all damages as are just and reasonable under the circumstances, including but not limited to the cost of testing Class members for exposure to chloroprene, the cost of research to determine the carcinogenicity of exposure to chloroprene emissions, treatment of physical symptoms of chloroprene exposure, compensation for reasonable and justified fear of cancer due to chloroprene exposure, and diminution of value of property due to the presence of concentrations of chloroprene in excess of the acceptable risk level of 0.2 $\mu g/m^3$;

e) To the extent the causes of action for such remedy becomes mature, medical monitoring for development of cancer and other maladies due to chloroprene exposure;

f) Judicial interest from the date of the judicial demand;

g) Punitive damages to the extent permitted under any applicable law;

h)  The award of costs, expenses, and reasonable attorneys' fees in favor of the Plaintiffs and all those similarly situated to the fullest extent authorized by law; and

i)  Such other and further relief which the Court deems necessary and proper at law and in equity and that may be just and reasonable under the circumstances of this matter;

j)  Plaintiffs request a jury trial of all claims in this matter.

Respectfully submitted,

*/s/ H.S. Bartlett III*

JONES, SWANSON, HUDDELL &
GARRISON, LLC
Gladstone N. Jones, III (La. Bar No. 22221)
Eberhard D. Garrison (La. Bar No. 22058)
Lynn E. Swanson (La. Bar No. 22650)
H.S. Bartlett III (La. Bar. No. 26795)
Kevin E. Huddell (La. Bar No. 26930)
Emma E. Antin Daschbach (La. Bar No. 27358)
Lindsay E. Reeves (La. Bar No. 32703)
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

BRUNO & BRUNO, L.L.P.
Joseph M. Bruno (La. Bar No. 3604)
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775

OF COUNSEL:
CUMMINGS & CUMMINGS, LLC
John Cummings (La. Bar No. 4652)
416 Gravier Street
New Orleans, LA 70118
Telephone: (504) 586-0000
Facsimile: (504) 522-8423

THE LAMBERT FIRM, PLC
Hugh P. Lambert, T.A. (La. Bar #7933)
Cayce C. Peterson, Esq. (La. Bar #32217)
Morgan Embleton, Esq. (La. Bar #35769)
701 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-1750

Facsimile: (504) 529-2931

Sylvia Elaine Taylor (La. Bar No. 08245)
1126 W. Airline Highway
LaPlace, Louisiana 70068

Randal L. Gaines (La. Bar No. 17576)
7 Turnberry Drive
LaPlace, Louisiana  70068

Darryl J. Tschirn (La. Bar # 12938)
7825 Fay Avenue, Suite 200
LaJolla, California 92037

***Counsel for Plaintiffs and all those similarly situated***

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2017, I electronically filed the foregoing with the

Clerk of court by using the CM/ECF system, which will send a notice of the electronic filing to

the counsel of record for Defendants

 */s/ H.S. Bartlett III*