UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ROBERT TAYLOR, JR., ET AL.                    CIVIL ACTION

v.                                            NO. 17-7668
                                              c/w 18-5739[1]

DENKA PERFORMANCE ELASTOMER LLC, ET AL.       SECTION "F"


ORDER AND REASONS

Before the Court are two Rule 12 motions: (1) Denka
Performance Elastomer LLC's motion to dismiss; and (2) E.I. du
Pont de Nemours and Company's motion to dismiss. For the reasons
that follow, DuPont's motion is GRANTED, and Denka's motion is
GRANTED without prejudice to the plaintiffs' opportunity to amend
their deficient nuisance allegations in their complaint.

**Background**

This environmental tort litigation arises from the production
of neoprene, which allegedly exposes those living in the vicinity
of the manufacturing plant to concentrated levels of chloroprene
well above the upper limit of acceptable risk, resulting in a risk
of cancer more than 800 times the national average.   Thirteen

---

[1] This Order and Reasons applies to Civil Action Number 17-7668.

1

people living in what environmentalists and the media have dubbed "Cancer Alley" filed this lawsuit seeking injunctive relief in the form of abatement of chloroprene releases from their industrial neighbor, the Pontchartrain Works facility, the only facility in the United States still manufacturing a synthetic rubber called neoprene, which is made from chloroprene, which the Environmental Protection Agency has classified as a "likely human carcinogen."

These facts are drawn from the allegations advanced in the second amended complaint. E.I. Dupont de Nemours & Co. invented neoprene in 1931. Neoprene is a synthetic rubber used in chemical and weather resistant products such as wet suits and orthopedic braces. It is also used as a base resin in adhesives, electrical insulation, and coatings. In 1969, DuPont built a neoprene manufacturing unit at its Pontchartrain Works facility in LaPlace, Louisiana. Chloroprene, a component of neoprene, is manufactured at the site. During the manufacturing process, chloroprene is emitted into the air and discharged into the water.

By 2008, DuPont had consolidated its neoprene production to its Pontchartrain Works facility (PWF), which is now the only facility manufacturing neoprene in the United States. Effective November 1, 2015, DuPont sold the PWF to Denka Performance

Elastomer LLC (DPE or Denka), but DuPont retained ownership of the land underlying the facility.

It is alleged that as early as 1988 DuPont knew "of the deleterious effects of exposure to chloroprene emissions," and that DPE had the same knowledge of such harms when it bought the Pontchartrain Works facility. It is alleged that both DuPont and DPE concealed from the Environmental Protection Agency (EPA) and the Louisiana Department of Environmental Quality (LDEQ) their knowledge regarding chloroprene's harmful effects. In 2010, the EPA classified chloroprene as a "likely human carcinogen." In its Integrated Risk Information System assessment of chloroprene, the EPA explained that chloroprene was "likely to be carcinogenic to humans' [sic] through a mutagenic mode of action and that the primary exposure route of concern is the inhalation pathway." Additionally, the EPA has noted that

> [s]ymptoms reported from acute human exposure to high concentrations of chloroprene include giddiness, headache, irritability, dizziness, insomnia, fatigue, respiratory irritation, cardiac palpitations, chest pains, nausea, gastrointestinal disorders, dermatitis, temporary hair loss, conjunctivitis, and corneal necrosis.... Acute exposure may [also]: damage the liver, kidneys, and lungs; affect the circulatory system and immune system; depress the central nervous system (CNS); irritate the skin and mucous membranes; and cause...respiratory difficulties in humans.

In December 2015, the EPA again classified chloroprene as a likely human carcinogen when it released a screening-level National Air Toxics Assessment (NATA), which analyzes exposure levels to toxins, estimates the expected number of incidences of cancer per one million people based on exposure to air toxins from industry, and also announces an upper limit of "acceptable risk" threshold.[2] The NATA acceptable risk exposure threshold for chloroprene was established as 0.2 μg/m³; that is, chloroprene emissions must stay below .2 micrograms per cubic meter[3] in order to comply with the limit of acceptable risk threshold (which is a risk of 100 in one million people).

Despite knowledge of this upper limit of the acceptable risk threshold for exposure to chloroprene concentrations, it is alleged that DPE continues to emit chloroprene at hundreds of times the 0.2 μg/m³ threshold. It is alleged that, historically, the Pontchartrain Works facility emitted chloroprene air emissions well in excess of the 0.2 μg/m³ threshold. Since May 25, 2016, the EPA has collected 24-hour air samples every three days from six locations around the Pontchartrain Works facility; air samples at all six locations are frequently up to 700 times the 0.2 μg/m³

---

[2] Exposure above the designated "acceptable risk" represents an unacceptable risk of cancer from exposure from the toxin.
[3] The concentration of an air pollutant is measured in units of density.

threshold, or more.[4] DPE's own sampling numbers at five locations surrounding the facility indicate that average chloroprene emissions range from 20.4 to 33.25 times the 0.2 µg/m³ threshold.

