# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ROBERT TAYLOR, JR., et al.,** | * | **Civil action no. 2:17-CV-07668** |
| | * | |
| **Plaintiffs** | * | **Section: F** |
| | * | |
| **v.** | * | **Division: 4** |
| | * | |
| **DENKA PERFORMANCE** | * | **Judge: Martin L.C. Feldman** |
| **ELASTOMER LLC and E.I. DUPONT** | * | |
| **DE NEMOURS AND COMPANY,** | * | **Magistrate: Karen Wells Roby** |
| | * | |
| **Defendants.** | * | |
| | * | |

## <u>THIRD AMENDED AND RESTATED COMPLAINT</u>

Plaintiffs—Robert Taylor, Jr., Kershell Bailey, Shondrell P. Campbell, Gloria Dumas, Janell Emery, George Handy, Annette Houston, Rogers Jackson, Michael Perkins, Allen Schnyder, Jr., Larry Soraparu, Sr., Kellie Tabb, and Robert Taylor, III (individually and on behalf of his minor daughter, N.T.)—file this Third Amended and Restated Complaint against defendant Denka Performance Elastomer LLC ("Denka"), pursuant to the Order and Reasons issued by this Court on July 26, 2018 (R. Doc. 100), as follows[1]:

---

[1] Plaintiffs originally filed this lawsuit also against defendant E.I. DuPont De Nemours and Company ("DuPont"); in the Court's July 26 Order and Reasons, the claims against DuPont were dismissed. Accordingly, for purposes of this Amended and Restated Complaint, Plaintiffs do not include DuPont herein but expressly reserve their rights to appeal the dismissal of DuPont. Plaintiffs also originally filed this lawsuit on behalf of all those similarly situated; on February 22, 2018, this Court issued an Order and Reasons dismissing Plaintiffs' class allegations. R. Doc. 72. The U.S. Court of Appeals for the Fifth Circuit declined to review that order interlocutorily pursuant to Fed. R. Civ. P. 23(f); for purposes of this Amended and Restated Complaint, Plaintiffs do not include the class allegations herein, but expressly reserve their rights to appeal the dismissal of the class allegations upon final judgment in this matter.

## PARTIES

1. **Plaintiffs.**

    1.1.    Robert Taylor, Jr., is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

    1.2.    Kershell Bailey is a person of the full age of majority and domiciled in Edgard in the Parish of St. John the Baptist, State of Louisiana.

    1.3.    Shondrell P. Campbell, is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

    1.4.    Gloria Dumas is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

    1.5.    Janell Emery is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

    1.6.    George Handy is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

    1.7.    Annette Houston is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

    1.8.    Rogers Jackson is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

    1.9.    Michael Perkins is a person of the full age of majority and domiciled in LaPlace in the Parish of St. John the Baptist, State of Louisiana.

1.10.   Allen Schnyder, Jr., is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.11.   Larry Sorapuru, Sr., is a person of the full age of majority and domiciled in Edgard in the Parish of St. John the Baptist, State of Louisiana.

1.12.   Kellie Tabb is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana.

1.13.   Robert Taylor, III, is a person of the full age of majority and domiciled in Reserve in the Parish of St. John the Baptist, State of Louisiana, and his minor daughter, N.T., is domiciled in the same residence as him in Reserve in the Parish of St. John the Baptist Parish, State of Louisiana.

2.   **Defendant.** Made defendant herein is Denka Performance Elastomer LLC ("Denka"). Denka is a Delaware limited liability company with its principal place of business and corporate headquarters in LaPlace, Louisiana.

## JURISDICTION AND VENUE

3.   Plaintiffs originally filed this action in the 40th Judicial District Court for the Parish of St. John the Baptist, State of Louisiana, where venue was proper pursuant to La. C.C.P. arts. 74 and 593 because Defendants engaged in wrongful conduct in and damages were sustained within this judicial district.

4.   Defendants (at that time, both Denka and DuPont) removed this action to this Court. The 40th Judicial District Court lies geographically within this federal judicial district. Defendants' basis for removal jurisdiction is diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs reserve their

right to contest the existence of such jurisdiction should subsequent discovery contradict the factual basis for Defendants' assertions of their citizenship in their response to Plaintiffs' motion to remand. Plaintiffs also reserve their right to appeal from the denial of their right to remand at the time any appeal ripens from any judgment in this matter.