The EPA's National Enforcement Investigation Center (NEIC) conducted a Clean Air Act (CAA) inspection of the Pontchartrain Works facility in June 2016.[5] A copy of the redacted inspection report from the EPA's CAA inspection was publicized on April 3, 2017. The NEIC inspection report revealed various areas of non-compliance by both DuPont and DPE in their operation of the facility, including failure to adhere to monitoring, recordkeeping, and reporting requirements for the chloroprene vent condenser; failure to replace leaking valves; failure to include appropriate emissions factors in air permit application materials; and failure to institute appropriate emissions controls for the chloroprene Group I storage tank.

On January 6, 2017, DPE entered into an Administrative Order on Consent (AOC) with LDEQ with a target to reduce its chloroprene emissions by 85 percent. Even if this reduction is achieved, the

_____

[4] The EPA did not report its sampling results until October 2016.
[5] Meanwhile, representatives of DuPont and DPE told members of the community that there was no danger arising from the facility's chloroprene emissions. On December 8, 2016, LDEQ Secretary Chuck Brown told members of the community that those expressing concern regarding chloroprene emissions were "fearmongers" and, he said, "forget about 0.2."

plaintiffs allege that DPE's emission levels will nevertheless exceed the 0.2 µg/m³ threshold. In any event, it is alleged that DPE has failed to meet all interim requirements for emission controls and emissions concentrations that it agreed to in the AOC.

According to the EPA, "[t]he top 6 census tracts with the highest NATA-estimated cancer risks nationally are in Louisiana due to Denka (formerly DuPont) chloroprene emissions." The NATA assessment reports that the cancer risk for the census tracts in the vicinity of the Pontchartrain Works facility is 3.365 per million, while the cancer risk from chloroprene exposure in those census tracts ranges from 158.515 to 768.46 per million, all well above the acceptable risk level recommended by the EPA.

Instead of reducing chloroprene emissions in compliance with the EPA's 0.2 µg/m³ threshold, on June 26, 2017, DPE representatives submitted a Request for Correction to the EPA in which they sought to increase the 0.2 µg/m³ threshold in order "to prevent further significant damage to" their business.[6] It is alleged the DPE representatives have lobbied members of the U.S.

---

[6] On January 25, 2018, the EPA wrote a detailed letter to DPE, rejecting its Request for Correction. The EPA's response leaves undisturbed its determinations that chloroprene is a likely human carcinogen and 0.2 µg/m³ is the upper limit of acceptable risk exposure threshold for chloroprene.

Congress to undermine the EPA and support reduction or removal of emissions restrictions at the facility.

Robert Taylor, Jr., individually and on behalf of his minor daughter, N.T., Kershell Bailey, Shondrell P. Campbell, Gloria Dumas, Janell Emery, George Handy, Annette Houston, Rogers Jackson, Michael Perkins, Allen Schnyder, Jr., Larry Sorapuru, Sr., Kellie Tabb, and Robert Taylor, III are all individuals living near PWF in Reserve, Edgard, and LaPlace, Louisiana. On June 29, 2017, these individuals, individually and as representatives of a putative class of similarly situated plaintiffs, sued Denka Performance Elastomer LLC and E.I. DuPont De Nemours and Company in the Louisiana 40th Judicial District Court in St. John the Baptist Parish. The plaintiffs allege that DuPont has emitted chloroprene for many years at levels resulting in concentrations many times the upper limit of acceptable risk, and DPE continues to do so. The plaintiffs advance Louisiana state law causes of action for nuisance, trespass, negligence, and strict liability; they seek injunctive relief in the form of abatement of chloroprene releases such that the concentration of chloroprene does not exceed the 0.2 µg/m³ threshold; damages for deprivation of enjoyment of occupancy of property; punitive damages; and additional damages

including medical monitoring to the extent personal injury claims become mature.[7]

The defendants jointly removed the lawsuit, invoking this Court's diversity jurisdiction. The Court denied the plaintiffs' motion to remand.[8] The plaintiffs filed an untimely request to extend the deadline to seek class certification, which the defendants opposed. The Court denied the plaintiffs' request to extend the deadline to seek class certification, and later denied the plaintiffs' motion to reconsider its ruling. See Order and Reasons dtd. 2/22/18 (denying plaintiffs' motion to reconsider, denying the plaintiffs' untimely motion for class certification, and granting DuPont's motion to dismiss class allegations). The

---

[7] The plaintiffs allege that they do not now seek to recover for personal injury damages due to chloroprene exposure; rather, they allege that they "seek to preserve" the right to bring claims to recover compensatory damages when evidence linking chloroprene emissions to physical injury may be developed.