## BACKGROUND FACTS

5. Neoprene was invented by DuPont in 1931. It is a synthetic rubber that is used in chemical- and weather-resistant products ranging from wet suits to orthopedic braces. Neoprene is used also as a base resin in adhesives, electrical insulation, and coatings.

6. DuPont constructed a neoprene manufacturing unit at its Pontchartrain Works facility in LaPlace, Louisiana, in 1969.

7. The manufacturing process at the Pontchartrain Works facility includes a Neoprene Unit, a Chloroprene Unit, an HCL Recovery Unit, and associated utilities.

8. Chloroprene is manufactured at the site of neoprene production and is used as a component of neoprene. Chloroprene is emitted into the air and discharged into the water as a result of these manufacturing processes. These chloroprene emissions and discharges have been released into the environment around the Pontchartrain Works facility for almost fifty years.

9. By 2008, the Pontchartrain Works facility was the only manufacturing facility for neoprene in the United States.

10. As detailed below, chloroprene concentration exposure levels for the area surrounding the Pontchartrain Works facility were not first publicly available until October 2016.

11. DuPont sold the neoprene production facility at the Pontchartrain Works facility to Denka effective November 1, 2015 but retained ownership of the land underlying the Pontchartrain Works facility.

12. Denka had knowledge of the harmful concentrations of chloroprene emitted from its Pontchartrain Works facility, but concealed that knowledge and associated data from the EPA, the LDEQ, and local St. John the Baptist Parish officials.

13. The EPA notes that "[s]ymptoms reported from acute human exposure to high concentrations of chloroprene include giddiness, headache, irritability, dizziness, insomnia, fatigue, respiratory irritation, cardiac palpitations, chest pains, nausea, gastrointestinal disorders, dermatitis, temporary hair loss, conjunctivitis, and corneal necrosis." In addition, the EPA notes that "[a]cute exposure may: damage the liver, kidneys, and lungs; affect the circulatory system and immune system; depress the central nervous system (CNS); irritate the skin and mucous membranes; and cause dermatitis and respiratory difficulties in humans[.]"

14. Denka's own Material Safety Data Sheet for chloroprene concedes that respiratory irritation, eye irritation, and nausea and vomiting can result from exposure to chloroprene.

15. More critically, the EPA has classified chloroprene as a "likely human carcinogen." In 2010, the EPA provided its Integrated Risk Information System ("IRIS") assessment of chloroprene. In that assessment, the agency concluded that chloroprene is "'likely to be carcinogenic to humans' [sic] through a mutagenic mode of action and that the primary exposure route of concern is the inhalation pathway."

16. In December 2015, the EPA released a screening-level National Air Toxics Assessment ("NATA"),[2] and classified chloroprene as a likely human carcinogen. EPA's NATA evaluation analyzes levels of exposure to various toxins and establishes a 1-in-10,000 (or 100 in 1 million) incidence of cancer as the upper limit of "acceptable risk." Exposure above that "acceptable risk" threshold represents an unacceptable risk of cancer from exposure to that toxin. The NATA acceptable risk exposure threshold for chloroprene was established in the December 2015 assessment as 0.2 µg/m$^3$.

17. Despite having knowledge of this upper limit of the acceptable risk threshold for exposure to concentrations to chloroprene, Denka has continued to emit chloroprene at hundreds of times the 0.2 µg/m$^3$ threshold into the surrounding community.

18. Since May 25, 2016, the EPA has collected 24-hour air samples every three days from six locations in the census tracts in the defined area—collection sites are located in St. John the Baptist Parish at Acorn and Highway 44, the Mississippi River Levee, Fifth Ward Elementary School, Ochsner Hospital, 238 Chad Baker, and East St. John the Baptist High School. Air samples at all six locations are frequently well in excess of the 0.2 µg/m$^3$ threshold.

19. EPA held its first community meeting to discuss the potential chloroprene emission issues on July 7, 2016. At that meeting, a representative from the Louisiana Department of Health advised that children should not breathe chloroprene.

---

[2] "NATA is EPA's ongoing comprehensive evaluation of air toxics in the U.S. EPA developed the NATA as a state-of-the-science screening tool for State/Local/Tribal Agencies to prioritize pollutants, emission sources and locations of interest for further study in order to gain a better understanding of risks." https://www.epa.gov/national-air-toxics-assessment/nata-overview.