[8] The plaintiffs timely moved to remand, arguing both that removal was procedurally defective (because the defendants failed to sufficiently allege their citizenship at the time of removal) and that the Court lacked diversity jurisdiction over the lawsuit. The defendants opposed the plaintiffs' motion to remand and, in response to the plaintiffs' argument that the allegations of citizenship were technically defective, the defendants additionally requested leave to file an amended joint notice of removal to correct any technically defective allegations. The Court denied the plaintiffs' motion to remand and granted the defendants' request for leave to file an amended notice of removal. Meanwhile, the plaintiffs filed an unopposed motion for leave to file a second amended and restated class action complaint; the motion was granted.

defendants now move to dismiss the plaintiffs' claims for lack of subject matter jurisdiction or failure to state a claim.[9]

I.

*A.*

The subject matter jurisdiction of federal courts is limited. Kokkonen v. Guardina Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Indeed, "[i]t is to be presumed that a cause lies outside this limited jurisdiction," the Supreme Court has observed, "and the burden of establishing the contrary rests upon the party asserting jurisdiction." Id. (citations omitted). Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

A lawsuit must be dismissed if it appears that the Court lacks subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1), (h)(3). The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. King v. U.S. Dep't of Veterans

---

[9] Meanwhile, the defendants recently removed from state court another lawsuit alleging exposure to chloroprene emissions, Lydia Gerard v. Denka Performance Elastomer LLC, Civil Action Number 18-5739, which has been consolidated with this matter. Ms. Gerard alleges that she has experienced some of the symptoms identified by the EPA as a result of chloroprene exposure, and she seeks to recover not more than $50,000 under theories of nuisance, negligence, strict liability, and civil battery. She has filed a motion to remand, which is pending and shall be resolved by separate order.

_Affairs_, 728 F.3d 410, 416 (5th Cir. 2013); _Ramming v. United_ _States_, 281 F.3d 158, 161 (5th Cir. 2001). When presented with other Rule 12 motions, jurisdictional challenges should be resolved first.

In addition to the jurisdictional challenge, the defendants also seek dismissal of the plaintiffs' claims for failure to state a claim under Rule 12(b)(6). The standard of review applicable to motions to dismiss under Rule 12(b)(1) is similar to that applicable to motions to dismiss under Rule 12(b)(6). _See_ _Williams_ _v. Wynne_, 533 F.3d 360, 364-65 n.2 (5th Cir. 2008)(observing that the Rule 12(b)(1) and Rule 12(b)(6) standards are similar, but noting that applying the Rule 12(b)(1) standard permits the Court to consider a broader range of materials in resolving the motion). The Court may find a plausible set of facts to support subject matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." _Barrera-Montenegro v. United States_, 74 F.3d 657, 659 (5th Cir. 1996). In the absence of a motion by one of the parties, the Court may also examine the basis of its jurisdiction on its own. _Crone_ _v. Cockrell_, 324 F.3d 833, 836 (5th Cir. 2003).

*B.*

In addition to the jurisdictional challenge, the defendants also seek dismissal of the plaintiffs' claims for failure to state a claim under Rule 12(b)(6).  Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted.  Such a motion is rarely granted because it is viewed with disfavor.  See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)(citing Fed. R. Civ. P. 8). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

In considering a Rule 12(b)(6) motion, the Court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." See Thompson v. City of Waco, Texas, 764 F.3d 500, 502 (5th Cir. 2014) (citing Doe ex rel. Magee

11

v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 854 (5th Cir. 2012)(en banc)). But, in deciding whether dismissal is warranted, the Court will not accept conclusory allegations in the complaint as true. Id. at 502-03 (citing Iqbal, 556 U.S. at 678).

To survive dismissal, "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009)(quoting Iqbal, 556 U.S. at 678)(internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations and footnote omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."). This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to

relief." Id. at 678 (internal quotations omitted)(citing Twombly, 550 U.S. at 557). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'", thus, "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (alteration in original)(citation omitted).

## II.

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" Clapper v. Amnesty Int'l USA, 568 U.S. 398, 133 S.Ct. 1138, 1146 (2013)("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court-jurisdiction to actual cases and controversies." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016)(citation omitted).

Justiciability doctrines -- standing, mootness, political question, and ripeness -- give meaning to Article III's case or controversy requirement. A plaintiff bears the burden of establishing standing and ripeness under Article III. See

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 and n.3 (2006)(in a case removed from state court, "[w]hatever the parties' previous positions on the propriety of a federal forum, plaintiffs, as the parties seeking to establish federal jurisdiction, must make the showings required for standing."); see also Miss. State Democratic Party v. Barbour, 529 F.3d 538, 545 (5th Cir. 2008). "One element of the case-or-controversy requirement" -- standing to sue -- commands that a litigant must have standing to invoke the power of a federal court. See Clapper, 133 S. Ct. at 1146 (citation omitted); Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1545 (2016)(citations omitted)(the standing doctrine "limits the categories of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."); see also National Federation of the Blind of Texas, Inc. v. Abbott, 647 F.3d 202, 208 (5th Cir. 2011).