20. EPA did not report sampling results showing the exceedances above the chloroprene acceptable risk threshold in the vicinity of the Pontchartrain Works facility until October 2016.

21. Denka commenced 24-hour air sampling every six days on August 8, 2016 at five locations in the census tracts in the defined area—Entergy, Railroad, Western Edge of Denka property at Spruce Street, Mississippi River Levee, Ochsner Hospital, and the St. John the Baptist Parish Courthouse in Edgard. As with the EPA sampling, samples collected at all five Denka sampling sites are frequently well in excess of the 0.2 μg/m$^3$ threshold, including concentrations at hundreds of times that threshold.

22. According to Denka's own sampling numbers for concentrations of chloroprene emissions, the *average* chloroprene concentration across all Denka sampling sites from August 2016 through March 2017 has ranged from 4.08 μg/m$^3$ to 6.65 μg/m$^3$, *i.e.* from 20.4 to 33.25 times the 0.2 μg/m$^3$ threshold directed by EPA.

23. On October 7, 2016, Denka submitted modeling results for concentrations of chloroprene emissions surrounding the Pontchartrain Works facility to LDEQ for the period 2011 through 2015, showing maximum modeled concentrations of 7.88 μg/m$^3$ in 2011, 9.88 μg/m$^3$ in 2012, 12.07 μg/m$^3$ in 2013, 8.23 μg/m$^3$ in 2014, and 7.22 μg/m$^3$ in 2015—all, of course, well in excess of the 0.2 μg/m$^3$ threshold.

24. Historically, the Pontchartrain Works facility has had chloroprene air emissions well in excess of the 0.2 μg/m$^3$ threshold.

25. There are no other sources of chloroprene within the census tracts that include and surround the Pontchartrain Works facility. The attached isopleth map created for Denka (**Exhibit A to**

this Amended and Restated Complaint), demonstrates the width of the geographic scope of the area subject to chloroprene air concentrations above 0.2 $\mu$g/m$^3$, based solely on Denka's own air sampling and modeling. All of the Plaintiffs reside within this area subject to excessive chloroprene emissions and were exposed to excessive chloroprene emissions while at their respective residences.

26. On June 6 through 10, 2016, EPA's National Enforcement Investigation Center ("NEIC") conducted a Clean Air Act inspection of the Pontchartrain Works facility's chloroprene unit, neoprene unit, and HCL Recovery Unit.

27. Shortly after EPA commenced its investigation, the Defendants' representatives held a meeting with select neighbors of the Pontchartrain Works facility and expressed to them that there was no problem arising from the Pontchartrain Works facility's chloroprene emissions.

28. Despite the measured elevated concentrations of chloroprene emissions, and despite EPA's NATA-based 0.2 $\mu$g/m$^3$ acceptable risk threshold, at a St. John the Baptist Parish School Board meeting on or about December 8, 2016, LDEQ Secretary Chuck Brown dismissed those expressing concern about the chloroprene concentrations as "fearmongerers" and said "forget about 0.2."

29. Finally, on April 3, 2017, the EPA for the first time made available to the public a redacted copy of the inspection report generated from the NEIC inspection.

30. The EPA's NEIC inspection report revealed numerous areas of non-compliance spanning both DuPont's and Denka's operation of the Pontchartrain Works facility, including but not limited to: failure from 1997 through the present to meet the monitoring, recordkeeping, and reporting

requirements for the chloroprene vent condenser; approximately 10,000 regulated components that have been neither identified nor monitored for leaks and emissions; failures to replace leaking valves within required time limits; more than 500 open-ended lines; failure to include appropriate emissions factors in air permit application materials; failure to institute appropriate emissions controls for the chloroprene Group I storage tank, the surge control vessels, and the combustion chambers; and failure to maintain required destruction efficiency and minimum atomization flow rates.

31. On information and belief, the acts and failures of Defendants as recorded in the NEIC inspection report are currently under review by the U.S. Department of Justice.

32. On January 6, 2017, Denka entered into an Administrative Order on Consent ("AOC") with LDEQ with a target to reduce its chloroprene emissions by 85%. Even if the results of the AOC are successful, however, an 85% reduction from the emission levels displayed by Denka's own community-wide modeling will still be far in excess of the 0.2 µg/m$^3$ threshold.

33. Denka has failed to meet all of the interim requirements, to date, for emissions controls and chloroprene emissions concentrations it agreed to in the AOC.