A.  Standing

Three elements comprise the "irreducible constitutional minimum" of standing:

> A plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

14

<u>Friends of the Earth, Inc. v. Laidlaw Env'l Services (TOC), Inc.</u>,
528 U.S. 167, 185 (2000).(citing <u>Lujan v. Defenders of Wildlife</u>,
504 U.S. 555, 560-61 (1992)).  "The injury-in-fact requirement
requires a plaintiff to allege an injury that is both 'concrete
*and* particularized.'"  <u>Spokeo</u>, 136 S. Ct. at 1545 (quoting <u>Friends
of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.</u>,
528 U.S. 167, 180-81 (2000)(emphasis in <u>Spokeo</u>)).  "For an injury
to be particularized, it must affect the plaintiff in a personal
and individual way."  <u>Id.</u> at 1548 (internal quotations, citation
omitted).  For an injury to be concrete, "it must actually exist[;
it must be] real, and not abstract."  <u>Id.</u> (internal quotations and
citations omitted).

The parties invoking federal jurisdiction, here, each of the
plaintiffs, bear the burden of establishing standing as to each
claim alleged.  <u>Clapper</u>, 133 S.Ct. at 1146; <u>DaimlerChrysler Corp.
v. Cuno</u>, 547 U.S. 332, 342 (2006); <u>Miss. State Democratic Party v.
Barbour</u>, 529 F.3d 538, 545 (5th Cir. 2008); <u>Doe v. Tangipahoa
Parish School Bd.</u>, 494 F.3d 494, 499 (5th Cir. 2007)("Standing to
sue must be proven, not merely asserted, in order to provide a
concrete case or controversy and to confine the courts' rulings
within our proper judicial sphere.").  "[E]ach element must be
supported in the same way as any other matter on which the

plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." Susan B. Anthony List v. Driehaus, 134 S.Ct. 2334, 2342 (2014) (citing Lujan, 504 U.S. at 561).

To meet the irreducible constitutional minimum of standing to seek injunctive relief, each plaintiff must establish that "he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged ... conduct." City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983)(citations and internal quotations omitted). However, a plaintiff may not simply rely on past injury to satisfy the injury requirement; he must show a likelihood that he will be injured in the future. See O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)(holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief...if unaccompanied by any continuing present adverse effects).

To satisfy constitutional standing, the plaintiffs must demonstrate that each form of relief they seek will redress their injuries. Here, the plaintiffs concede that any claims for physical injury (or property damage) are not ripe and therefore not at stake in this litigation; they only seek injunctive relief in the form of abatement of chloroprene releases above a certain

threshold. An injunctive remedy is an appropriate form of redress if it will effectively abate or deter illegal conduct that is ongoing at the time of the lawsuit. <u>Friends of the Earth, Inc. v. Laidlaw Env'l Services (TOC), Inc.</u>, 528 U.S. 167, 185 (2000). Here, the plaintiffs claim that the defendants continue to emit harmful levels of chloroprene from the PWF and that this lawsuit seeks an injunction to abate that conduct. But an injunction would only abate Denka's conduct; the plaintiffs fail to reconcile the prospective nature of the relief sought with their allegation that DuPont neither owns nor operates the offending neoprene facility.[10] The plaintiffs simply have neither alleged nor advanced any argument that any nuisance or deprivation they are experiencing (and will continue to experience in the future if emissions are not abated) is traceable to DuPont's present or future conduct. More significantly, the plaintiffs fail to allege facts sufficient to support a finding that a favorable judgment against DuPont would redress their forward looking injury. To be sure, the plaintiffs' own allegations concede that DuPont is no longer operating the neoprene plant; they fail to explain how DuPont could comply with an injunction ordered by this Court.[11]

---

[10] The plaintiffs allege that DuPont sold the PWF in 2015, but that it retained ownership of the land underlying the facility.

[11] The Court underscores that the plaintiffs *in this lawsuit* do not seek redress in the form of damages linked to DuPont's past

The plaintiffs have failed to carry their burden to demonstrate that they have standing to sue DuPont in their quest for injunctive relief only. The plaintiffs wholly ignore their obligation to satisfy the Court that they have standing to pursue their injunctive remedy against DuPont. They limply assert only that they "have alleged that DuPont still owns the property underlying the chloroprene production facility and that DuPont still derives benefit from the continuing operations at the facility; the level of DuPont's control over what happens on its property is a fact question not amenable to resolution at the Rule 12(b)(6) stage." This argument glaringly fails to overcome the fact that an injunction enjoining DuPont from exceeding the emissions threshold suggested by the EPA would not prevent or deter Denka, the only party alleged to be operating the plant emitting chloroprene, from violating the suggested emissions threshold.[12]

Because the injunctive remedy the plaintiffs seek against DuPont would not redress the alleged nuisance or deprivation (because it would not abate Denka's emission of chloroprene), the

---

conduct as responsible for emissions in its capacity of owner and operator of the PWF.