34. To date, air samples continue to show concentrations of chloroprene spike to many multiples of the 0.2 µg/m$^3$ threshold within the geographic area where the Plaintiffs reside.

35. Indeed, on May 3, 2018, LDEQ issued Notices of Proposed Penalties to both Denka and DuPont for failure of emissions controls under their Title V air permits and under the AOC to achieve the required chloroprene emissions reductions during stack tests performed by Denka.

36. On August 1, 2018, LDEQ issued another Notice of Potential Penalty to Denka for failure to disclose or include an Outside Brine Pit ("OBP") on its Title V air permit application, which OBP is "the first stage of collections for the wastewater streams exiting the Polymers area of the Facility" and which is "a source of Volatile Organic Compounds (VOC) emissions, mostly chloroprene."

37. The EPA has observed that "[t]he top 6 census tracts with the highest NATA-estimated cancer risks nationally are in Louisiana due to Denka (formerly DuPont) chloroprene emissions." The "Background Cancer Risk" reported in the NATA assessment for the census tracts in the vicinity of the Pontchartrain Works facility is 3.365 per million, while the cancer risk from chloroprene exposure in those census tracts ranges from 158.515 to 768.46 per million, all well above the acceptable risk level recommended by EPA.

38. Instead of reducing chloroprene emissions in accordance with the EPA's 0.2 $\mu g/m^3$ threshold, on June 26, 2017, representatives of Denka submitted to the EPA a Request for Correction ("RFC") to raise the 0.2 $\mu g/m^3$ threshold above the acceptable level thresholds previously determined by the EPA based on rigorous, peer-reviewed scientific review. Denka's stated justification for the requested change was "to prevent further significant damage to [Denka's] business."

39. As recently as November 2017, Dr. Jimmy Guidry, the health officer for the Louisiana Department of Health, has acknowledged that the question of whether human exposure to particular concentrations of chloroprene can harm those exposed presents "difficult and complicated questions." Dr. Guidry stated that "[i]t is a big deal. … From what I know today

those risks are something we have to consider. We have to minimize it. We have to mitigate it."

40. On January 25, 2018, the EPA rejected Denka's Request for Correction, leaving the determination of likely human carcinogenicity and the 0.2 µ/m³ threshold in place: "Ultimately the Agency stands behind the conclusions made in the 2010 IRIS Toxicological Review of Chloroprene, including the derived cancer values. The new studies on chloroprene do not provide a reasonable basis for reassessing the human health effects due to chronic chloroprene exposure."

41. The Plaintiffs have suffered nuisance due to the regular and repeated exposure to concentrations of chloroprene emissions in excess of levels Denka knows are unsafe—as demonstrated by the peer-reviewed scientific analysis relied on in EPA's issuance of the 0.2 µg/m³ threshold—and as a result have sustained damages pursuant to La. C.C. art. 667.

## COUNT 1: NUISANCE UNDER LA. C.C. ARTS. 667-669[3]

42. Plaintiffs incorporate by reference all previous allegations in the preceding paragraphs as if fully set forth herein.

43. Plaintiffs each live within the area corresponding to the isopleth developed for Denka showing an area of emissions with chloroprene concentrations greater than 0.2 µg/m³.

---

[3] Plaintiffs had previously also brought causes of action of trespass, negligence, and strict liability, as to which this Court dismissed without affording an opportunity to amend. R. Doc. 100. Plaintiffs expressly reserve their right to appeal from that dismissal following final judgment. The Court also dismissed any causes of action by Plaintiffs for claims arising from personal injury or physical injury originally reserved by the Plaintiffs as "immature torts," without prejudice as not ripe as of the filing of the Second Amended and Restated Complaint. R. Doc. 100. Plaintiffs reserve their rights to pursue such claims if and when they ripen.

44. The conduct of Denka in its respective operations at the Pontchartrain Works neoprene manufacturing facility constitutes an unreasonable interference with each Plaintiff's lawful use of and presence on properties within the defined area, as detailed below.

45. Each Plaintiff is, and has been, deprived of enjoyment of his or her property and has thus incurred harm, due to exposure to unacceptably high concentrations of chloroprene emissions in excess of 0.2 µg/m$^3$, as follows, and that deprivation of enjoyment thereby constitutes a nuisance. The factual basis of the nuisance committed as to each Plaintiff is as follows:

    45.1.    Plaintiff Robert Taylor, Jr. has lived at 389 E. 26th Street in Reserve, Louisiana since 1969. He has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including headaches, irritability, fatigue, respiratory irritation, chest pain, stomach problems, and skin and mucus membrane irritation. When he leaves the area for more than a couple days at a time, the symptoms abate. He and his children and grandchildren are compelled to curtail their outdoor activities as a result of the symptoms from breathing the air around his house. These symptoms and the associated distress and impact on Mr. Taylor Jr.'s activities constitute a nuisance to Mr. Taylor.