[12] The standing test is directed to defendant's *conduct*; not ownership of land on which the allegedly harmful conduct is occurring. It is not the land that is creating a nuisance; it is the operation of the neoprene facility.

plaintiffs lack standing to maintain their claims against DuPont. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998)("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."); Lujan, 540 U.S. at 560 (no standing where a claim could be redressed only through "the unfettered choices made by independent actors...")(citations omitted); see also Bd. of Supervisors of La. State Univ. v. Fleming, 265 F.2d 736, 738 (5th Cir. 1959)("The law does not require the doing of a vain and useless thing."); Sancho v. U.S. Dep't of Energy, 392 Fed.Appx. 610, 611-12 (9th Cir. 2010)(the plaintiff lacked standing to pursue an injunction against the Department of Energy because it had no control over the operations plaintiff sought to enjoin such that a favorable decision "would not afford [the plaintiff] the relief he seeks").

The plaintiffs' own allegations against DuPont are self-defeating. The plaintiffs concede that their claims arise from continuing active releases; in this lawsuit they do not seek to recover money damages for personal injuries contributed to by past chloroprene emissions. It is alleged that the source of the chloroprene emissions that the plaintiffs seek to enjoin is the neoprene production facility at the Pontchartrain Works; DuPont sold the facility and neoprene business to Denka on November 1,

2015; Denka has owned and operated the facility since then; it is Denka and its neoprene business that is subject to comprehensive regulations and permit requirements related to the neoprene production operations that the plaintiffs seek to enjoin; Denka is working with the LDEQ to reduce emissions; Denka has entered into an Administrative Order on Consent with state regulators. The plaintiffs offer no basis for this Court to plausibly infer that any injunctive relief that could be granted enjoining DuPont would have the effect of abating chloroprene emissions from a facility it no longer owns nor operates. Because the injunctive relief the plaintiffs seek from DuPont would not abate emissions, it would not redress their injury. Accordingly, the plaintiffs have failed to carry their burden to show that they have standing to pursue an injunction against DuPont.[13]

## 2. Ripeness

A case or controversy "must be ripe for decision, meaning that it must not be premature or speculative." Lower Colorado River Authority v. Papalote Creek II, L.L.C., 858 F.3d 916, 922 (5th Cir. 2017)(citing Shields v. Norton, 289 F.3d 832, 836-37 (5th Cir. 2002)). The Court "should dismiss a case for lack of

---

[13] The Court does not reach DuPont's arguments directed to whether the plaintiffs have stated plausible claims concerning DuPont's conduct or whether any claims are time-barred.

20

'ripeness' when the case is abstract or hypothetical." Id.
(citation omitted). "The 'basic rationale [behind the ripeness
doctrine] is to prevent the courts, through avoidance of premature
adjudication, from entangling themselves in abstract
disagreements.'" Roark & Hardee LP v. City of Austin, 522 F.3d
533, 544 (5th Cir. 2008) (quoting Abbott Labs. v. Gardner, 387
U.S. 136, 148 (1967)). The two key considerations for a ripeness
determination are "the fitness of the issues for judicial decision
and the hardship to the parties of withholding court
consideration." Roark & Hardee LP v. City of Austin, 522 F.3d
533, 545 (5th Cir. 2008). "A case is generally ripe if any
remaining questions are purely legal ones . . . ." Id.

Paragraphs 62 and 80 of the second amended complaint state:

Plaintiffs also reserve their rights to assert claims
for damages due to any personal injury or property damage
from exposure to chloroprene emissions, should such
injury or damage become manifest and such claims ripen
and no longer be immature torts.[14]

---

[14] The plaintiffs allege that, if their reserved immature tort
claims become mature, they seek as damages the cost of testing
class members for chloroprene exposure, the cost of research to
determine the carcinogenicity of exposure to chloroprene
emissions, treatment of physical symptoms of exposure,
compensation for reasonable and justified fear of cancer due to
exposure, medical monitoring for development of cancer and other
maladies due to chloroprene exposure, and diminution of property
value due to the presence of chloroprene concentrations exceeding
the acceptable risk level of 0.2 $\mu g/m^3$.

21

Insofar as the plaintiffs' allegations can be read as an attempt to allege "immature torts" or claims for personal injury and property damages, the defendants seek to dismiss such claims as not ripe. The plaintiffs concede that whether or not the plaintiffs will develop compensable personal injury or property based damages claims in the future is, at this point, hypothetical. Accordingly, insofar as the plaintiffs attempted to state a claim for or hold a place for personal injury or property based damage claims, any such claims must be dismissed without prejudice. Simply put, the plaintiffs' mere wish to reserve their right to assert certain damage-based claims, combined with the absence of any alleged factual predicate supporting personal injury or property damage caused by exposure to chloroprene emitted from the PWF renders any such claims not yet ripe for adjudication. All "immature tort" claims are dismissed without prejudice.

III.