    45.2.    Plaintiff Robert Taylor III, the adult son of Robert Taylor Jr., was born at 389 E. 26th Street in Reserve, Louisiana, where he now lives. He has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of

symptoms from chloroprene exposure), including kidney disease, respiratory irritation, and mucous membrane irritation. Mr. Taylor III fears for the health of his family, particularly his young daughter N.T.. N.T., now eleven years old, lives at 389 E. 26th Street in Reserve. Her symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), include respiratory difficulties, headaches, and dizziness. Both Mr. Taylor III and N.T. experience an abatement of symptoms when they are not in the area. Mr. Taylor III and N.T. must curtail their outdoor activities because of the symptoms they experience from the excess exposure to chloroprene emissions. These symptoms and the associated distress and impact on Mr. Taylor III's and N.T.'s activities constitute a nuisance to Mr. Taylor III and N.T..

45.3.  Plaintiff Allen Schnyder, Jr. was born in 1963 and has lived at 266 E. 24th Street in Reserve, Louisiana, his whole life. He has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including near-constant headaches and respiratory difficulties; frequent dizziness; occasional chest pains; skin irritation; constant fatigue; and nausea whenever outside for too long. As a result of these symptoms, he stays inside as much as possible. These symptoms and the associated distress and impact on Mr. Schnyder's activities constitute a nuisance to Mr. Schnyder.

45.4.   Plaintiff George Handy Sr. has lived at 999 W. 5th Street in LaPlace, Louisiana from 2015 to the present. He has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including respiratory difficulties, fatigue, and skin irritation. These symptoms make him dread leaving his house, because his symptoms are not as intense when he is indoors. He also feels mental anxiety about his family and their future. These symptoms and the associated distress and impact on Mr. Handy's activities constitute a nuisance to Mr. Handy.

45.5.   Plaintiff Michael Perkins has lived for the past 32 years at 2108 Tiffany Drive in LaPlace, Louisiana. He has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including respiratory difficulties and chest pains and fatigue whenever he has to engage in outdoor activities. Due to these symptoms, he tries to stay indoors as much as possible, and tries to spend his weekends outside of the area. For his job as a delivery driver, he tries to take routes and deliveries outside the area. These symptoms and the associated distress and impact on Mr. Perkins's activities constitute a nuisance to Mr. Perkins.

45.6.   Plaintiff Annette Houston has lived at 2701 Virginian Colony in LaPlace, Louisiana from 1995 through the present. She has suffered from a variety of symptoms due to

exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including headaches, dizziness, insomnia, fatigue, respiratory difficulties, chest pains, gastrointestinal disorders, skin irritation, and temporary hair loss. As a result of these symptoms, she avoids certain outdoor activities. These symptoms and the associated distress and impact on Ms. Houston's activities constitute a nuisance to Ms. Houston.

45.7. Plaintiff Gloria Dumas has lived her entire life at 143 E. 24th Street in Reserve, Louisiana. She has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including frequent headaches, dizziness, fatigue, nausea, respiratory difficulties, irritated skin, and hair loss. These symptoms are usually diminished when she is inside her house. However, she has a room with a vent in it that lets in air from the outside, and Ms. Dumas experiences the headaches and shortness of breath while in this room, so she now avoids going into this room. She is sad because she cannot do basic activities like sit on her back porch with her grandbaby because their eyes itch when they sit outside. She also cannot garden in her own backyard because of the symptoms, which are much worse when outdoors. These symptoms and the associated distress and impact on Ms. Dumas's activities constitute a nuisance to Ms. Dumas.

45.8.  Plaintiff Kershell Bailey has lived at 258 E. 13th Street in Edgard from 2005 to the present. She has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including frequent severe headaches, severe insomnia, occasional dizziness, fatigue, nausea, severe skin and mucous membrane irritation, and conjunctivitis. As a result of these symptoms, she avoids outdoor activities. These symptoms and the associated distress and impact on Ms. Bailey's activities constitute a nuisance to Ms. Bailey.