Denka moves to dismiss for failure to state a claim the plaintiffs' causes of action for nuisance, trespass, negligence, "strict liability," as well as the plaintiffs' demand for punitive damages. As a threshold matter, the Court observes that two factors hinder this Court's review of the plausibility of these

causes of action.  First, this case was originally styled as a putative class action, and no amended complaint was filed after the class allegations were dismissed.  Therefore, absent from the complaint are any specific factual allegations concerning each plaintiffs' exposure or linking plaintiffs to any (unstated) manifestations of emissions.  This impairs the Court's assessment of both a determination as to whether each of these plaintiffs has standing to pursue a claim against Denka, and also unnecessarily complicates a determination as to whether each plaintiff has stated a plausible claim for relief.  Second, that the plaintiffs concede that their "immature tort" claims based on personal injury or property damage are not yet ripe necessarily informs the Court's determination as to whether they have stated a plausible claim for trespass, negligence, and strict liability (given that causation and damages are elements of these causes of action).

The plaintiffs offer a detailed "background facts" section providing an overview of the PWF and the EPA's designation of chloroprene as a likely human carcinogen.  Although the "background facts" section of the second amended complaint also lists various symptoms that the EPA says is caused by acute chloroprene exposure, not one of the plaintiffs alleges that he or she has experienced any of these symptoms.  Nor do any of the plaintiffs allege in any concrete way how chloroprene exposure manifests any physical

injury, disease, or nuisance; they simply conclude that the emissions interfere with the enjoyment of their property. It is this lack of factual predicate that dooms the plaintiffs' claims.

Paragraph 50 of the second amended complaint states that the plaintiffs "have suffered trespass and nuisance due to the regular and repeated exposure to concentrations of chloroprene emissions in excess of levels the Defendants know are unsafe—as demonstrated by the peer-reviewed scientific analysis relied on in EPA's issuance of the 0.2 µg/m³ threshold and as a result have sustained damages pursuant to La. C.C. art. 667." The remaining defendant, Denka, challenges the sufficiency of the plaintiffs' allegations as to each cause of action asserted on the ground that the plaintiffs fail to allege a factual predicate for any actual harm or damages, or what precisely is the predicate for the alleged nuisance. The Court agrees. However, because leave to amend should be granted when justice requires, the Court will allow the plaintiffs fourteen days to amend their complaint to cure their defective nuisance allegations and to add factual allegations to support the now conclusory allegations (as well as to remove the class allegations, which were previously dismissed).

The Court turns briefly to address the distinct causes of action the plaintiffs purport to allege.

1. Nuisance, La. C.C. arts. 667-669

The plaintiffs first allege that the chloroprene emissions violate the defendants' obligations of vicinage, found in Louisiana Civil Code articles 667-669. The Louisiana Supreme Court has observed:

> These obligations of vicinage are legal servitudes imposed on the owner of property. These provisions embody a balancing of rights and obligations associated with the ownership of immovables. As a general rule, the landowner is free to exercise his rights of ownership in any manner he sees fit. He may even use his property which "...occasion some inconvenience to his neighbor." However, his extensive rights do not allow him to do "real damage" to his neighbor.

Rodrigue v. Copeland, 475 So.2d 1071, 1077 (La. 1985). Nuisance describes the type of conduct that violates these articles.

Louisiana Civil Code article 667, Limitations on use of property, states:

> Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care....

Louisiana Civil Code article 668, Inconvenience to neighbor, states:

> Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.

> Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbor's house, because this act occasions only an inconvenience, but not a real damage.

Louisiana Civil Code article 669, Regulation of inconvenience, states:

> If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.

Brushing broadly, the plaintiffs allege that the chloroprene emissions are a nuisance within the meaning of Louisiana Civil Code articles 667-669. They allege that the emissions from Denka's plant have deprived them of enjoyment of their property, and at paragraph 56, state that "chloroprene emissions...are sufficient to cause physical discomfort and annoyance to Plaintiffs, who must confine themselves indoors to escape the excess concentrations of chloroprene emissions, and those emissions cause a nuisance."

Absent from these allegations, however, is any factual content. What precisely is the source of the physical discomfort and annoyance? A noxious smell? Throat irritation? How does this nuisance physically manifest, if at all? The plaintiffs simply omit any facts that might indicate the nature or degree of intrusion, or its relative persistence or duration.

The plaintiffs do not suggest what about the emissions makes them remain indoors or how they are aware of the emissions.[15] They merely recite and intone generic and formulaic conclusions. Another point of deficiency is the absence of any individualized allegations regarding each plaintiff's experience.[16] Nevertheless, because the plaintiffs may indeed be able to cure these wholly defective allegations and because injunctive relief to abate an airborne nuisance could be plausible, the Court again provides the plaintiffs with fourteen days to amend their deficient allegations by adding some factual content specific to each plaintiff.

---

[15] They allege that mutagenic metabolites reside in their bodies. The Court assumes without deciding that this allegation without additional factual content is insufficient to state a plausible claim for nuisance.

[16] This matter was originally a putative class action, but those class action allegations have been dismissed. Each and every plaintiff must allege facts sufficient to have standing to seek injunctive relief and to allege facts that, if true, would plausibly entitle them to relief.