45.9.  Plaintiff Larry Sorapuru, Sr. has lived at 502-504 Highway 18 (River Road) in Edgard, Louisiana, for decades. He suffers from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including headaches, respiratory difficulties, mucous membrane irritation, and insomnia. He enjoys going on walks and bicycle rides but is unable to do so when in the vicinity of his residence because his physical symptoms intensify when he goes outside. He dreads going outside because of the worsening of his physical symptoms when he does so. The symptoms hamper his ability to maintain an active lifestyle as a senior citizen. As a result, he suffers depression and anxiety for his family's future. These symptoms and the associated distress and impact on Mr. Sorapuru's activities constitute a nuisance to Mr. Sorapuru.

45.10. Plaintiff Rogers Jackson has lived for 39 years at 991 W. 5th Street in LaPlace, Louisiana. He suffers from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including liver problems, gastrointestinal issues, frequent dizziness, fatigue, hair loss, respiratory difficulties, and nausea. These symptoms are reduced while Mr. Jackson is inside his house, so he curtails outdoor activities as much as possible. He feels that the direction of the wind affects the intensity of the symptoms, such that they are worse when the wind is coming from the direction of the Pontchartrain Works facility. These symptoms have seriously diminished his quality of life. An avid BBQ cook, Mr. Jackson can no longer spend long amounts of time in his back yard BBQ-ing because of the physical discomfort he experiences. The related stress and anxiety he has dealt with for years has diminished his emotional state. He is constantly worried and feels like he is trapped inside his house. These symptoms and the associated distress and impact on Mr. Jackson's activities constitute a nuisance to Mr. Jackson.

45.11. Plaintiff Shondrell Campbell has lived at 1118 New Street (Old Highway 51) from 2005 to the present. She has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including headaches, irritability, dizziness, insomnia, fatigue, chest pains, nausea, gastrointestinal disorder, hair loss, and skin and mucus membrane irritation. When she

has been outside this area, she does not experience these symptoms. These symptoms negatively impact her enjoyment of outdoor activities. These symptoms and the associated distress and impact on Ms. Campbell's activities constitute a nuisance to Ms. Campbell.

45.12. Plaintiff Janell Emery has lived from 2010 to the present at 110 Cambon Court in LaPlace. She has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including constant fatigue and headaches, nausea, dizziness, irritated mucous membranes, and respiratory difficulties. She has experienced a notable difference in her symptoms between when she is outside the area and when she is in the vicinity of her home. Because of the symptoms she experiences, she feels like she cannot go outside in her own community without breathing dirty air. These symptoms and the associated distress and impact on Ms. Emery's activities constitute a nuisance to Ms. Emery.

45.13. Plaintiff Kellie Tabb lived for twenty years at 502 Homewood Place in Reserve, Louisiana. She has suffered from a variety of symptoms due to exposure to Denka's excessive chloroprene emissions from the Pontchartrain Works facility (which symptoms are included on the EPA's list of symptoms from chloroprene exposure), including irritated mucous membranes; conjunctivitis; circulatory system issues; and respiratory difficulty. She has recently relocated outside of the isopleth on the

recommendation of her doctor, and her symptoms have abated. She continues to suffer from emotional distress due to the symptoms she experienced and her inability to either live in or sell her home in Reserve. This distress constitutes a nuisance to Ms. Tabb.

46. The physical symptoms experienced by each Plaintiff, and the deprivation of their enjoyment of their property due to the emissions of excess concentrations of chloroprene from the Pontchartrain Works facility, has caused each Plaintiff emotional distress.

47. Plaintiffs Janell Emery, Robert Taylor Jr., Robert Taylor III, N.T., Rogers Jackson, George Handy, and Kershell Bailey participated in a urinalysis that confirmed the presence of chloroprene-specific metabolites in each of their urine. The urinalysis supports the fact that each person residing within the Denka-drawn isopleth (Exhibit A), which includes each Plaintiff here, has been and is being exposed to chloroprene and that their bodies are being damaged as they process chloroprene's mutagenic metabolites, which independently constitutes a nuisance.

48. Concentrations of chloroprene emissions above 0.2 μg/m$^3$ have been determined by the EPA to present an unacceptable risk of exposure to a likely human carcinogen, and those emissions thereby constitute a nuisance.