2.  Trespass

The plaintiffs allege that the defendants' operation of the PWF caused excess levels of chloroprene to encroach upon the property where they "live or are otherwise occupants," and that the "actual physical invasion...is continuing." The excess levels of chloroprene is allegedly "unauthorized...and continue[s] to cause damages to the plaintiffs." Notably, the plaintiffs disclaim any property damage at this time and seek only prospective relief. Denka urges the Court to dismiss this cause of action because the plaintiffs fail to allege specific facts supporting how transient air emissions have physically invaded the plaintiffs' properties.

The Louisiana Civil Code recognizes the tort of trespass under article 2315. Richard v. Richard, 24 So. 3d 292, 296 (La. App. 3 Cir. 2009). "A trespass occurs when there is an unlawful physical invasion of the property or possession of another." Id. There is no trespass when the landowner gives consent to the presence. Beals v. Griswold, 468 So. 2d 641, 644 (La. App. 4 Cir. 1985). "Damages are recoverable for 'unconsented to activities performed on the property of another, based on physical property damage, invasion of privacy, inconvenience, and mental and physical suffering." Richard, 24 So. 3d at 296 ("The tort of trespass has long been recognized by courts...as a means to correct the damage

caused when an owner is unjustly deprived of the use and enjoyment of his immovable.")(citations omitted). "In an action for trespass,...the plaintiff [must] show damages based on the result or the consequences of an injury flowing from the act of trespass." Harrington v. Abshire, 732 So. 2d 677, 682 (La.App. 3 Cir. 1999).

Seeking to save their broadly recited trespass claim from dismissal, the plaintiffs invoke two cases which they say embrace the principle that trespass has long been held to include the trespass of airborne emissions from industrial operations onto neighboring properties. But the cases they invoke are not applicable. One, Sevenson v. E.I. Dupont de Nemours & Co., 327 F.3d 400, 406 (5th Cir. 2003) applied the law of Texas, not Louisiana law. And the other, Tilton v. New Orleans City R. Co., 35 La. Ann. 1062, 1072 (La. 1883), concerned a *nuisance* lawsuit seeking an injunction and damages to prevent the defendant from running and stationing their cars and trains in front of the houses and stores of the plaintiffs on the neutral ground of Canal Street between Rampart and Bourbon and Carondelet Streets. There, the plaintiffs specifically complained that the cars caused noises and

motions that disturbed them and that the engines emitted noxious odors.  <u>Id.</u>[17]

The plaintiffs fail to offer any legal support or factual allegations indicating that they might plausibly recover on a trespass theory having only alleged transient airborne emissions, especially where, as here, they disclaim any property damage or impact whatsoever.  There is no allegation by the plaintiffs that their properties have been impacted by the chloroprene emissions. The plaintiffs have failed to allege any facts that, if proved, would entitle them to relief under a trespass theory of recover.

3.  Negligence, La. C.C. art. 2315

The plaintiffs allege that the defendants have a duty to protect the plaintiffs and their property from the effects of excessive chloroprene emissions, that defendants breached this duty knowing the hazardous nature of the excess emissions, that defendants failed to act reasonably to prevent excess emissions, failed to warn or disclose to plaintiffs, the EPA, that LDEQ, or

---

[17] The plaintiffs cherry pick from the concurring opinion this comment in support of their trespass claim: "One has as much right to protection from gases and mephitic odors transmitted through the air, as to protection from trespass upon his soil, and there is no good reason why courts should not guard the one as jealously as the other."  Such comment might be sympathetic to plaintiffs, but is of no binding or helpful precedent.

government or community members.  The plaintiffs allege that the defendants should be enjoined from further emissions exceeding the 0.2 µg/m³ threshold.  Denka contends that the plaintiffs' damage disclaimer prevents them from stating a cause of action for negligence.  Denka is correct, and the Court agrees.

"Every act whatever of man that causes damages to another obliges him by whose fault it happened to repair it."  La. Civ. Code art. 2315(A).  "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."  La. Civ. Code art. 2316. Courts employ the duty-risk analysis to determine whether to impose liability based on these broad negligence principles.  See Lemann v. Essen Lane Daiquiris, 923 So. 2d 627, 633 (La. 2006).

Here, the plaintiffs not only fail to allege that they have suffered harm or damages, they disclaim physical injury damages because they do not dispute that they cannot prove a causal link between chloroprene emissions exposure and personal injury.  The plaintiffs' allegations that chloroprene emissions have caused mutagenic metabolites to reside in their bodies is entirely speculative and insufficient to support a negligence claim in which injunctive relief to the exclusion of damages is sought.

4.  Strict Liability, La. C.C. arts. 2317-2317.1.

Louisiana Civil Code article 2317 states, "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by . . . the things which we have in our custody."  Article 2317.1 provides:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

To prevail on a custodial liability claim, a plaintiff must prove: "(1) the object was in the defendant's custody; (2) the thing contained a vice or defect which presented an unreasonable risk of harm to others; (3) the defective condition caused the damage; and (4) the defendant knew or should have known of the defect." Cormier v. Dolgencorp, Inc., 136 Fed.Appx. 627, 627-28 (5th Cir. 2008)(citing La. C.C. arts 2317, 2317.1).  Under Louisiana law, a claim for "strict" liability requires that a duty of care was breached, just as a negligence claim does.  Bd. of Commissioners of Southeast La. Flood Protection Authority-East v. Tennessee Gas Pipeline Company, LLC, 850 F.3d 714, 729 (5th Cir. 2017)(citing

<u>Oster v. Dep't of Transp. & Dev.</u>, 582 So.2d 1285, 1288 (La. 1991)).