49. This nuisance is caused solely by emissions from the Pontchartrain Works facility, operated by Denka.

50. Denka has released and continues to release chloroprene into the atmosphere in concentrations that exceed 0.2 μg/m$^3$.

51. Denka knew or should have known that the release of excessive concentrations of chloroprene would invade the airspace of the residents in the community that surrounds the plant, such as Plaintiffs.

52. Denka in fact knew that the excessive amounts of chloroprene that it releases invaded the airspace of surrounding nearby residences, including those of each Plaintiff, and exposed the residents of the community surrounding the plant to excessive concentrations of chloroprene.

53. Denka's release of excessive concentrations of chloroprene constitutes a nuisance pursuant to Louisiana Civil Code articles 667-669.

54. As proximately caused by the nuisance created and maintained by Denka, each Plaintiff has suffered substantial distress and anguish resulting from the knowledge that he or she has been exposed to a likely human carcinogen, and that his or her adverse physical symptoms are symptoms of the exposure to excess chloroprene concentrations.

55. Denka knew that the release of chloroprene in levels resulting in concentrations greater than 0.2 µg/m$^3$ presented a disruption of nearby residents' peaceful enjoyment of their property.

56. Denka could have prevented the deprivation of enjoyment had it exercised reasonable care by instituting and implementing technology and processes that prevented the excess release of chloroprene from the Pontchartrain Works facility. Nevertheless, Denka failed—and continues to fail, as evidenced by the most recent notices of potential penalties issued by LDEQ and the continuing excessive chloroprene air samples—to exercise reasonable care.

57. Therefore, Plaintiffs are being damaged by the continuing nuisance created by Denka, through emotional distress and the other harms alleged above, and Denka is liable to be enjoined from

any further emissions of chloroprene that will result in exposure of any Plaintiff to concentrations of chloroprene in excess of 0.2 µg/m$^3$.

      **WHEREFORE**, the Plaintiffs pray that, after due proceedings be had, there be judgment rendered in their favor and against Denka finding that Denka is liable to each Plaintiff for:

a) Injunctive relief in the form of abatement of chloroprene releases such that concentrations of chloroprene in the defined area never exceed 0.2 µg/m$^3$;

b) The award of costs, expenses, and reasonable attorneys' fees in favor of the Plaintiffs if authorized by law; and

c) Such other and further relief which the Court deems necessary and proper at law and in equity and that may be just and reasonable under the circumstances of this matter;

d) Plaintiffs request a jury trial of all claims in this matter.

                        Respectfully submitted,

                        */s/  H.S. Bartlett III*
                        JONES, SWANSON, HUDDELL &
                        GARRISON, LLC
                        Gladstone N. Jones, III (La. Bar No. 22221)
                        Eberhard D. Garrison (La. Bar No. 22058)
                        Lynn E. Swanson (La. Bar No. 22650)
                        H.S. Bartlett III (La. Bar. No. 26795)
                        Kevin E. Huddell (La. Bar. No. 26930)
                        Emma E. Antin Daschbach (La. Bar No. 27358)
                        Lindsay E. Reeves (La. Bar No. 32703)
                        601 Poydras Street, Suite 2655
                        New Orleans, Louisiana 70130
                        Telephone: (504) 523-2500
                        Facsimile: (504) 523-2508

BRUNO & BRUNO, L.L.P.
Joseph M. Bruno (La. Bar No. 3604)
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775

OF COUNSEL:
CUMMINGS & CUMMINGS, LLC
John Cummings (La. Bar No. 4652)
416 Gravier Street
New Orleans, LA 70118
Telephone: (504) 586-0000
Facsimile: (504) 522-8423

THE LAMBERT FIRM, PLC
Hugh P. Lambert, T.A. (La. Bar #7933)
Cayce C. Peterson, Esq. (La. Bar #32217)
701 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-1750
Facsimile: (504) 529-2931

Sylvia Elaine Taylor (La. Bar No. 08245)
1126 W. Airline Highway
LaPlace, Louisiana 70068

Randal L. Gaines (La. Bar No. 17576)
7 Turnberry Drive
LaPlace, Louisiana  70068

Darryl J. Tschirn (La. Bar #12938)
7825 Fay Avenue, Suite 200
LaJolla, California 92037

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2018, I electronically filed the foregoing with the Clerk of court by using the CM/ECF system, which will send a notice of the electronic filing to the counsel of record for Defendants

_/s/   *H.S. Bartlett III*_____