In fact, "[t]here is essentially no difference between the two

types of claims under Louisiana law." <u>Id.</u> A custodian's duty is

the same as that under the general negligence doctrine of article

2315. <u>Carroll v. American Empire Surplus Lines Ins. Co.</u>, 289 F.

Supp. 3d 767, 771 (E.D. La. 2017)(citation omitted)(Milazzo, J.).

The plaintiffs allege that the operation of the PWF including

all units that emit chloroprene exceeding the 0.2 µg/m³ threshold

"is the cause-in-fact for Plaintiffs' damages;" that the defects

in operation of the PWF caused the plaintiffs to be exposed to an

unreasonable risk of harm; and the defendants knew of the

unreasonable risks; and the defendants should be enjoined from any

emissions of chloroprene that will result in further exposure to

excess chloroprene emissions. This focus on the *operation* of the

PWF undermines any attempt to claim that a "ruin, vice, or defect"

caused the plaintiffs harm. The plaintiffs counter that their

allegations must be read in the context of the EPA materials

including an inspection report that revealed "ruin" and "vice" in

the equipment itself, in the form of leaking valves and open-ended

lines and the lack of appropriate emission controls on various

components of the chloroprene facility. Even if the plaintiffs

sufficiently alleged facts indicating a flaw or condition of

relative permanence inherent in the PWF equipment, the plaintiffs'

strict or custodial liability claim fails the plausibility test for the same reason as their negligence claim: in this lawsuit, they disclaim that they can prove that chloroprene emissions have caused personal injury damages. The plaintiffs' attempt to proceed under a strict liability theory of recovery therefore appears to be another immature tort claim that is not yet ripe.

    6. Punitive Damages

The plaintiffs seek "[p]unitive damages to the extent permitted under any applicable law." Denka contends that recovery of punitive damages is limited and the plaintiffs fail to identify any provision of Louisiana law authorizing recovery of punitive damages. The Court agrees.

Louisiana law permits recovery of punitive damages only in limited circumstances when expressly authorized by law; even when authorized, the statute is strictly construed. See Ross v. Conoco, Inc., 828 So. 2d 546, 555 (La. 2002). The Civil Code permits punitive damages in causes of action arising out of child pornography (article 2315.3), driving while intoxicated (article 2315.4), child molestation (article 2315.7), and domestic abuse article 2315.8). See Moore v. Wayne Smith Trucking, Inc., No. 14-1919, 2015 WL 471606, at *3 (E.D. La. Feb. 4, 2015)(Vance, J.). Former article 2315.3 (effective in 1984 and repealed as of April

34

16, 1996) authorized recovery of punitive damages against a party that wantonly or recklessly disregarded public safety in the storage or handling of hazardous toxic substances. Given the article's repeal, the offending conduct must have occurred between the article's passage in 1984 and its repeal in 1996; and the plaintiffs must plead facts that establish their cause of action during the effective period. See Brownell Land Co., L.L.C. v. Apache Corp., No. 05-322, 2005 WL 3543772, at *6 (E.D. La. Oct. 13, 2005)(Africk, J.).

Here, the plaintiffs allege that "chloroprene emissions and discharges have been released into the environment around the Pontchartrain Works facility for 48 years[,]" but that "nationwide chloroprene emissions have been concentrated almost exclusively in LaPlace" since 2007. The plaintiffs fail to plead facts that establish a cause of action for the effective period of former article 2315.3. A common sense reading of the plaintiffs' allegations triggers Denka's recent conduct: the plaintiffs' request for injunctive relief focuses on Denka's present and continuing conduct; and, in particular, its failure to heed the limit of acceptable risk threshold for chloroprene emissions as

recently identified by the EPA, below .2 micrograms per cubic meter.[18]

Accordingly, for the foregoing reasons, IT IS ORDERED: that DuPont's Rule 12 motion is GRANTED; Denka's Rule 12(b)(1) and 12(b)(6) motion is also GRANTED, without prejudice to the plaintiffs' opportunity to amend their deficient nuisance allegations if they can in good faith do so. Any amended complaint must be filed within 14 days.[19]

New Orleans, Louisiana, July 26, 2018

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[18] It is worth noting that there are no allegations that any of these plaintiffs were injured by conduct between 1984 and 1996. According to the dismissed class allegations, the plaintiffs restricted the putative class members to persons living in the vicinity after January 1, 2011.

[19] The attention of all counsel in this case is drawn to the provisions of 28 U.S.C. § 1927, which if they are not already familiar with...they should be.